UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
…………………………………………………………..x
JUAN/JUANA DOES 1- 377 individually
and/or as legal heirs and/or personal representatives of                    07 Civ. 10300
JOSE/JOSEFINA DOES 1A-375 (said names being fictitious),

                                                    Plaintiffs,

              - against -

CHIQUITA BRANDS INTERNATIONAL, INC.,
INDIVIDUALS "A THROUGH J" (whose identities
are presently unknown) MOE CORPORATIONS 1-5
and MOES 6-25 (said names being fictitious).

                                                    Defendants.
…………………………………………………………...x

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EX-PARTE MOTION TO COMMENCE AND PROCEED WITH AN ACTION USING PSEUDONYMS

         Plaintiffs Juan/Juana Does 1-377, by their undersigned counsel, hereby submit

this Memorandum of Points and Authorities in Support of Plaintiff's Ex-Parte Motion to

Commence and Proceed with an Action Using Pseudonyms.  As set forth below,

Plaintiffs face a very real threat of physical injury and death if their identities and

addresses are disclosed publicly, and accordingly believe that an order permitting them to

commence and proceed with this action using pseudonyms is appropriate and should be

granted.

         This case arises under the Alien tort Statute, 28 U.S. C. §1350 and the Torture

Victims Protection Act, 28 U.S.C. §1350 (note) for the intimidation and murder of

plaintiff's family members by paramilitary groups receiving material support from Defendant Chiquita Brands International, Inc.[1]

By way of background, Plaintiffs' relatives lived on or near banana plantations operated by Defendants in the Uraba, Magdalena, La Guajira and Santa Marta regions of Colombia, South America, and were murdered as a result of Defendants unlawful association with the Autodefensas Unidas de Colombia (United Self-Defense Forces of Colombia, hereinafter "AUC").  As explained in Plaintiff's Complaint, the AUC is a violent, right-wing paramilitary organization operating in Colombia.  It was formed in or about April 1997 to organize loosely-affiliated illegal paramilitary groups that had emerged in Colombia to retaliate against left-wing guerillas fighting the Colombian government.  The AUC's activities include assassinating union leaders and suspected guerilla supporters, drug trafficking, kidnapping and the murder of at least 10,000 people in Colombia and burying many of the bodies in mass graves.  Since September 10, 2001, the AUC has also been designated as a foreign terrorist organization by the U.S. Secretary of State.

Plaintiffs assert that Defendant CHIQUITA has maintained a long and well known relationship with the AUC by providing money and arms to maintain its business operations in the regions where Plaintiffs and their families live.

Accordingly, Plaintiffs believe that because of Defendants' unlawful ties with the notorious AUC, public disclosure of their names and addresses will no doubt subject them and their families to grave danger, including death, as retaliation for bringing suit against Defendant CHIQUITA.

---

[1] In their proposed Complaint, Plaintiffs also raise several supplemental common law tort claims against the Defendants.

It is well settled that the Court has discretion to permit plaintiffs to proceed anonymously. "The decision whether to permit parties to proceed anonymously at trial is one of many involving management of the trial process that for obvious reasons is committed in the first instance to trial court discretion." *James v. Jacobson*, 6 F.3D 233 (4th Cir. 1993). See also, *Doe v. Frank*, 951 F.2d 320 (11th Cir. 1992) (reviewing denial of anonymity application for abuse of discretion); *Doe v. Stegall*, 653 F.2d 180 (5th Cir. 1981) (same). *Cf Pansy v. Borough of Stroudsburg*, 23 F.3d 772 (3d Cir. 1994) (quoting 8 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §2043, at 305 (1979)) ("[T]he most common kind of order allowing discovery on conditions is an order limiting the persons who are to have access to the information disclosed and the use to which these person may put the information").

While the Second Circuit has yet to address the issue, the cases make clear that the decision whether to allow a plaintiff to proceed anonymously rests within the sound discretion of the court. See *Doe v. Smith*, 189 F.R.D. 239, 242 (E.D.N.Y.1998), vacated on rehearing and modified on other grounds, 105 F.Supp.2d 40, 45 (E.D.N.Y.1999); *Mateer v. Ross, Suchoff, Egert, Hankin, Maidenbaum & Mazel, P.C.*, 1997 WL 171011 (S.D.N.Y. April 10, 1997); *Doe v. Shakur*, 164 F.R.D. 359 (S.D.N.Y.1996).

Courts that have considered applications by litigants to proceed anonymously have applied a balancing test that weighs the party's need for anonymity against prejudice to the defendant and the presumption of public openness. See, e.g. *Does I Thru XXIII v. Advanced Textile Corp*, 214 F.3d 1058 (9th Cir. 2000) (noting the four circuits to consider the applicable standard had held that "the district court must balance the need for anonymity against the general presumption that parties' identities are public

information and the risk of unfairness to the opposing party").  Under this test, "a party

may preserve his or her anonymity in judicial proceedings in special circumstances when

the party's need for anonymity outweighs prejudice to the opposing party and the

public's interest in knowing party's identity."  *Id* at 1068.  See also *Doe v. Frank*, 951

F.2d at 323 (test for permitting plaintiff to proceed anonymously is "whether the plaintiff

has a substantial privacy right which outweighs the 'customary and constitutionally

embedded presumption of openness of judicial proceedings." (quoting *Doe v. Stegall*, 653

F.2d at 186).

Further, courts have generally considered three factors in determining whether to

grant an anonymity application to shield the party from retaliation:  (1) the severity of

the threatened harm; (2) the reasonableness of the anonymous party's fears; and (3) the

anonymous party's vulnerability to retaliation.  *Id* at 1068.  With respect to the second

factor, whether the parties' fears are reasonable, parties "are not required to prove that

the defendants intend to carry out the threatened retaliation."  *Id* at 1071. Further, the

Supreme Court has permitted plaintiffs to proceed anonymously without comment.  See,

e.g. *Roe v. Wade*, 410 U.S. 113 (1973).

A.  **Plaintiffs' Use of Pseudonyms In this Case is Appropriate**.

In the present case, Plaintiffs' use of pseudonyms is appropriate.  In their

Complaint, Plaintiffs allege that their family members are victims of egregious human

rights abuses, including torture and murder, all of which were committed by AUC

paramilitary agents supported and financed by Defendants, and on banana plantation

owned and operated by Defendants.  If their identities and addresses are disclosed

publicly, there is no question based on the well-documented atrocities already committed

by the AUC and the AUC's well-known connection to Defendants' business interests, that Plaintiffs face imminent and virtually certain serious physical harm, and likely death, at the hands of Defendants' AUC paramilitary agents. In light of these very real dangers, this case falls squarely within the confines of allowing parties to proceed anonymously.

Indeed, the threat of physical abuse is one of the paradigmatic cases in which courts have permitted plaintiffs to use pseudonyms. See, e.g. *James v. Jacobson*, 6 F.3d 238 (4th Cit. 1993) (factor in considering anonymity requests is "whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties"). Protective orders regarding identifying information have routinely been granted where the movant demonstrates risk of threats of physical harm and other forms of retaliation, *Doe v. Stegall*, 653 F.2d at 186; *Stamicarbo v. Am. Cyanamid Co.*, 506 F.2d 532 (2d Cir. 1974), along with the other, less severe risks that have also warranted protection, such as "annoyance, embarrassment, oppression or undue burden or expense." Fed. R. Civ. P. 26 (c).

In *Does I Thru XXIII v. Advanced Textile Corp*, 214 F.3d 1058 (9th Cir. 2000), the Ninth Circuit concluded that employees of garment manufacturers in Saipan who claimed they faced the threat that they would be deported from Saipan to China and that their families would face economic retaliation were entitled to proceed anonymously. *Id.* at 1069. In so holding, the court found "based on the extreme nature of the retaliation threatened against plaintiffs coupled with their highly vulnerable status, that plaintiffs reasonably fear severe retaliation, and that this fear outweighs the interests in favor of open judicial proceedings." *Id.* See also Jed Greer, "Plaintiff Pseudonymity and the Alien Tort Claims Act: Questions and Challenges." 32 Colum. Hum. Rts. Rev. 517,

538-558 (2001) (discussing protective orders entered in *Doe I v. Islamic Salvation Front*, No. 96-02792-JR (D.D.C.) and the two companion "Unocal" cases, *Doe I. v. Unocal Corp*, No. 96-6959-RAP (C.D. Cal) and *Nat'l Coalition Gov't of the Union of Burma v. Unocal, Inc.*, No. 96-6112 RSLW BQR (C.D. Cal), both of which limited disclosure of plaintiffs' identifying information to defendant(s).  Here, the risk of harm faced by Plaintiffs is even more extreme and concrete given the involvement of the AUC in Colombia.  There is no question that Plaintiffs' safety far outweighs any possible privacy interest of the public.

**B.  Defendants Will Not Be Prejudiced by Plaintiffs' Use of Pseudonyms**

Finally, in requesting an order allowing them to proceed anonymously, Plaintiffs do not seek to preclude Defendants' counsel from learning their identities and addresses. Recognizing that the case involves numerous fact specific issues, after commencing this action using pseudonyms, Plaintiffs will provide such disclosures to Defendants' counsel upon entering into an appropriate protective agreement and/or order to permit Defendants appropriate discovery while preventing public disclosure of their identities.  Limiting disclosure to Defendants' counsel does not prejudice Defendants.  Disclosure of sensitive information is routinely limited to an opposing party's attorneys, and protected from disclosure to the opposing party itself.  See *Westside-Marrero Jeep Eagle, Inc. v. Chrysler Corp., Inc.*, Civ. A. No. 97-3012, 1998 WL 186728 (E.D. La, April 17, 1998) (citing cases).

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court enter an

order allowing them to commence and proceed with their action using pseudonyms.


Dated: New York, New York
       November 12, 2007

                                    LAW FIRM OF JONATHAN C. REITER


                                    _____
                                    JONATHAN C. REITER  (JR 7522)
                                    Attorneys for Plaintiff
                                    350 Fifth Avenue, Suite 2811
                                    New York, New York 10118
                                    (212) 736-0979

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
……………………………………………………………..x
JUAN/JUANA DOES 1-377 Individually                          07 cv 10300 (HB)
and/or as Legal Heirs and/or Personal Representatives of    "ECF CASE"
JOSE/JOSEFINA DOES 1A-375 (said names being fictitious),

                              Plaintiffs,

          - against -                          **COMPLAINT**

CHIQUITA BRANDS INTERNATIONAL, INC.,
INDIVIDUALS "A THROUGH J" (whose identities
are presently unknown), MOE CORPORATIONS 1-5
and MOES 6-25 (said names being fictitious).

                         Defendants.
……………………………………………………………...x

        Plaintiffs, by and through their attorneys, the **LAW FIRM OF**

**JONATHAN C. REITER**, complaining of the defendants, respectfully allege upon

information and belief as follows:

## INTRODUCTION

        This is an action seeking damages for terrorism, war crimes, crimes

against humanity, extrajudicial killing, torture and wrongful death of plaintiffs' decedents

and/or individual living plaintiff(s) committed by defendant CHIQUITA BRANDS

INTERNATIONAL, INC. (CHIQUITA), its officers, directors, agents, servants and

employees, acting in concert with, aiding, abetting, facilitating, soliciting, directing,

orchestrating and conspiring with Colombian paramilitaries and their collaborators in

those atrocities, in violation of the Law of Nations, the laws of the United States of

America and of individual states, including but not limited to the State of Ohio, and the

laws of the Republic of Colombia.

**JURISDICTION**

1.      The Court has subject matter jurisdiction over this case under the Alien Tort Claims Act (ATCA) 28 U.S.C. § 1350 and the Torture Victim Protection Act of 1991 (TVPA) 28 U.S.C. § 1350, note,§ 2(a) and 28 U.S.C. § 1331 (Federal Question Jurisdiction), and 28 U.S.C. § 1332 (diversity jurisdiction).  Plaintiffs also invoke the supplemental jurisdiction of this Court with respect to claims based upon the laws of the State of Ohio, the Republic of Colombia and/or any other applicable jurisdiction pursuant to 28 U.S.C. § 1367.

2.      All plaintiffs are citizens of the Republic of Colombia.

3.      All plaintiffs and plaintiff's decedents are or were aliens, being and/or having been citizens or subjects of a foreign state.

4.      Defendant CHIQUITA is a United States corporation organized under the laws of the State of New Jersey, having its principal place of business and corporate headquarters at 250 East 5th Street, Cincinnati, Ohio 45202.

5.      The amount in controversy, both individually and collectively, exceeds $75,000.

**PARTIES**

The Plaintiffs

6.      There are a total of 377 plaintiffs, of whom 370 JUAN/JUANA DOE Plaintiffs are the legal heirs of 387 JOSE/JOSEFINA DOES who were murdered/disappeared by Colombian paramilitaries of the "Autodefensas Unidas de Colombia" (commonly known as and referred to hereinafter as the "AUC"), a violent,

right-wing organization in the Republic of Colombia, and their collaborators.  The

decedents are given numbers corresponding to the numbers used for their heirs.  Where a

JUAN DOE is heir to more than one JOSE DOE, the additional decedents are given letter

designations (such as JOSE DOE 1A, 1B etc.), so that the numbers correspond to the

numbers used for heirs.  In addition, plaintiffs JUAN/JUANA DOE 103, 113, 115, 343,

356 and 376 were tortured and shot by AUC paramilitaries and survived.  Accordingly

claim is made for a total of 393 deaths and/or injuries.

7.      The plaintiffs who are the next of kin of the decedents either have been or

will be appointed the personal representatives of the decedents if required by law.

The Defendants

8.      At all times hereinafter mentioned, CHIQUITA was and is an international

producer, distributor, and marketer of bananas and other produce; it is one of the largest

banana producers in the world and a major supplier of bananas in Europe and North

America.  The company was founded in 1899 as the United Fruit Company, became the

United Brands Company in 1970, and changed its name to Chiquita Brands International

in 1990.

9.      Upon information and belief, C.I. Bananos de Exportacion, S.A.,

(Banadex) was a Colombian corporation or other business entity headquartered in

Medellin, Colombia and was a wholly owned subsidiary of CHIQUITA.

10.     Upon information and belief and at all times relevant herein, CHIQUITA

dominated and controlled Banadex.

11.     At all times relevant herein, CHIQUITA, by and through Banadex, produced, contracted for and traded in bananas in the Uraba and Santa Marta regions of Colombia, and elsewhere in Colombia.

12.     At all times material herein, Banadex was an agent and/or alter ego, of CHIQUITA.

13.     At all times material herein, Banadex was an agent and/or alter ego, of CHIQUITA and a co-conspirator and joint tortfeasor with CHIQUITA with whom it cooperated in a joint criminal enterprise.

14.     Defendants designated as "Individuals A through J" are those individuals referred to in that manner in the Factual Proffer filed March 19, 2007 in a criminal case entitled "United States of America v. Chiquita Brands International, Inc.", Criminal No. 07-055 in the United States District Court for the District of Columbia, which factual proffer is incorporated by reference herein and annexed hereto.

15.     Upon information and belief, defendants designated as "Individuals A through J" may include former CHIQUITA CEO Cyrus Friedheim, former CHIQUITA general counsel Robert Olsen and former CHIQUITA board member Roderick M. Hills and others whose identities are presently unknown to the plaintiffs.

16.     Plaintiffs are ignorant of the true names and capacities of the Defendants who are sued herein as Moe Corporations 1-5 and Moes 6-25, and plaintiffs sue these Defendants by such fictitious names and capacities.  Plaintiffs will amend this Complaint to allege the Moes' true names and capacities when ascertained.  Plaintiffs are informed and believe, and on that basis allege, that each fictitiously named Defendant is responsible in some manner for the occurrences herein alleged and that the deaths of

plaintiffs' decedents and the injuries to plaintiffs herein alleged were proximately caused by the conduct of such Defendants, in that each caused, conspired to cause, worked in concert to cause, participated in a joint criminal enterprise that caused, or aided and abetted the principal tortfeasors in causing the injuries complained of, and /or was the principal, employer, or other legally responsible person for the persons who caused, conspired to cause, worked in concert to cause, participated in a joint criminal enterprise that caused, or aided and abetted such injuries.  Whenever and wherever reference is made in this Complaint to any conduct committed by CHIQUITA, and/or Banadex, such allegations and references shall also be deemed to mean the conduct of CHIQUITA and Banadex, acting individually, jointly and severally, through personnel working in the United States and Colombia for the benefit of CHIQUITA and Banadex.

17.     At all times herein material, with respect to the events at issue, CHIQUITA, Banadex, Individuals A through J, Moe Corporations 1-5 and Moes 6-25 conspired with each other, and/or participated in a joint criminal enterprise with each other, and /or acted in concert, and/or aided or abetted each others' actions, and/or were in an agency or alter ego or joint venture relationship, and were acting within the course and scope of such conspiracy, joint criminal enterprise, concerted activity, aiding and abetting, and/or agency or alter ego or joint venture relationship.  As described herein, "agency" included agency by ratification.  Whenever reference is made in this Complaint to any conduct by a defendant, such allegations and references shall be construed to mean the conduct of each of the defendants, acting individually, jointly, and severally.

## VENUE

18. Venue is proper in the Southern District of New York pursuant to 28 USC § 1391 (a) and (b) in that CHIQUITA is authorized to do business and is in fact doing business in the District and is subject to personal jurisdiction in the District.

## ALLEGATIONS OF FACT COMMON TO ALL COUNTS

The following allegations of fact are made upon information and belief, derived from public and/or de-classified documents of the United States government, as well as documents in the public domain, statements of informants, filed Court documents in the United States and/or Colombia and other documents in the plaintiffs files.

19. The defendants and each of them tortiously, intentionally, willfully, wantonly, maliciously, knowingly, recklessly and negligently murdered and/or otherwise proximately caused the death of the plaintiff's decedents, and or injuries to plaintiff(s).

20. The defendants and each of them aided and abetted Colombian paramilitaries, including but not limited to the Autodefensas Unidas de Colombia ("AUC") and their collaborators, in tortiously, intentionally, willfully, wantonly, maliciously, knowingly, recklessly and negligently murdering and/or otherwise proximately causing the death of the plaintiffs' decedents, and/or injuries to plaintiff(s).

21. The defendants and each of them conspired with the AUC in murdering and/or otherwise proximately causing the death of the plaintiffs' decedents, and/or injuries to plaintiff(s).

22.    The defendants and each of them, acted in concert with the AUC in murdering and/or otherwise proximately causing the death of the plaintiffs' decedents, and/or injuries to plaintiff(s).

23.    The defendants ordered, directed, solicited and facilitated the murders of the plaintiffs' decedents by the AUC and/or injuries to plaintiff(s).

24.    On February 10, 2000, Jose/Josefina Doe 1A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants.  Plaintiff Juan/Juana Doe 1, who was the mother of Jose/Josefina Doe 1A, is the legal heir to Jose/Josefina Doe 1A and resides in the municipality of Pueblo Viejo-Magdalena.

25.    On February 10, 2000, Jose/Josefina Doe 1B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 1, who was the mother of Jose/Josefina Doe 1B, is the legal heir to Jose/Josefina Doe 1B and resides in the municipality of Pueblo Viejo-Magdalena.

26.    On November 6, 1997, Jose/Josefina Doe 2 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 2, who was the wife of Jose/Josefina Doe 2, is the legal heir to Jose/Josefina Doe 2 and resides in the municipality of Cienaga-Magdalena.

27.    On November 11, 2003, Jose/Josefina Doe 3 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 3, who was the

mother of Jose/Josefina Doe 3, is the legal heir to Jose/Josefina Doe 3 and resides in the municipality of Cienaga-Magdalena.

28.    On February 20, 2003, Jose/Josefina Doe 4 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants.  Plaintiff Juan/Juana Doe 4, who was the wife of Jose/Josefina Doe 4, is the legal heir to Jose/Josefina Doe 4 and resides in the municipality of Cienaga-Magdalena.

29.    On July 12, 2000, Jose/Josefina Doe 5 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants.  Plaintiff Juan/Juana Doe 5, who was the wife of Jose/Josefina Doe 5, is the legal heir to Jose/Josefina Doe 5 and resides in the municipality of Cienaga-Magdalena.

30.    On August 15, 2003, Jose/Josefina Doe 6 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 6, who was the mother of Jose/Josefina Doe 6, is the legal heir to Jose/Josefina Doe 6 and resides in the municipality of Cienaga-Magdalena.

31.    On February 5, 2001, Jose/Josefina Doe 7 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 7, who was the daughter of Jose/Josefina Doe 7, is the legal heir to Jose/Josefina Doe 7 and resides in the municipality of Cienaga-Magdalena.

32.     On May 1, 2001, Jose/Josefina Doe 8 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 8, who was the daughter of Jose/Josefina Doe 8, is the legal heir to Jose/Josefina Doe 8 and resides in the municipality of Cienaga-Magdalena.

33.     On March 27, 2002, Jose/Josefina Doe 9 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 9, who was the wife of Jose/Josefina Doe 9, is the legal heir to Jose/Josefina Doe 9 and resides in the municipality of Aracataca-Magdalena.

34.     On February 20, 2002, Jose/Josefina Doe 10 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 10, who was the mother of Jose/Josefina Doe 10, is the legal heir to Jose/Josefina Doe 10 and resides in the municipality of Cienaga-Magdalena.

35.     On January 23, 2003, Jose/Josefina Doe 11 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 11, who was the sister of Jose/Josefina Doe 11, is the legal heir to Jose/Josefina Doe 11 and resides in the municipality of Aracataca-Magdalena.

36.     On June 26, 2004, Jose/Josefina Doe 12 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 12, who was the daughter of

Jose/Josefina Doe 12, is the legal heir to Jose/Josefina Doe 12 and resides in the municipality of Aracataca-Magdalena.

37.     On February 10, 2004, Jose/Josefina Doe 13 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 13, who was the brother of Jose/Josefina Doe 13, is the legal heir to Jose 13 and resides in the municipality of Aracataca-Magdalena.

38.     On May 14, 2003, Jose/Josefina Doe 14 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 14, who was the son of Jose/Josefina Doe 14, is the legal heir to Jose/Josefina Doe 14 and resides in the municipality of Aracataca-Magdalena.

39.     On July 7, 1999, Jose/Josefina Doe 15 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 15, who was the husband of Jose/Josefina Doe 15, is the legal heir to Jose/Josefina Doe 15 and resides in the municipality of Fundacion-Magdalena.

40.     On April 9, 2002, Jose/Josefina Doe 16 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 16, who was the husband of Jose/Josefina Doe 16, is the legal heir to Jose/Josefina Doe 16 and resides in the municipality of Aracataca-Magdalena.

10

41.     On November 19, 2001, Jose/Josefina Doe 17 was killed or went missing by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 17 is the legal heir to Jose/Josefina Doe 17 and resides in the municipality of Aracataca-Magdalena.

42.     On November 19, 2001, Jose/Josefina Doe 18 was killed or went missing by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 18 is the legal heir to Jose/Josefina Doe 18 and resides in the municipality of Aracataca-Magdalena.

43.     On December 14, 2004, Jose/Josefina Doe 19 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 19, who was the mother of Jose/Josefina Doe 19, is the legal heir to Jose/Josefina Doe 19 and resides in the municipality of Aracataca-Magdalena.

44.     On June 18, 1998, Jose/Josefina Doe 20 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 20, who was the brother of Jose/Josefina Doe 20, is the legal heir to Jose/Josefina Doe 20 and resides in the municipality of Aracataca-Magdalena.

45.     On March 14, 2003, Jose/Josefina Doe 21 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 21, who was the

father of Jose/Josefina Doe 21, is the legal heir to Jose/Josefina Doe 21 and resides in the municipality of Aracataca-Magdalena.

46.     On November 19, 2002, Jose/Josefina Doe 22 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 22 is the legal heir to Jose/Josefina Doe 22 and resides in the municipality of Aracataca-Magdalena.

47.     On March 24, 2002, Jose/Josefina Doe 23 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 23, who was the mother of Jose/Josefina Doe 23, is the legal heir to Jose/Josefina Doe 23 and resides in the municipality of Aracataca-Magdalena.

48.     On February 22, 2003, Jose/Josefina Doe 24 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 24 is the legal heir to Jose/Josefina Doe 24 and resides in the municipality of Aracataca-Magdalena.

49.     On December 12, 2003, Jose/Josefina Doe 25A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 25, who was the father of Jose/Josefina Doe 25A, is the legal heir to Jose/Josefina Doe 25A and resides in the municipality of Cienaga-Magdalena.

50.     On December 12, 2003, Jose/Josefina Doe 25B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 25, who was the

father of Jose/Josefina Doe 25B, is the legal heir to Jose 25B and resides in the municipality of Cienaga-Magdalena.

51.     On May 29, 2001, Jose/Josefina Doe 26 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 26, who was the mother of Jose/Josefina Doe 26, is the legal heir to Jose/Josefina Doe 26 and resides in the municipality of Cienaga-Magdalena.

52.     On July 8, 2002, Jose/Josefina Doe 27A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 27A, who was the sister of Jose/Josefina Doe 27A, is the legal heir to Juan/Juana Doe 27A and resides in the municipality of Sevilla-Zona Bananera.

53.     On July 8, 2002, Jose/Josefina Doe 27B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 27A, who was the sister of Jose/Josefina Doe 27B, is the legal heir to Jose/Josefina Doe 27B and resides in the municipality of Sevilla-Zona Bananera.

54.     On July 8, 2002, Jose/Josefina Doe 27A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 27B, who was the sister of Jose/Josefina Doe 27A, is the legal heir to Juan/Juana Doe 27A and resides in the municipality of Sevilla-Zona Bananera.

55.     On July 8, 2002, Jose/Josefina Doe 27B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 27B, who was the sister of Jose/Josefina Doe 27B, is the legal heir to Jose/Josefina Doe 27B and resides in the municipality of Sevilla-Zona Bananera.

56.     On July 8, 2002, Jose/Josefina Doe 27C was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 27A, who was the mother of Jose/Josefina Doe 27C, is the legal heir to Jose/Josefina Doe 27C and resides in the municipality of Sevilla-Zona Bananera.

57.     On May 31, 2000, Jose/Josefina Doe 28A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 28, who was the mother of Jose/Josefina Doe 28A, is the legal heir to Jose/Josefina Doe 28A and resides in the municipality of Sevilla-Zona Bananera.

58.     On May 31, 2000, Jose/Josefina Doe 28B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 28, who was the aunt of Jose/Josefina Doe 28B, is the legal heir to Jose/Josefina Doe 28B and resides in the municipality of Sevilla-Zona Bananera.

59.     On June 19, 2003, Jose/Josefina Doe 29 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 29A, who was the sister of

Jose/Josefina Doe 29, is the legal heir to Jose/Josefina Doe 29 and resides in the municipality of Sevilla-Zona Bananera.

60.     On June 19, 2003, Jose/Josefina Doe 29 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 29B, who was the sister of Jose/Josefina Doe 29, is the legal heir to Jose/Josefina Doe 29 and resides in the municipality of Sevilla-Zona Bananera.

61.     On February 14, 2007, Jose/Josefina Doe 30 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 30, who was the sister of Jose/Josefina Doe 30, is the legal heir to Jose/Josefina Doe 30 and resides in the municipality of Fundacion-Magdalena.

62.     On April 29, 2000, Jose/Josefina Doe 31 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 31, who was the son of Jose/Josefina Doe 31, is the legal heir to Jose/Josefina Doe 31 and resides in the municipality of Cienaga-Magdalena.

63.     On September 29, 1997, Jose/Josefina Doe 32 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 32A, who was the father of Jose/Josefina Doe 32, is the legal heir to Jose/Josefina Doe 32 and resides in the municipality of Sevilla-Zona Bananera.

64.     On September 29, 1997, Jose/Josefina Doe 32 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 32A, who was the father of Jose/Josefina Doe 32, is the legal heir to Jose/Josefina Doe 32 and resides in the municipality of Sevilla-Zona Bananera.

65.     On July 3, 2003, Jose/Josefina Doe 33 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 33, who was the father of Jose/Josefina Doe 33, is the legal heir to Jose/Josefina Doe 33 and resides in the municipality of Sevilla-Zona Bananera.

66.     On November 14, 2005, Jose/Josefina Doe 34 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 34, who was the father of Jose/Josefina Doe 34, is the legal heir to Jose/Josefina Doe 34 and resides in the municipality of Fundacion-Magdalena.

67.     On January 31, 2003, Jose/Josefina Doe 35 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 35, who was the mother of Jose/Josefina Doe 35, is the legal heir to Jose/Josefina Doe 35 and resides in the municipality of Sevilla-Zona Bananera.

68.     On October 30, 2004, Jose/Josefina Doe 36 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 36, who was the

sister of Jose/Josefina Doe 36, is the legal heir to Jose/Josefina Doe 36 and resides in the municipality of Aracataca-Magdalena.

69.    On April 26, 2001, Jose/Josefina Doe 37 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 37 is the legal heir to Jose/Josefina Doe 37 and resides in the municipality of Sevilla-Magdalena.

70.    On December 1, 2000, Jose/Josefina Doe 38 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 38, who was the mother of Jose/Josefina Doe 38, is the legal heir to Jose/Josefina Doe 38 and resides in the municipality of Cienaga-Magdalena.

71.    On October 3, 1997, Jose/Josefina Doe 39 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 39, who was the sister of Jose/Josefina Doe 39, is the legal heir to Jose/Josefina Doe 39 and resides in the municipality of Cienaga-Magdalena.

72.    On February 11, 2000, Jose/Josefina Doe 40 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 40, who was the wife of Jose/Josefina Doe 40, is the legal heir to Jose/Josefina Doe 40 and resides in the municipality of Cienaga-Magdalena.

73.    On June 24, 2003, Jose/Josefina Doe 41 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex

and the other Defendants. Plaintiff Juan/Juana Doe 41, who was the mother of Jose/Josefina Doe 41, is the legal heir to Jose/Josefina Doe 41 and resides in the municipality of Cienaga-Magdalena.

74.    On October 8, 2001, Jose/Josefina Doe 42 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 42, who was the wife of Jose/Josefina Doe 42, is the legal heir to Jose/Josefina Doe 42 and resides in the municipality of Cienaga-Magdalena.

75.    On October 27, 2000, Jose/Josefina Doe 43 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 43 is the legal heir to Jose/Josefina Doe 43 and resides in the municipality of Cienaga-Magdalena.

76.    On October 3, 1997, Jose/Josefina Doe 44 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 44 is the legal heir to Jose/Josefina Doe 44 and resides in the municipality of Cienaga-Magdalena.

77.    On April 2, 2005, Jose/Josefina Doe 45 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 45, who was the wife of Jose/Josefina Doe 45, is the legal heir to Jose/Josefina Doe 45 and resides in the municipality of Cienaga-Magdalena.

78.    On September 12, 2001, Jose/Josefina Doe 46 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA

and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 46 is the legal heir to Jose/Josefina Doe 46 and resides in the municipality of Sevilla-Zona Bananera.

79.    On        , Jose/Josefina Doe 47 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 47, who was the mother of Jose/Josefina Doe 47, is the legal heir to Jose/Josefina Doe 47 and resides in the municipality of Sevilla-Zona Bananera.

80.    On April 18, 2001, Jose/Josefina Doe 48 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 48 is the legal heir to Jose/Josefina Doe 48 and resides in the municipality of Guacamayal-Zona Bananera.

81.    On November 9, 2002, Jose/Josefina Doe 49 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 49, who was the mother of Jose/Josefina Doe 49, is the legal heir to Jose/Josefina Doe 49 and resides in the municipality of Sevilla-Zona Bananera.

82.    On June 19, 2003, Jose/Josefina Doe 50 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 50, who was the mother of Jose/Josefina Doe 50, is the legal heir to Jose/Josefina Doe 50 and resides in the municipality of Sevilla-Zona Bananera.

83.    On July 8, 1999, Jose/Josefina Doe 51A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA

and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 51, who was the mother of Jose/Josefina Doe 51A, is the legal heir to Jose/Josefina Doe 51A and resides in the municipality of Sevilla-Zona Bananera.

84.     On July 8, 1999, Jose/Josefina Doe 51B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 51, who was the mother of Jose/Josefina Doe 51B, is the legal heir to Jose/Josefina Doe 51B and resides in the municipality of Cienaga-Magdalena.

85.     On July 8, 1999, Jose/Josefina Doe 51C was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 51, who was the wife of Jose/Josefina Doe 51C, is the legal heir to Jose/Josefina Doe 51C and resides in the municipality of Cienaga-Magdalena.

86.     On December 10, 1996, Jose/Josefina Doe 52 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 52, who was the wife of Jose/Josefina Doe 52, is the legal heir to Jose/Josefina Doe 52 and resides in the municipality of Apartado-Barrio Obrero.

87.     On September 24, 1996, Jose/Josefina Doe 53 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 53, who was the wife of Jose/Josefina Doe 53, is the legal heir to Jose/Josefina Doe 53 and resides in the municipality of Apartado-Antioquia.

88.     On July 22, 2001, Jose/Josefina Doe 54 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 54, who was the wife of Jose/Josefina Doe 54, is the legal heir to Jose/Josefina Doe 54 and resides in the municipality of Apartado-Antioquia.

89.     On August 7, 1993, Jose/Josefina Doe 55A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 55, who was the daughter of Jose/Josefina Doe 55A is the legal heir to Jose/Josefina Doe 55A and resides in the municipality of Apartado-Antioquia.

90.     On August 10, 2000, Jose/Josefina Doe 55B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 55, who was the mother of Jose/Josefina Doe 55B, is the legal heir to Jose/Josefina Doe 55B and resides in the municipality of Apartado-Antioquia.

91.     On April 26, 2002, Jose/Josefina Doe 56 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 56, who was the wife of Jose/Josefina Doe 56, is the legal heir to Jose/Josefina Doe 56 and resides in the municipality of Apartado.

92.     On July 26, 2002, Jose/Josefina Doe 57 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 57, who was the mother of

Jose/Josefina Doe 57, is the legal heir to Jose/Josefina Doe 57 and resides in the municipality of Apartado-Uraba.

93.     On November 8, 1997, Jose/Josefina Doe 58 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 58, who was the wife of Jose/Josefina Doe 58, is the legal heir to Jose/Josefina Doe 58 and resides in the municipality of Apartado-Antioquia.

94.     On July 6, 1996, Jose/Josefina Doe 59 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 59 is the legal heir to Jose/Josefina Doe 59 and resides in the municipality of Apartado-Antioquia.

95.     On July 13, 1999, Jose/Josefina Doe 60 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 60, who was the wife of Jose/Josefina Doe 60, is the legal heir to Jose/Josefina Doe 60 and resides in the municipality of Apartado.

96.     On November 18, 1996, Jose/Josefina Doe 61 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 61, who was the wife of Jose/Josefina Doe 61, is the legal heir to Jose/Josefina Doe 61 and resides in the municipality of Apartado-Uraba.

97.     On April 3, 1996, Jose/Josefina Doe 62 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex

and the other Defendants. Plaintiff Juan/Juana Doe 62, who was the partner of Jose/Josefina Doe 62, is the legal heir to Jose/Josefina Doe 62 and resides in the municipality of Apartado-Antioquia.

98.    On May 8, 2001, Jose/Josefina Doe 63 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 63, who was the sister of Jose/Josefina Doe 63, is the legal heir to Jose/Josefina Doe 63 and resides in the municipality of Apartado-Antioquia.

99.    On November 23, 2000, Jose/Josefina Doe 64 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 64, who was the wife of Jose/Josefina Doe 64, is the legal heir to Jose/Josefina Doe 64 and resides in the municipality of Apartado-Antioquia.

100.    On April 26, 2002, Jose/Josefina Doe 65 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 65, who was the wife of Jose/Josefina Doe 65, is the legal heir to Jose/Josefina Doe 65 and resides in the municipality of Apartado-Barrio Obrero.

101.    On February 27, 1997, Jose/Josefina Doe 66 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 66, who was the brother of Jose/Josefina Doe 66, is the legal heir to Jose/Josefina Doe 66 and resides in the municipality of Apartado.

102.    On October 2, 2001, Jose/Josefina Doe 67 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 67, who was the mother of Jose/Josefina Doe 67, is the legal heir to Jose/Josefina Doe 67 and resides in the municipality of Apartado.

103.    On December 16, 1999, Jose/Josefina Doe 68 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 68, who was the wife of Jose/Josefina Doe 68, is the legal heir to Jose/Josefina Doe 68 and resides in the municipality of Apartado.

104.    On April 26, 2002, Jose/Josefina Doe 69 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 69, who was the wife of Jose/Josefina Doe 69, is the legal heir to Jose/Josefina Doe 69 and resides in the municipality of Apartado-Uraba.

105.    On February 29, 1996, Jose/Josefina Doe 70 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 70, who was the partner of Jose/Josefina Doe 70 is the legal heir to Jose/Josefina Doe 70 and resides in the municipality of Apartado-Uraba.

106.    On May 10, 1998, Jose/Josefina Doe 71 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 71, who was the father of

Jose/Josefina Doe 71, is the legal heir to Jose/Josefina Doe 71 and resides in the municipality of Apartado-Uraba.

107.    On January 18, 2000, Jose/Josefina Doe 72 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 72, who was the niece of Jose/Josefina Doe 72, is the legal heir to Jose/Josefina Doe 72 and resides in the municipality of Apartado-Uraba.

108.    On August 17, 1999, Jose/Josefina Doe 73 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 73, who was the wife of Jose/Josefina Doe 73, is the legal heir to Jose/Josefina Doe 73 and resides in the municipality of Apartado-Uraba.

109.    On October 5, 2001, Jose/Josefina Doe 74 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 74, who was the husband of Jose/Josefina Doe 74, is the legal heir to Jose/Josefina Doe 74 and resides in the municipality of Barrio Las Brisas-Antioquia.

110.    On March 25, 2002, Jose/Josefina Doe 75 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 75, who was the mother of Jose/Josefina Doe 75, is the legal heir Jose/Josefina Doe 75 to and resides in the municipality of Apartado-Uraba.

111.    On April 26, 2002, Jose/Josefina Doe 76 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 76, who was the wife of Jose/Josefina Doe 76, is the legal heir to Jose/Josefina Doe 76 and resides in the municipality of Apartado.

112.    On June 26, 2004, Jose/Josefina Doe 77 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 77, who was the partner of Jose/Josefina Doe 77, is the legal heir to Jose/Josefina Doe 77 and resides in the municipality of Apartado-Barrio Obrero.

113.    On August 19, 2004, Jose/Josefina Doe 78 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 78, who was the partner of Jose/Josefina Doe 78, is the legal heir to Jose/Josefina Doe 78 and resides in the municipality of Apartado-Antioquia.

114.    On June 9, 1997, Jose/Josefina Doe 79 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 79, who was the wife of Jose/Josefina Doe 79, is the legal heir to Jose/Josefina Doe 79 and resides in the municipality of Apartado-Uraba.

115.    On July 31, 1999, Jose/Josefina Doe 80 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 80, who was the wife of Jose/Josefina

Doe 80, is the legal heir to Jose/Josefina Doe 80 and resides in the municipality of Apartado.

116.    On January 2, 1997, Jose/Josefina Doe 81 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 81, who was the wife of Jose/Josefina Doe 81, is the legal heir to Jose/Josefina Doe 81 and resides in the municipality of Apartado.

117.    On December 23, 1997, Jose/Josefina Doe 82A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 82, who was the sister of Jose/Josefina Doe 82A, is the legal heir to Jose/Josefina Doe 82A and resides in the municipality of Apartado.

118.    On December 23, 1997, Jose/Josefina Doe 82B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 82, who was the sister-in-law of Jose/Josefina Doe 82B, is the legal heir to Jose/Josefina Doe 82B and resides in the municipality of Apartado.

119.    On June 1, 1997, Jose/Josefina Doe 83 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 83, who was the wife of Jose/Josefina Doe 83, is the legal heir to Jose/Josefina Doe 83 and resides in the municipality of Apartado-Uraba.

120.     On March 9, 1997, Jose/Josefina Doe 84 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 84, who was the sister of Jose/Josefina Doe 84, is the legal heir to Jose/Josefina Doe 84 and resides in the municipality of Apartado-Uraba.

121.     On September 29, 2002, Jose/Josefina Doe 85 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 85, who was the wife of Jose/Josefina Doe 85, is the legal heir to Jose/Josefina Doe 85 and resides in the municipality of Apartado.

122.     On January 23, 1997, Jose/Josefina Doe 86 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 86, who was the partner of Jose/Josefina Doe 86, is the legal heir to Jose/Josefina Doe 86 and resides in the municipality of Apartado.

123.     On July 18, 2000, Jose/Josefina Doe 87 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 87, who was the wife of Jose/Josefina Doe 87, is the legal heir to Jose/Josefina Doe 87 and resides in the municipality of Apartado-Uraba.

124.     On July 11, 1998, Jose/Josefina Doe 88 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 88, who was the wife of Jose/Josefina

Doe 88, is the legal heir to Jose/Josefina Doe 88 and resides in the municipality of Apartado-Uraba.

125.    On December 19, 2001, Jose/Josefina Doe 89 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 89, who was the partner of Jose/Josefina Doe 89, is the legal heir to Jose/Josefina Doe 89 and resides in the municipality of Apartado.

126.    On April 12, 2002, Jose/Josefina Doe 90 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 90, who was the wife of Jose/Josefina Doe 90, is the legal heir to Jose/Josefina Doe 90 and resides in the municipality of Apartado-Antioquia.

127.    On April 15, 1997, Jose/Josefina Doe 91 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 91, who was the wife of Jose/Josefina Doe 91, is the legal heir to Jose/Josefina Doe 91 and resides in the municipality of Apartado.

128.    On December 3, 2005, Jose/Josefina Doe 92 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 92, who was the wife of Juan/Juana Doe 92, is the legal heir to Jose/Josefina Doe 92 and resides in the municipality of Apartado.

129.    On March 14, 2005, Jose/Josefina Doe 93 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 93, who was the partner of Jose/Josefina Doe 93, is the legal heir to Jose/Josefina Doe 93 and resides in the municipality of Apartado-Antioquia.

130.    On November 23, 2006, Jose/Josefina Doe 94 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 94, who was the wife of Jose/Josefina Doe 94, is the legal heir to Jose/Josefina Doe 94 and resides in the municipality of Cienaga-Magdalena.

131.    On January 24, 2004, Jose/Josefina Doe 95 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 95 is the legal heir to Jose/Josefina Doe 95 and resides in the municipality of Paraiso-Magdalena.

132.    On March 14, 2001, Jose/Josefina Doe 96 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 96, who was the mother of Jose/Josefina Doe 96, is the legal heir to Jose/Josefina Doe 96 and resides in the municipality of Cienaga-Magdalena.

133.    On March 1, 2000, Jose/Josefina Doe 97 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 97, who was the wife

of Jose/Josefina Doe 97, is the legal heir to   Jose/Josefina Doe 97 and resides in the municipality of Cienaga-Magdalena.

134.    On August 15, 2006, Jose/Josefina Doe 98 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 98, who was the wife of Jose/Josefina Doe 98, is the legal heir to Jose/Josefina Doe 98 and resides in the municipality of Cienaga-Magdalena.

135.    On January 13, 2002, Jose/Josefina Doe 99 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 99, who was the wife of Jose/Josefina Doe 99, is the legal heir to Jose/Josefina Doe 99 and resides in the municipality of Cienaga-Magdalena.

136.    On April 23, 2007, Jose/Josefina Doe 100 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 100, who was the wife of Jose/Josefina Doe 100, is the legal heir to Jose/Josefina Doe 100 and resides in the municipality of Cienaga-Magdalena.

137.    On January 17, 2001, Jose/Josefina Doe 101A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 101, who was the sister of Jose/Josefina Doe 101A, is the legal heir to Jose/Josefina Doe 101A and resides in the municipality of Palmor-Magdalena.

138.    On January 17, 2001, Jose/Josefina Doe 101B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 101, who was the sister of Jose/Josefina Doe 101B, is the legal heir to Jose/Josefina Doe 101B and resides in the municipality of Palmor-Magdalena.

139.    On August 1, 2005, Jose/Josefina Doe 102 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 102, who was the partner of Jose/Josefina Doe 102, is the legal heir to Jose/Josefina Doe 102 and resides in the municipality of Cienaga-Magdalena.

140.    On May 12, 1996, Juan/Juana Doe 103 was shot and severely injured by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Jose/Josefina Doe 103 resides in the municipality of Apartado-Antioquia.

141.    On December 7, 2005, Jose/Josefina Doe 104 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 104, who was the father of Jose/Josefina Doe 104, is the legal heir to Jorge Luis Ortega Perez and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

142.    On March 12, 2001, Jose/Josefina Doe 105 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 105, who was the

mother of Jose/Josefina Doe 105, is the legal heir to Jose/Josefina Doe 105 and resides in the municipality of El Yeso-Morroa.

143.    On November 15, 2001, Jose/Josefina Doe 106 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 106 is the legal heir to Jose/Josefina Doe 106 and resides in the municipality of Vereda-Palmarcito.

144.    On April 23, 2004, Jose/Josefina Doe 107 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 107, who was the mother of Jose/Josefina Doe 107, is the legal heir to Jose/Josefina Doe 107 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

145.    On September 3, 2004, Jose/Josefina Doe 108 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 108, who was the wife of Jose/Josefina Doe 108, is the legal heir to Jose/Josefina Doe 108 and resides in the municipality of Las Lomas de Corozal-Sucre-Sucre.

146.    On July 12, 2006, Jose/Josefina Doe 109 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 109 is the legal heir to Jose/Josefina Doe 109 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

147.    On May 24, 2004, Jose/Josefina Doe 110 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 110, who was the

sister of Jose/Josefina Doe 110, is the legal heir to Jose/Josefina Doe 110 and resides in the municipality of Corozal-Sucre-Sucre.

148.    On March 11, 2004, Jose/Josefina Doe 111 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 111, who was the sister of Jose/Josefina Doe 111, is the legal heir to Jose/Josefina Doe 111 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

149.    On January 8, 2004, Jose/Josefina Doe 112 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 112, who was the sister of Jose/Josefina Doe 112, is the legal heir to Jose/Josefina Doe 112 and resides in the municipality of Corozal-Sucre-Sucre.

150.    On July 29, 2003, Juan/Juana Doe 113 was shot and severely injured by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 113 resides in the municipality of Corozal-Sucre-Sucre.

151.    On September 18, 1999, Jose/Josefina Doe 114 was killed or went missing by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 114, who was the wife of Jose/Josefina Doe 114, is the legal heir to Jose/Josefina Doe 114 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

152.    On July 29, 2003, Juan/Juana Doe 115 was shot and severely injured by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with

CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 115 resides in the municipality of Morroa-Sucre.

153.    On September 3, 2003, Jose/Josefina Doe 116 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 116, who was the brother of Jose/Josefina Doe 116, is the legal heir to Jose/Josefina Doe116 and resides in the municipality of Corozal-Sucre-Sucre.

154.    On September 4, 2005, Jose/Josefina Doe 117 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 117, who was the mother of Jose/Josefina Doe 117, is the legal heir to Jose/Josefina Doe 117 and resides in the municipality of Corozal-Sucre-Sucre.

155.    On July 23, 2006, Jose/Josefina Doe 118 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 118 is the legal heir to Jose/Josefina Doe 118 and resides in the municipality of Corozal-Sucre-Sucre.

156.    On August 20, 2006, Jose/Josefina Doe 119 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 119, who was the sister of Jose/Josefina Doe 119, is the legal heir to Jose/Josefina Doe 119 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

157.    On May 14, 2004, Jose/Josefina Doe 120 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA

and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 120, who was the sister of Jose/Josefina Doe 120, is the legal heir to Jose/Josefina Doe 120 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

158.    On June 19, 2004, Jose/Josefina Doe 121 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 121, who was the father of Jose/Josefina Doe 121, is the legal heir to Jose/Josefina Doe 121 and resides in the municipality of Corozal-Sucre-Sucre.

159.    On July 29, 2003, Jose/Josefina Doe 122 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 122, who was the wife of Jose/Josefina Doe 122, is the legal heir to Jose/Josefina Doe 122 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

160.    On September 16, 2004, Jose/Josefina Doe 123 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 123, who was the wife of Jose/Josefina Doe 123, is the legal heir to Jose/Josefina Doe 123 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

161.    On April 23, 2006, Jose/Josefina Doe 124 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 124, who was the brother of Jose/Josefina Doe 124, is the legal heir to Jose/Josefina Doe 124 and resides in the municipality of Corozal-Sucre-Sucre.

162. On October 15, 2006, Jose/Josefina Doe 125 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 125, who was the wife of Jose/Josefina Doe 125, is the legal heir to Jose/Josefina Doe 125 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

163. On February 16, 2007, Jose/Josefina Doe 126 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 126, who was the wife of Jose/Josefina Doe 126, is the legal heir to Jose/Josefina Doe 126 and resides in the municipality of Corozal-Sucre-Sucre.

164. On January 27, 2004, Jose/Josefina Doe 127 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 127, who was the mother of Jose/Josefina Doe 127, is the legal heir to Jose/Josefina Doe 127 and resides in the municipality of Sucre.

165. On February 23, 2004, Jose/Josefina Doe 128 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 128, who was the brother of Jose/Josefina Doe 128, is the legal heir to Jose/Josefina Doe 128 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

166. On May 4, 2004, Jose/Josefina Doe 129 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 129, who was the wife of

Jose/Josefina Doe 129, is the legal heir to Jose/Josefina Doe 129 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

167.    On February 2, 1998, Jose/Josefina Doe 130 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 130A, who was the wife of Jose/Josefina 130, is the legal heir to Jose/Josefina Doe 130 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

168.    On February 2, 1998, Jose/Josefina Doe 130 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 130B, who was the wife of Jose/Josefina 130, is the legal heir to Jose/Josefina Doe 130 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

169.    On December 22, 2003, Jose/Josefina Doe 131 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 131, who was the mother of Jose/Josefina Doe 131, is the legal heir to Jose/Josefina Doe 131 and resides in the municipality of Corozal-Sucre-Sucre.

170.    On June 15, 2002, Jose/Josefina Doe 132 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 132, who was the wife of Jose/Josefina Doe 132, is the legal heir to Jose/Josefina Doe 132 and resides in the municipality of Sucre.

171.    On November 4, 2002, Jose/Josefina Doe 133 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 133, who was the wife of Jose/Josefina Doe 133, is the legal heir to Jose/Josefina Doe 133 and resides in the municipality of Corozal-Sucre-Sucre.

172.    On April 29, 1997, Jose/Josefina Doe 134 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 134, who was the daughter of Jose/Josefina Doe 134, is the legal heir to Jose/Josefina Doe 134 and resides in the municipality of Corozal-Sucre-Sucre.

173.    On February 27, 1995, Jose/Josefina Doe 135 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 135 is the legal heir to Jose/Josefina Doe 135 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

174.    On September 4, 2005, Jose/Josefina Doe 136 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 136 is the legal heir to Jose/Josefina Doe 136 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

175.    On July 25, 2000, Jose/Josefina Doe 137 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 137, who was the mother of Jose/Josefina Doe 137, is the legal heir to Jose/Josefina Doe 137 and resides in the municipality of Sincelejo.

176.    On June 7, 1998, Jose/Josefina Doe 138 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 138 is the legal heir to Jose/Josefina Doe 138 and resides in the municipality of Sucre.

177.    On November 1, 2003, Jose/Josefina Doe 139 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 139 is the legal heir to Jose/Josefina Doe 139 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

178.    On May 6, 2005, Jose/Josefina Doe 140 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 140, who was the mother of Jose/Josesfina Doe 140, is the legal heir to Jose/Josefina Doe 140 and resides in the municipality of San Onofre-Sucre.

179.    On February 2, 1998, Jose/Josefina Doe 141 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 141, who was the wife of Jose/Josefina Doe 141, is the legal heir to Jose/Josefina Doe 141 and resides in the municipality of Ovejas-Sucre.

180.    On April 4, 1999, Jose/Josefina Doe 142 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 142, who was the daughter of Jose/Josefina Doe 142, is the legal heir to Jose/Josefina Doe 142 and resides in the municipality of Corozal-Sucre-Sucre.

181.    On May 7, 2003, Jose/Josefina Doe 143 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 143, who was the wife of Jose/Josefina Doe 143, is the legal heir to Jose/Josefina Doe 143 and resides in the municipality of Corozal-Sucre-Sucre.

182.    On March 8, 2007, Jose/Josefina Doe 144 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 144, who was the wife of Jose/Josefina Doe 144, is the legal heir to Jose/Josefina Doe 144 and resides in the municipality of Corozal-Sucre-Sucre.

183.    On July 19, 2000, Jose/Josefina Doe 145 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 145, who was the mother of Jose/Josefina Doe 145, is the legal heir to Jose/Josefina Doe 145 and resides in the municipality of Corozal-Sucre-Sucre.

184.    On November 15, 2002, Jose/Josefina Doe 146 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 146 is the legal heir to Jose/Josefina Doe 146 and resides in the municipality of San Francisco-Antioquia.

185.    On September 24, 2000, Jose/Josefina Doe 147 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 147, who was the wife of

Jose/Josefina Doe 147, is the legal heir to Jose/Josefina Doe 147 and resides in the municipality of Sucre.

186.    On February 15, 2004, Jose/Josefina Doe 148 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 148, who was the wife of Jose/Josefina Doe 148, is the legal heir to Jose/Josefina Doe 148 and resides in the municipality of Corozal-Sucre-Sucre.

187.    On July 15, 1993, Jose/Josefina Doe 149 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 149, who was the son of Jose/Josefina Doe 149, is the legal heir to Jose/Josefina Doe 149 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

188.    On January 9, 1999, Jose/Josefina Doe 150 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 150 is the legal heir to Jose/Josefina Doe 150 and resides in the municipality of Sucre.

189.    On April 15, 2001, Jose/Josefina Doe 151 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 151, who was the wife of Jose/Josefina Doe 151, is the legal heir to Jose/Josefina Doe 151 and resides in the municipality of Morroa-Sucre.

190.    On July 4, 2004, Jose/Josefina Doe 152 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and

the other Defendants. Plaintiff Juan/Juana Doe 152, who was the father of Jose/Josefina Doe 152, is the legal heir to Jose/Josefina Doe 152 and resides in the municipality of Corozal-Sucre-Sucre.

191.    On February 12, 2007, Jose/Josefina Doe 153 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 153, who was the mother of Jose/Josefina Doe 153, is the legal heir to Jose/Josefina Doe 153 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

192.    On May 3, 1997, Jose/Josefina Doe 154 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 154 is the legal heir to Jose/Josefina Doe 154 and resides in the municipality of Sucre.

193.    On July 3, 2004, Jose/Josefina Doe 155 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 155, who was the wife of Jose/Josefina Doe 155, is the legal heir to Jose/Josefina Doe 155 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

194.    On January 3, 1999, Jose/Josefina Doe 156 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 156 is the legal heir to Jose/Josefina Doe 156 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

195.    On April 16, 2005, Jose/Josefina Doe 157 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or

Banadex and the other Defendants. Plaintiff Juan/Juana Doe 157, who was the mother of Jose/Josefina Doe 157, is the legal heir to Jose/Josefina Doe 157 and resides in the municipality of Corozal-Sucre-Sucre.

196.     On September 13, 2002, Jose/Josefina Doe 158 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 158, who was the wife of Jose/Josefina Doe 158, is the legal heir to Jose/Josefina Doe 158 and resides in the municipality of Sucre.

197.     On January 4, 2001, Jose/Josefina Doe 159 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 159, who was the mother of Jose/Josefina Doe 159, is the legal heir to Jose/Josefina Doe 159 and resides in the municipality of Corozal-Sucre-Sucre.

198.     On August 5, 2004, Jose/Josefina Doe 160 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 160, who was the wife of Jose/Josefina Doe 160, is the legal heir to Jose/Josefina Doe 160 and resides in the municipality of Corozal-Sucre-Sucre.

199.     On July 15, 2004, Jose/Josefina Doe 161 was killed or went missing by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 161, who was the wife of Jose/Josefina Doe 161, is the legal heir to Jose/Josefina Doe 161 and resides in the municipality of Corozal-Sucre-Sucre.

200.    On February 12, 2004, Jose/Josefina Doe 162 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 162, who was the wife of Jose/Josefina Doe 162, is the legal heir to Jose/Josefina Doe 162 and resides in the municipality of Morroa-Sucre.

201.    On April 22, 1991, Jose/Josefina Doe 163 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 163, who was the wife of Jose/Josefina Doe 163, is the legal heir to Jose/Josefina Doe 163 and resides in the municipality of Corozal-Sucre-Sucre.

202.    On February 25, 2006, Jose/Josefina Doe 164 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 164 is the legal heir to Jose/Josefina Doe 164 and resides in the municipality of Corozal-Sucre-Sucre.

203.    On February 7, 2001, Jose/Josefina Doe 165 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 165, who was the wife of Jose/Josefina Doe 165, is the legal heir to Jose/Josefina Doe 165 and resides in the municipality of Sucre.

204.    On October 22, 1996, Jose/Josefina Doe 166 was killed or went missing by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 166, who was the

wife of Jose/Josefina Doe 166, is the legal heir to Jose/Josefina Doe 166 and resides in the municipality of Corozal-Sucre-Sucre.

205.    On April 16, 2005, Jose/Josefina Doe 167 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 167, who was the sister of Jose/Josefina Doe 167, is the legal heir to Jose/Josefina Doe 167 and resides in the municipality of Corozal-Sucre-Sucre.

206.    On January 10, 1999, Jose/Josefina Doe 168 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 168, who was the father of Jose/Josefina Doe 168, is the legal heir to Jose/Josefina Doe 168 and resides in the municipality of Toluviejo-Sucre.

207.    On April 23, 2004, Jose/Josefina Doe 169 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 169, who was the father of Jose/Josefina Doe 169, is the legal heir to Jose/Josefina Doe 169 and resides in the municipality of Corozal-Sucre-Sucre.

208.    On April 28, 1997, Jose/Josefina Doe 170 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 170, who was the sister of Jose/Josefina Doe 170, is the legal heir to Jose/Josefina Doe 170 and resides in the municipality of Sucre.

209.    On June 15, 2002, Jose/Josefina Doe 171 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 171, who was the wife of Jose/Josefina Doe 171, is the legal heir to Jose/Josefina Doe 171 and resides in the municipality of Ovejas-Sucre.

210.    On April 2, 2000, Jose/Josefina Doe 172 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 172, who was the wife of Jose/Josefina Doe 172, is the legal heir to Jose/Josefina Doe 172 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

211.    On March 12, 2003, Jose/Josefina Doe 173 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 173, who was the father of Jose/Josefina Doe 173, is the legal heir to Jose/Josefina Doe 173 and resides in the municipality of Corozal-Sucre-Sucre.

212.    On February 28, 2004, Jose/Josefina Doe 174 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 174, who was the father of Jose/Josefina Doe 174, is the legal heir to Jose/Josefina Doe 174 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

213.    On November 29, 2003, Jose/Josefina Doe 175 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 175, who was the wife of

Jose/Josefina Doe 175, is the legal heir to Jose/Josefina Doe 175 and resides in the municipality of Corozal-Sucre-Sucre.

214.    On April 2, 2001, Jose/Josefina Doe 176 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 176, who was the mother of Jose/Josefina Doe 176, is the legal heir to Jose/Josefina Doe 176 and resides in the municipality of Sucre.

215.    On December 21, 2003, Jose/Josefina Doe 177 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 177, who was the mother of Jose/Josefina Doe 177, is the legal heir to Jose/Josefina Doe 177 and resides in the municipality of Corozal-Sucre-Sucre.

216.    On December 7, 2001, Jose/Josefina Doe 178 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 178, who was the wife of Jose/Josefina Doe 178, is the legal heir to Jose/Josefina Doe 178 and resides in the municipality of Sucre.

217.    On November 9, 2003, Jose/Josefina Doe 179 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 179 is the legal heir to Jose/Josefina Doe 179 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

218.    On January 26, 2002, Jose/Josefina Doe 180 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or

Banadex and the other Defendants. Plaintiff Juan/Juana Doe 180, who was the mother of 180, is the legal heir to Jose/Josefina Doe 180 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

219. On July 4, 2001, Jose/Josefina Doe 181 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 181, who was the mother of Jose/Josefina Doe 181, is the legal heir to Jose/Josefina Doe 181 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

220. On March 25, 2005, Jose/Josefina Doe 182 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 182 is the legal heir to Jose/Josefina Doe 182 and resides in the municipality of Sucre.

221. On July 29, 2003, Jose/Josefina Doe 183 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 183, who was the wife of Jose/Josefina Doe 183, is the legal heir to Jose/Josefina Doe 183 and resides in the municipality of Corozal-Sucre-Sucre.

222. On June 16, 1993, Jose/Josefina Doe 184 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 184, who was the father of Jose/Josefina Doe 184, is the legal heir to Jose/Josefina Doe 184 and resides in the municipality of Corozal-Sucre-Sucre.

223.    On May 15, 2001, Jose/Josefina Doe 185 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 185, who was the wife of Jose/Josefina Doe 185, is the legal heir to Jose/Josefina Doe 185 and resides in the municipality of Corozal-Sucre-Sucre.

224.    On September 24, 2005, Jose/Josefina Doe 186 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 186, who was the mother of Jose/Josefina Doe 186, is the legal heir to Jose/Josefina Doe 186 and resides in the municipality of Corozal-Sucre-Sucre.

225.    On April 15, 2001, Jose/Josefina Doe 187 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 187, who was the brother of Jose/Josefina Doe 187, is the legal heir to Jose/Josefina Doe 187 and resides in the municipality of Morroa-Sucre.

226.    On November 25, 2003, Jose/Josefina Doe 188 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 188 is the legal heir to Jose/Josefina Doe 188 and resides in the municipality of Morroa-Sucre.

227.    On January 9, 1999, Jose/Josefina Doe 189A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 189 is the legal heir to Jose/Josefina Doe 189A and resides in the municipality of Morroa-Sucre.

228.     On February 11, 2004, Jose/Josefina Doe 189B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 189 is the legal heir to Jose/Josefina Doe 189B and resides in the municipality of Morroa-Sucre.

229.     On October 17, 1997, Jose/Josefina Doe 189C was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 189 is the legal heir to Jose/Josefina Doe 189C and resides in the municipality of Morroa-Sucre.

230.     On August 15, 2005, Jose/Josefina Doe 190 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 190, who was the wife of Jose/Josefina Doe 190, is the legal heir to Jose/Josefina Doe 190 and resides in the municipality of Corozal-Sucre-Sucre.

231.     On November 7, 2002, Jose/Josefina Doe 191 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 191, who was the mother of Jose/Josefina Doe 191, is the legal heir to Jose/Josefina Doe 191 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

232.     On January 23, 2005, Jose/Josefina Doe 192 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 192, who was the wife of Jose/Josefina Doe 192, is the legal heir to Jose/Josefina Doe 192 and resides in the municipality of Sincelejo.

233.    On May 18, 2003, Jose/Josefina Doe 193 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 193, who was the mother of Jose/Josefina Doe 193, is the legal heir to Jose/Josefina Doe 193 and resides in the municipality of Corozal-Sucre-Sucre.

234.    On June 21, 2001, Jose/Josefina Doe 194A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 194 is the legal heir to Jose/Josefina Doe 194A and resides in the municipality of Cartagena.

235.    On June 21, 2001, Jose/Josefina Doe 194B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 194 is the legal heir to Jose/Josefina Doe 194B and resides in the municipality of Cartagena.

236.    On June 21, 2001, Jose/Josefina Doe 194C was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 194 is the legal heir to Jose/Josefina Doe 194C and resides in the municipality of Cartagena.

237.    On July 24, 2005, Jose/Josefina Doe 195 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 195, who was the mother of Jose/Josefina Doe 195, is the legal heir to Jose/Josefina Doe 195 and resides in the municipality of Aracataca-Magdalena.

238.     On May 3, 1999, Jose/Josefina Doe 196 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 196, who was the sister of Jose/Josefina Doe 196, is the legal heir to Jose/Josefina Doe 196 and resides in the municipality of Tucurinca-Magdalena.

239.     On May 21, 2003, Jose/Josefina Doe 197 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 197, who was the wife of Jose/Josefina Doe 197, is the legal heir to Jose/Josefina Doe 197 and resides in the municipality of Cienaga-Magdalena.

240.     On April 4, 1999, Jose/Josefina Doe 198 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 198, who was the sister of Jose/Josefina Doe 198, is the legal heir to Jose/Josefina Doe 198 and resides in the municipality of Zona Bananera.

241.     On November 21, 2001, Jose/Josefina Doe 199 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 199, who was the wife of Jose/Josefina Doe 199, is the legal heir to Jose/Josefina Doe 199 and resides in the municipality of Aracataca-Magdalena.

242.     On February 3, 2003, Jose/Josefina Doe 200 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 200, who was the mother of

Jose/Josefina Doe 200, is the legal heir to Jose/Josefina Doe 200 and resides in the municipality of Cienaga-Magdalena.

243.    On February 16, 1998, Jose/Josefina Doe 201 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 201 is the legal heir to Jose/Josefina Doe 201 and resides in the municipality of Cienaga-Magdalena.

244.    On January 19, 2001, Jose/Josefina Doe 202 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 202 is the legal heir to Jose/Josefina Doe 202 and resides in the municipality of Cienaga-Magdalena.

245.    On January 31, 1998, Jose/Josefina Doe 203 was killed or went missing by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 203, who was the sister of Jose/Josefina Doe 203, is the legal heir to Jose/Josefina Doe 203 and resides in the municipality of Casa Loma.

246.    On August 27, 2000, Jose/Josefina Doe 204 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 204, who was the daughter of Jose/Josefina Doe 204, is the legal heir to Jose/Josefina Doe 204 and resides in the municipality of Cienaga-Magdalena.

247.    On December 23, 2004, Jose/Josefina Doe 205 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 205, who was the wife of

Jose/Josefina Doe 205, is the legal heir to Jose/Josefina Doe 205 and resides in the municipality of Cienaga-Magdalena.

248.    On May 6, 2004, Jose/Josefina Doe 206 was killed or went missing by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 206, who was the wife of Jose/Josefina Doe 206, is the legal heir to Jose/Josefina Doe 206 and resides in the municipality of Maicao.

249.    On September 18, 1997, Jose/Josefina Doe 207A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 207, who was the mother of Jose/Josefina Doe 207A, is the legal heir to Jose/Josefina Doe 207A and resides in the municipality of Aracataca-Magdalena.

250.    On September 18, 1997, Jose/Josefina Doe 207B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 207, who was the mother of Jose/Josefina Doe 207B, is the legal heir to Jose/Josefina Doe 207B and resides in the municipality of Aracataca-Magdalena.

251.    On February 21, 2003, Jose/Josefina Doe 208 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 208 is the legal heir to Jose/Josefina Doe 208 and resides in the municipality of Zona Bananera.

252.    On August 13, 1998, Jose/Josefina Doe 209 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or

Banadex and the other Defendants. Plaintiff Juan/Juana Doe 209, who was the mother of Jose/Josefina Doe 209, is the legal heir to Jose/Josefina Doe 209 and resides in the municipality of Guacamayal.

253.    On September 21, 1997, Jose/Josefina Doe 210 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 210, who was the mother of Jose/Josefina Doe 210, is the legal heir to Jose/Josefina Doe 210 and resides in the municipality of Guacamayal.

254.    On December 12, 2002, Jose/Josefina Doe 211 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 211, who was the brother of Jose/Josefina Doe 211, is the legal heir to Jose/Josefina Doe 211 and resides in the municipality of Sevilla-Zona Bananera.

255.    On July 10, 2003, Jose/Josefina Doe 212 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 212, who was the wife of Jose/Josefina Doe 212, is the legal heir to Jose/Josefina Doe 212 and resides in the municipality of Sevilla-Magdalena.

256.    On September 25, 2003, Jose/Josefina Doe 213 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 213, who was the father of Jose/Josefina Doe 213, is the legal heir to Jose/Josefina Doe 213 and resides in the municipality of Guacamayal-Cienaga.

257.    On May 29, 2000, Jose/Josefina Doe 214 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 214, who was the mother of Jose/Josefina Doe 214, is the legal heir to Jose/Josefina Doe 214 and resides in the municipality of Sevilla-Zona Bananera.

258.    On September 29, 1997, Jose/Josefina Doe 215 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 215, who was the sister of Jose/Josefina Doe 215, is the legal heir to Jose/Josefina Doe 215 and resides in the municipality of Sevilla-Zona Bananera.

259.    On July 7, 1997, Jose/Josefina Doe 216 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 216, who was the wife of Jose/Josefina Doe 216, is the legal heir to Jose/Josefina Doe 216 and resides in the municipality of Cienaga-Magdalena.

260.    On December 25, 1996, Jose/Josefina Doe 217 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 217, who was the wife of Jose/Josefina Doe 217, is the legal heir to Jose/Josefina Doe 217 and resides in the municipality of Cienaga-Magdalena.

261.    On January 27, 1997, Jose/Josefina Doe 218 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 218, who was the mother of

Jose/Josefina Doe 218, is the legal heir to Jose/Josefina Doe 218 and resides in the municipality of Pueblo Viejo-Magdalena.

262.    On August 1, 2003, Jose/Josefina Doe 219 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 219, who was the mother of Jose/Josefina Doe 219, is the legal heir to Jose/Josefina Doe 219 and resides in the municipality of Cienaga-Magdalena.

263.    On July 14, 2001, Jose/Josefina Doe 220 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 220, who was the mother of Jose/Josefina Doe 220, is the legal heir to Jose/Josefina Doe 220 and resides in the municipality of Cienaga-Magdalena.

264.    On January 9, 1998, Jose/Josefina Doe 221 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 221, who was the wife of Jose/Josefina Doe 221, is the legal heir to Jose/Josefina Doe 221 and resides in the municipality of Guacamayal-Cienaga.

265.    On May 20, 1997, Jose/Josefina Doe 222 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 222, who was the mother of Jose/Josefina Doe 222, is the legal heir to Jose/Josefina Doe 222 and resides in the municipality of Cienaga-Magdalena.

266.    On April 19, 2001, Jose/Josefina Doe 223 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 223, who was the wife of Jose/Josefina Doe 223, is the legal heir to Jose/Josefina Doe 223 and resides in the municipality of Guacamayal-Cienaga.

267.    On November 14, 2004, Jose/Josefina Doe 224 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 224, who was the mother of Jose/Josefina Doe 224, is the legal heir to Jose/Josefina Doe 224 and resides in the municipality of Fonseca-Guajira.

268.    On June 2, 2000, Jose/Josefina Doe 225 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 225, who was the mother of Jose/Josefina Doe 225, is the legal heir to Jose/Josefina Doe 225 and resides in the municipality of Cienaga-Magdalena.

269.    On June 13, 2003, Jose/Josefina Doe 226 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 226, who was the wife of Jose/Josefina Doe 226, is the legal heir to Jose/Josefina Doe 226 and resides in the municipality of Cienaga-Magdalena.

270.    On August 22, 1998, Jose/Josefina Doe 227A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 227, who was the wife of

Jose/Josefina Doe 227A, is the legal heir to Jose/Josefina Doe 227A and resides in the municipality of Guacamayal.

271.     On March 21, 2002, Jose/Josefina Doe 227B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 227, who was the mother of Jose/Josefina Doe 227B, is the legal heir to Jose/Josefina Doe 227B and resides in the municipality of Guacamayal.

272.     On September 18, 1997, Jose/Josefina Doe 228 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 228, who was the wife of Jose/Josefina Doe 228, is the legal heir to Jose/Josefina Doe 228 and resides in the municipality of Cienaga-Magdalena.

273.     On March 18, 2005, Jose/Josefina Doe 229 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 229, who was the wife of Jose/Josefina Doe 229, is the legal heir to Jose/Josefina Doe 229 and resides in the municipality of Cienaga-Magdalena.

274.     On March 17, 1998, Jose/Josefina Doe 230 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 230, who was the son of Jose/Josefina Doe 230, is the legal heir to Jose/Josefina Doe 230 and resides in the municipality of Cienaga-Magdalena.

275.    On October 6, 2000, Jose/Josefina Doe 231 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 231, who was the wife of Jose/Josefina Doe 231, is the legal heir to Jose/Josefina Doe 231 and resides in the municipality of Sevilla-Zona Bananera.

276.    On July 8, 2002, Jose/Josefina Doe 232A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 232, who was the mother of Jose/Josefina Doe 232A, is the legal heir to Jose/Josefina Doe 232A and resides in the municipality of Sevilla-Zona Bananera.

277.    On July 8, 2002, Jose/Josefina Doe 232B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 232, who was the mother of Jose/Josefina Doe 232B, is the legal heir to Jose/Josefina Doe 232B and resides in the municipality of Sevilla-Zona Bananera.

278.    On August 27, 2003, Jose/Josefina Doe 233 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 233, who was the mother of Jose/Josefina Doe 233, is the legal heir to Jose/Josefina Doe 233 and resides in the municipality of Cienaga-Magdalena.

279.    On May 22, 2003, Jose/Josefina Doe 234 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 234, who was the wife of

Jose/Josefina Doe 234, is the legal heir to Jose/Josefina Doe 234 and resides in the municipality of Zona Bananera.

280.    On October 30, 1997, Jose/Josefina Doe 235 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 235, who was the wife of Jose/Josefina Doe 235, is the legal heir to Jose/Josefina Doe 235 and resides in the municipality of Tucurinca-Magdalena.

281.    On November 27, 1998, Jose/Josefina Doe 236 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 236, who was the wife of Jose/Josefina Doe 236, is the legal heir to Jose/Josefina Doe 236 and resides in the municipality of Cienaga-Magdalena.

282.    On April 20, 2003, Jose/Josefina Doe 237 was killed or went missing by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 237, who was the sister of Jose/Josefina Doe 237, is the legal heir to Jose/Josefina Doe 237 and resides in the municipality of Zona Bananera.

283.    On April 14, 2005, Jose/Josefina Doe 238 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 238, who was the wife of Jose/Josefina Doe 238, is the legal heir to Jose/Josefina Doe 238 and resides in the municipality of Zona Bananera.

284.    On May 12, 1999, Jose/Josefina Doe 239 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 239, who was the sister of Jose/Josefina Doe 239, is the legal heir to Jose/Josefina Doe 239 and resides in the municipality of Cienaga-Magdalena.

285.    On October 17, 2003, Jose/Josefina Doe 240 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 240, who was the son of Jose/Josefina Doe 240, is the legal heir to Jose/Josefina Doe 240 and resides in the municipality of Aracataca-Magdalena.

286.    On May 7, 2002, Jose/Josefina Doe 241 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 241, who was the sister of Jose/Josefina Doe 241, is the legal heir to Jose/Josefina Doe 241 and resides in the municipality of Aracataca-Magdalena.

287.    On November 15, 2002, Jose/Josefina Doe 242 was killed or went missing by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 242, who was the wife of Jose/Josefina Doe 242, is the legal heir to Jose/Josefina Doe 242 and resides in the municipality of Cienaga-Magdalena.

288.    On September 15, 2006, Jose/Josefina Doe 243 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 243, who was the sister of

Jose/Josefina Doe 243, is the legal heir to Jose/Josefina Doe 243 and resides in the municipality of Fundacion-Magdalena.

289.    On May 3, 1999, Jose/Josefina Doe 244 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 244, who was the sister of Jose/Josefina Doe 244, is the legal heir to Jose/Josefina Doe 244 and resides in the municipality of Tucurinca-Magdalena.

290.    On September 20, 2004, Jose/Josefina Doe 245 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 245 is the legal heir to Jose/Josefina Doe 245 and resides in the municipality of Aracataca-Magdalena.

291.    On May 14, 2003, Jose/Josefina Doe 246 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 246, who was the sister of Jose/Josefina Doe 246, is the legal heir to Jose/Josefina Doe 246 and resides in the municipality of Fundacion-Magdalena.

292.    On August 29, 1996, Jose/Josefina Doe 247 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 247, who was the brother of Jose/Josefina Doe 247, is the legal heir to Jose/Josefina Doe 247 and resides in the municipality of Aracataca-Magdalena.

293.    On August 20, 2004, Jose/Josefina Doe 248 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or

Banadex and the other Defendants. Plaintiff Juan/Juana Doe 248, who was the wife of Jose/Josefina Doe 248, is the legal heir to Jose/Josefina Doe 248 and resides in the municipality of Aracataca-Magdalena.

294.    On October 22, 1996, Jose/Josefina Doe 249 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 249, who was the mother of Jose/Josefina Doe 249, is the legal heir to Jose/Josefina Doe 249 and resides in the municipality of Cienaga-Magdalena.

295.    On May 6, 1999, Jose/Josefina Doe 250 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 250, who was the sister of Jose/Josefina Doe 250, is the legal heir to Jose/Josefina Doe 250 and resides in the municipality of Riosucio-Caldas.

296.    On April 8, 2005, Jose/Josefina Doe 251 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 251, who was the sister of Jose/Josefina Doe 251, is the legal heir to Jose/Josefina Doe 251 and resides in the municipality of Apartado.

297.    On March 25, 1997, Jose/Josefina Doe 252A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 252, who was the mother of Jose/Josefina Doe 252A, is the legal heir to Jose/Josefina Doe 252A and resides in the municipality of Apartado.

298.    On April 27, 1997, Jose/Josefina Doe 252B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 252, who was the mother of Jose/Josefina Doe 252B, is the legal heir to Jose/Josefina Doe 252B and resides in the municipality of Apartado.

299.    On July 15, 1997, Jose/Josefina Doe 253 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 253, who was the wife of Jose/Josefina Doe 253, is the legal heir to Jose/Josefina Doe 253 and resides in the municipality of Puerto Libertado-Cordoba.

300.    On April 18, 1998, Jose/Josefina Doe 254 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 254, who was the wife of Jose/Josefina Doe 254, is the legal heir to Jose/Josefina Doe 254 and resides in the municipality of Cienaga.

301.    On May 13, 2007, Jose/Josefina Doe 255 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 255, who was the sister of Jose/Josefina Doe 255, is the legal heir to Jose/Josefina Doe 255 and resides in the municipality of Apartado.

302.    On January 22, 1999, Jose/Josefina Doe 256 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 256, who was the wife of

Jose/Josefina Doe 256, is the legal heir to Jose/Josefina Doe 256 and resides in the municipality of Apartado-Antioquia.

303.    On April 26, 2002, Jose/Josefina Doe 257 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 257, who was the mother of Jose/Josefina Doe 257, is the legal heir to Jose/Josefina Doe 257 and resides in the municipality of Apartado.

304.    On June 2, 1997, Jose/Josefina Doe 258 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 258, who was the wife of Jose/Josefina Doe 258, is the legal heir to Jose/Josefina Doe 258 and resides in the municipality of Cienaga-Magdalena.

305.    On July 30, 1998, Jose/Josefina Doe 259 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 259, who was the wife of Jose/Josefina Doe 259, is the legal heir to Jose/Josefina Doe 259 and resides in the municipality of Cienaga-Magdalena.

306.    On October 8, 2001, Jose/Josefina Doe 260 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 260, who was the wife of Jose/Josefina Doe 260, is the legal heir to Jose/Josefina Doe 260 and resides in the municipality of Cienaga.

307.    On May 2, 1999, Jose/Josefina Doe 261 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 261, who was the son of Jose/Josefina Doe 261, is the legal heir to Jose/Josefina Doe 261 and resides in the municipality of Cienaga.

308.    On April 30, 1996, Jose/Josefina Doe 262 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 262, who was the mother of Jose/Josefina Doe 262, is the legal heir to Jose/Josefina Doe 262 and resides in the municipality of Cienaga.

309.    On May 11, 2004, Jose/Josefina Doe 263 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 263, who was the mother of Jose/Josefina Doe 263, is the legal heir to Jose/Josefina Doe 263 and resides in the municipality of Cienaga-Magdalena.

310.    On October 13, 1998, Jose/Josefina Doe 264 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 264, who was the sister of Jose/Josefina Doe 264, is the legal heir to Jose/Josefina Doe 264 and resides in the municipality of Cienaga-Magdalena.

311.    On December 2, 2002, Jose/Josefina Doe 265 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 265, who was the sister of

Jose/Josefina Doe 265, is the legal heir to Jose/Josefina Doe 265 and resides in the municipality of Cienaga-Magdalena.

312.    On May 5, 2002, Jose/Josefina Doe 266 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 266, who was the mother of Jose/Josefina Doe 266, is the legal heir to Jose/Josefina Doe 266 and resides in the municipality of Cienaga-Magdalena.

313.    On May 28, 2002, Jose/Josefina Doe 267 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 267, who was the father of Jose/Josefina Doe 267, is the legal heir to Jose/Josefina Doe 267 and resides in the municipality of Cienaga-Magdalena.

314.    On June 22, 1997, Jose/Josefina Doe 268 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 268, who was the mother of Jose/Josefina Doe 268, is the legal heir to Jose/Josefina Doe 268 and resides in the municipality of Cienaga-Magdalena.

315.    On October 20, 2001, Jose/Josefina Doe 269 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 269, who was the mother of Jose/Josefina Doe 269, is the legal heir to Jose/Josefina Doe 269 and resides in the municipality of Cienaga-Magdalena.

316.     On January 22, 2005, Jose/Josefina Doe 270 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 270, who was the brother of Jose/Josefina Doe 270, is the legal heir to Jose/Josefina Doe 270 and resides in the municipality of Cienaga-Magdalena.

317.     On August 5, 2004, Jose/Josefina Doe 271 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 271, who was the daughter of Jose/Josefina Doe 271, is the legal heir to Jose/Josefina Doe 271 and resides in the municipality of Barrio Concepcion.

318.     On October 17, 2003, Jose/Josefina Doe 272 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 272, who was the wife of Jose/Josefina Doe 272, is the legal heir to Jose/Josefina Doe 272 and resides in the municipality of Sevilla-Zona Bananera.

319.     On October 8, 2001, Jose/Josefina Doe 273 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 273, who was the sister of Jose/Josefina Doe 273, is the legal heir to Jose/Josefina Doe 273 and resides in the municipality of Cienaga-Magdalena.

320.     On May 15, 2003, Jose/Josefina Doe 274 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 274, who was the wife of

Jose/Josefina Doe 274, is the legal heir to Jose/Josefina Doe 274 and resides in the municipality of Cienaga-Magdalena.

321.    On September 9, 2004, Jose/Josefina Doe 275 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 275, who was the uncle of Jose/Josefina Doe 275, is the legal heir to Jose/Josefina Doe 275 and resides in the municipality of Sevilla-Zona Bananera.

322.    On February 21, 1997, Jose/Josefina Doe 276 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 276, who was the sister of Jose/Josefina Doe 276, is the legal heir to Jose/Josefina Doe 276 and resides in the municipality of Santa Marta-Magdalena.

323.    On August 12, 2002, Jose/Josefina Doe 277 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 277, who was the brother of Jose/Josefina Doe 277, is the legal heir to Jose/Josefina Doe 277 and resides in the municipality of Cienaga-Magdalena.

324.    On June 4, 2003, Jose/Josefina Doe 278 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 278, who was the father of Jose/Josefina Doe 278, is the legal heir to Jose/Josefina Doe 278 and resides in the municipality of Fonseca-Guajira.

325.    On January 1, 1997, Jose/Josefina Doe 279 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 279, who was the brother of Jose/Josefina Doe 279, is the legal heir to Jose/Josefina Doe 279 and resides in the municipality of Sevilla-Cienaga.

326.    On September 18, 1997, Jose/Josefina Doe 280 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 280, who was the husband of Jose/Josefina Doe 280, is the legal heir to Jose/Josefina Doe 280 and resides in the municipality of Sevilla-Zona Bananera.

327.    On August 16, 2006, Jose/Josefina Doe 281 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 281, who was the sister of Jose/Josefina Doe 281, is the legal heir to Jose/Josefina Doe 281 and resides in the municipality of Cienaga-Magdalena.

328.    On October 14, 2003, Jose/Josefina Doe 282 was killed or went missing by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 282, who was the wife of Jose/Josefina Doe 282, is the legal heir to Jose/Josefina Doe 282 and resides in the municipality of Cienaga-Magdalena.

329.    On September 20, 1998, Jose/Josefina Doe 283 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or

Banadex and the other Defendants. Plaintiff Juan/Juana Doe 283 is the legal heir to Jose/Josefina Doe 283 and resides in the municipality of Cienaga-Magdalena.

330.    On July 11, 2001, Jose/Josefina Doe 284 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 284 is the legal heir to Jose/Josefina Doe 284 and resides in the municipality of Pueblo Viejo-Magdalena.

331.    On January 15, 2005, Jose/Josefina Doe 285 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 285 is the legal heir to Jose/Josefina Doe 285 and resides in the municipality of Cienaga-Magdalena.

332.    On May 20, 2003, Jose/Josefina Doe 286 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 286, who was the mother of Jose/Josefina Doe 286, is the legal heir to Jose/Josefina Doe 286 and resides in the municipality of Pivijay-Magdalena.

333.    On April 11, 1997, Jose/Josefina Doe 287 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 287, who was the brother of Jose/Josefina Doe 287, is the legal heir to Jose/Josefina Doe 287 and resides in the municipality of Apartado.

334.    On April 21, 1999, Jose/Josefina Doe 288 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or

Banadex and the other Defendants. Plaintiff Juan/Juana Doe 288 is the legal heir to Jose/Josefina Doe 288 and resides in the municipality of Apartado-Antioquia.

335.    On August 27, 2000, Jose/Josefina Doe 289 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 289, who was the mother of Jose/Josefina Doe 289, is the legal heir to Jose/Josefina Doe 289 and resides in the municipality of Cienaga-Magdalena.

336.    On September 30, 2004, Jose/Josefina Doe 290 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 290, who was the aunt of Jose/Josefina Doe 290, is the legal heir to Jose/Josefina Doe 290 and resides in the municipality of Cienaga-Magdalena.

337.    On December 3, 2004, Jose/Josefina Doe 291 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 291, who was the wife of Jose/Josefina Doe 291, is the legal heir to Jose/Josefina Doe 291 and resides in the municipality of Cienaga-Magdalena.

338.    On June 16, 2004, Jose/Josefina Doe 292 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 292, who was the wife of Jose/Josefina Doe 292, is the legal heir to Jose/Josefina Doe 292 and resides in the municipality of Cienaga-Magdalena.

339.    On April 22, 1998, Jose/Josefina Doe 293 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 293, who was the mother of Jose/Josefina Doe 293, is the legal heir to Jose/Josefina Doe 293 and resides in the municipality of Apartado-Antioquia.

340.    On April 16, 2002, Jose/Josefina Doe 294 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 294, who was the wife of Jose/Josefina Doe 294, is the legal heir to Jose/Josefina Doe 294 and resides in the municipality of Apartado.

341.    On October 16, 2004, Jose/Josefina Doe 295 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 295, who was the mother of Jose/Josefina Doe 295, is the legal heir to Jose/Josefina Doe 295 and resides in the municipality of Supia-Caldes.

342.    On May 18, 2002, Jose/Josefina Doe 296 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 296, who was the wife of Jose/Josefina Doe 296, is the legal heir to Jose/Josefina Doe 296 and resides in the municipality of Apartado-Antioquia.

343.    On November 6, 1997, Jose/Josefina Doe 297 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 297, who was the mother of

Jose/Josefina Doe 297, is the legal heir to Jose/Josefina Doe 297 and resides in the municipality of Apartado.

344.    On October 21, 1996, Jose/Josefina Doe 298 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 298, who was the father of Jose/Josefina Doe 298, is the legal heir to Jose/Josefina Doe 298 and resides in the municipality of Apartado-Antioquia.

345.    On March 9, 2000, Jose/Josefina Doe 299 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 299, who was the mother of Jose/Josefina Doe 299, is the legal heir to Jose/Josefina Doe 299 and resides in the municipality of Apartado-Antioquia.

346.    On January 7, 1999, Jose/Josefina Doe 300 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 300, who was the wife of Jose/Josefina Doe 300, is the legal heir to Jose/Josefina Doe 300 and resides in the municipality of Apartado-Antioquia.

347.    On February 19, 2003, Jose/Josefina Doe 301 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 301, who was the mother of Jose/Josefina Doe 301, is the legal heir to Jose/Josefina Doe 301 and resides in the municipality of Cienaga-Magdalena.

348.    On October 1, 1996, Jose/Josefina Doe 302A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 302, who was the daughter of Jose/Josefina Doe 302A, is the legal heir to Jose/Josefina Doe 302A and resides in the municipality of Turbo-Antioquia.

349.    On October 1, 1996, Jose/Josefina Doe 302B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 302, who was the daughter of Jose/Josefina Doe 302B, is the legal heir to Jose/Josefina Doe 302B and resides in the municipality of Turbo-Antioquia.

350.    On July 5, 2001, Jose/Josefina Doe 303 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 303, who was the mother of Jose/Josefina Doe 303, is the legal heir to Jose/Josefina Doe 303 and resides in the municipality of Apartado.

351.    On July 16, 2004, Jose/Josefina Doe 304 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 304, who was the mother of Jose/Josefina Doe 304, is the legal heir to Jose/Josefina Doe 304 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

352.    On August 1, 2005, Jose/Josefina Doe 305 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 305, who was the mother of

Jose/Josefina Doe 305, is the legal heir to Jose/Josefina Doe 305 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

353.    On June 14, 2004, Jose/Josefina Doe 306 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 306, who was the mother of Jose/Josefina Doe 306, is the legal heir to Jose/Josefina Doe 306 and resides in the municipality of Sucre.

354.    On October 4, 2007, Jose/Josefina Doe 307 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 307, who was the wife of Jose/Josefina Doe 307, is the legal heir to Jose/Josefina Doe 307 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

355.    On December 29, 2001, Jose/Josefina Doe 308 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 308, who was the wife of Jose/Josefina Doe 308, is the legal heir to Jose/Josefina Doe 308 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

356.    On August 5, 2004, Jose/Josefina Doe 309 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 309, who was the sister of Jose/Josefina Doe 309, is the legal heir to Jose/Josefina Doe 309 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

357.    On February 13, 2005, Jose/Josefina Doe 310 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 310, who was the father of Jose/Josefina Doe 310, is the legal heir to Jose/Josefina Doe 310 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

358.    On June 24, 2007, Jose/Josefina Doe 311 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 311, who was the mother of Jose/Josefina Doe 311, is the legal heir to Jose/Josefina Doe 311 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

359.    On May 4, 1997, Jose/Josefina Doe 312 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 312, who was the mother of Jose/Josefina Doe 312, is the legal heir to Jose/Josefina Doe 312 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

360.    On February 12, 2007, Jose/Josefina Doe 313 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 313, who was the wife of Jose/Josefina Doe 313, is the legal heir to Jose/Josefina Doe 313 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

361.    On May 18, 2003, Jose/Josefina Doe 314 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 314, who was the mother of

Jose/Josefina Doe 314, is the legal heir to Jose/Josefina Doe 314 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

362.    On October 19, 2002, Jose/Josefina Doe 315 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 315, who was the mother of Jose/Josefina Doe 315, is the legal heir to Jose/Josefina Doe 315 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

363.    On November 4, 2006, Jose/Josefina Doe 316 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 316, who was the mother of Jose/Josefina Doe 316, is the legal heir to Jose/Josefina Doe 316 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

364.    On July 3, 2000, Jose/Josefina Doe 317 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 317, who was the wife of Jose/Josefina Doe 317, is the legal heir to Jose/Josefina Doe 317 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

365.    On December 31, 1999, Jose/Josefina Doe 318 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 318, who was the wife of Jose/Josefina Doe 318, is the legal heir to Jose/Josefina Doe 318 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

366.     On November 4, 2005, Jose/Josefina Doe 319 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 319, who was the wife of Jose/Josefina Doe 319, is the legal heir to Jose/Josefina Doe 319 and resides in the municipality of Monteria-Cordoba.

367.     On August 13, 2007, Jose/Josefina Doe 320 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 320 is the legal heir to Jose/Josefina Doe 320 and resides in the municipality of Sucre.

368.     On January 10, 1999, Jose/Josefina Doe 321A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juan Doe 321 is the legal heir to Jose/Josefina Doe 321A and resides in the municipality of Toluviejo-Sucre.

369.     On August 25, 2000, Jose/Josefina Doe 321B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 321 is the legal heir to Jose/Josefina Doe 321B and resides in the municipality of Toluviejo-Sucre.

370.     On August 25, 2000 Jose/Josefina Doe 321C was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 321 is the legal heir to Jose/Josefina Doe 321C and resides in the municipality of Toluviejo-Sucre.

371.     On May 9, 2000, Jose/Josefina Doe 322 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and

the other Defendants. Plaintiff Juan/Juana Doe 322 is the legal heir to Jose/Josefina Doe 322 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

372.    On August 22, 1997, Jose/Josefina Doe 323 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 323, who was the wife of Jose/Josefina Doe 323, is the legal heir to Jose/Josefina Doe 323 and resides in the municipality of Ovejas-Sucre.

373.    On August 9, 2004, Jose/Josefina Doe 324 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 324, who was the daughter of Jose/Josefina Doe 324, is the legal heir to Jose/Josefina Doe 324 and resides in the municipality of Monteria-Cordoba.

374.    On January 15, 2007, Jose/Josefina Doe 325 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 325, who was the wife of Jose/Josefina Doe 325, is the legal heir to Jose/Josefina Doe 325 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

375.    On April 21, 2006, Jose/Josefina Doe 326 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 326 is the legal heir to Jose/Josefina Doe 326 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

376.    On February 28, 1999, Jose/Josefina Doe 327 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or

Banadex and the other Defendants. Plaintiff Juan/Juana Doe 327, who was the wife of Jose/Josefina Doe 327, is the legal heir to Jose/Josefina Doe 327 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

377.    On December 19, 2003, Jose/Josefina Doe 328 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 328, who was the mother of Jose/Josefina Doe 328, is the legal heir to Jose/Josefina Doe 328 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

378.    On September 17, 1993, Jose/Josefina Doe 329 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 329, who was the wife of Jose/Josefina Doe 329, is the legal heir to Jose/Josefina Doe 329 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

379.    On November 1, 1996, Jose/Josefina Doe 330 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 330, who was the wife of Jose/Josefina Doe 330, is the legal heir to Jose/Josefina Doe 330 and resides in the municipality of Ovejas-Sucre.

380.    On August 23, 2000, Jose/Josefina Doe 331 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 331 is the legal heir to Jose/Josefina Doe 331 and resides in the municipality of Toluviejo-Sucre.

381.    On November 16, 2005, Jose/Josefina Doe 332 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 332 is the legal heir to Jose/Josefina Doe 332 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

382.    On February 1, 1995, Jose/Josefina Doe 333 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 333 is the legal heir to Jose/Josefina Doe 333 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

383.    On June 3, 1994, Jose/Josefina Doe 334 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 334, who was the wife of Jose/Josefina Doe 334, is the legal heir to Jose/Josefina Doe 334 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

384.    On January 24, 2006, Jose/Josefina Doe 335 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 335, who was the wife of Jose/Josefina Doe 335, is the legal heir to Jose/Josefina Doe 335 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

385.    On November 12, 2001, Jose/Josefina Doe 336 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 336 is the legal heir to Jose/Josefina Doe 336 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

386.    On November 20, 2005, Jose/Josefina Doe 337 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 337, who was the wife of Jose/Josefina Doe 337, is the legal heir to Jose/Josefina Doe 337 and resides in the municipality of Sincelejo-Sucre.

387.    On February 27, 1997, Jose/Josefina Doe 338 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 338, who was the daughter of Jose/Josefina Doe 338, is the legal heir to Jose/Josefina Doe 338 and resides in the municipality of Ovejas-Sucre.

388.    On July 3, 2000, Jose/Josefina Doe 339 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 339, who was the brother of Jose/Josefina Doe 339, is the legal heir to Jose/Josefina Doe 339 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

389.    On October 13, 2002, Jose/Josefina Doe 340 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 340, who was the sister of Jose/Josefina Doe 340, is the legal heir to Jose/Josefina Doe 340 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

390.    On September 18, 1999, Jose/Josefina Doe 341 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 341, who was the mother of

Jose/Josefina Doe 341, is the legal heir to Jose/Josefina Doe 341 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

391.    On September 24, 2000, Jose/Josefina Doe 342 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 342, who was the father of Jose/Josefina Doe 342, is the legal heir to Jose/Josefina Doe 342 and resides in the municipality of El Coley-Sucre.

392.    On September 18, 2006, Juan/Juana Doe 343 was shot and severely injured by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 343 resides in the municipality of Corozal-Sucre-Sucre-Sucre.

393.    On November 9, 2003, Jose/Josefina Doe 344 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 344, who was the mother of Jose/Josefina Doe 344, is the legal heir to Jose/Josefina Doe 344 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

394.    On September 7, 2005, Jose/Josefina Doe 345 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 345, who was the wife of Jose/Josefina Doe 345, is the legal heir to Jose/Josefina Doe 345 and resides in the municipality of Ovejas-Sucre.

395.    On July 4, 2001, Jose/Josefina Doe 346 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and

the other Defendants. Plaintiff Juan/Juana Doe 346, who was the father of Jose/Josefina Doe 346, is the legal heir to Jose/Josefina Doe 346 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

396.    On November 29, 2003, Jose/Josefina Doe 347 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 347, who was the wife of Jose/Josefina Doe 347, is the legal heir to Jose/Josefina Doe 347 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

397.    On August 3, 1999, Jose/Josefina Doe 348 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 348, who was the mother of Jose/Josefina Doe 348, is the legal heir to Jose/Josefina Doe 348 and resides in the municipality of San Onofre-Sucre.

398.    On October 7, 2002, Jose/Josefina Doe 349 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 349, who was the wife of Jose/Josefina Doe 349, is the legal heir to Jose/Josefina Doe 349 and resides in the municipality of San Pedro-Sucre.

399.    On October 3, 2002, Jose/Josefina Doe 350 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 350, who was the sister of Jose/Josefina Doe 350, is the legal heir to Jose/Josefina Doe 350 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

400.    On May 4, 1997, Jose/Josefina Doe 351 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 351, who was the mother of Jose/Josefina Doe 351, is the legal heir to Jose/Josefina Doe 351 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

401.    On July 28, 1994, Jose/Josefina Doe 352 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 352 is the legal heir to Jose/Josefina Doe 352 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

402.    On June 18, 2004, Jose/Josefina Doe 353 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 353, who was the mother of Jose/Josefina Doe 353, is the legal heir to Jose/Josefina Doe 353 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

403.    On December 29, 2000, Jose/Josefina Doe 354 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 354, who was the brother-in-law of Jose/Josefina Doe 354, is the legal heir to Jose/Josefina Doe 354 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

404.    On September 17, 1998, Jose/Josefina Doe 355 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 355, who was the wife of

Jose/Josefina Doe 355, is the legal heir to Jose/Josefina Doe 355 and resides in the municipality of San Jose de Pileta-Sucre.

405.    On May 26, 1999, Juan/Juana Doe 356 was shot and severely injured by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 356 resides in the municipality of Corozal-Sucre-Sucre-Sucre.

406.    On April 25, 1992, Jose/Josefina Doe 357 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 357, who was the wife of Jose/Josefina Doe 357, is the legal heir to Jose/Josefina Doe 357 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

407.    On January 8, 2002, Jose/Josefina Doe 358 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 358, who was the sister of Jose/Josefina Doe 358, is the legal heir to Jose/Josefina Doe 358 and resides in the municipality of Ovejas-Sucre.

408.    On April 16, 2005, Jose/Josefina Doe 359 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 359, who was the father of Jose/Josefina Doe 359, is the legal heir to Jose/Josefina Doe 359 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

409.    On August 20, 2001, Jose/Josefina Doe 360 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or

Banadex and the other Defendants. Plaintiff Juan/Juana Doe 360, who was the father of Jose/Josefina Doe 360, is the legal heir to Jose/Josefina Doe 360 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

410.    On August 10, 2004, Jose/Josefina Doe 361 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 361, who was the mother of Jose/Josefina Doe 361, is the legal heir to Jose/Josefina Doe 361 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

411.    On November 7, 2002, Jose/Josefina Doe 362 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 362, who was the wife of Jose/Josefina Doe 362, is the legal heir to Jose/Josefina Doe 362 and resides in the municipality of Sincelejo-Sucre.

412.    On May 25, 2000, Jose/Josefina Doe 363 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 363 is the legal heir to Jose/Josefina Doe 363 and resides in the municipality of Sincelejo-Sucre.

413.    On June 8, 1995, Jose/Josefina Doe 364 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 364, who was the wife of Jose/Josefina Doe 364, is the legal heir to Jose/Josefina Doe 364 and resides in the municipality of San Juan de Betulia-Sucre.

414.    On February 15, 1997, Jose/Josefina Doe 365 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 365, who was the wife of Jose/Josefina Doe 365, is the legal heir to Jose/Josefina Doe 365 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

415.    On February 15, 1997, Jose/Josefina Doe 366 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 366, who was the wife of Jose/Josefina Doe 366, is the legal heir to Jose/Josefina Doe 366 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

416.    On October 27, 2006, Jose/Josefina Doe 367 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 367, who was the mother of Jose/Josefina Doe 367, is the legal heir to Jose/Josefina Doe 367 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

417.    On August 17, 1990, Jose/Josefina Doe 368 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 368 is the legal heir to Jose/Josefina Doe 368 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

418.    On November 9, 2003, Jose/Josefina Doe 369 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 369, who was the mother of

Jose/Josefina Doe 369, is the legal heir to Jose/Josefina Doe 369 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

419.    On August 27, 2000, Jose/Josefina Doe 370 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 370, who was the brother of Jose/Josefina Doe 370, is the legal heir to Jose/Josefina Doe 370 and resides in the municipality of San Juan de Betulia-Sucre.

420.    On May 29, 1995, Jose/Josefina Doe 371 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 371, who was the mother of Jose/Josefina Doe 371, is the legal heir to Jose/Josefina Doe 371 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

421.    On April 26, 2001, Jose/Josefina Doe 372 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 372, who was the son of Jose/Josefina Doe 372, is the legal heir to Jose/Josefina Doe 372 and resides in the municipality of Apartado-Antioquia.

422.    On March 31, 2000, Jose/Josefina Doe 373 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 373, who was the wife of Jose/Josefina Doe 373, is the legal heir to Jose/Josefina Doe 373 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

423.    On May 1, 1998, Jose/Josefina Doe 374 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 374, who was the wife of Jose/Josefina Doe 374, is the legal heir to Jose/Josefina Doe 374 and resides in the municipality of Apartado-Antioquia.

424.    On March 16, 1997, Jose/Josefina Doe 375 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants.  Plaintiff Juan/Juana Doe 375, who was the sister-in-law of Jose/Josefina Doe 375, is the legal heir to Jose/Josefina Doe 375 and resides in the municipality of Apartado-Antioquia.

425.    On September 20, 2002, Juan/Juana Doe 376 was shot and severely injured by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants.  Plaintiff Juan/Juana Doe 377 is the spouse of Plaintiff Juan/Juana 376.  Plaintiff Juan/Juana Doe 377 claims loss of services of Plaintiff Juan/Juana Doe 376.  They reside in the municipality of Santaurio-Antioquia.

<u>The Colombian Conflict/Civil War</u>

426.    Heretofore and at the time of the occurrences herein, there existed a state of armed conflict and civil war in Colombia.

427.    At the time of the occurrences herein, there were three main sets of actors in Colombia's longstanding conflict: leftist guerrilla groups, right-wing paramilitary groups, and government security forces.

428.    The most significant leftist guerilla group was, and is, the Revolutionary Armed Forces of Colombia (FARC).

429.    In 2004, the FARC was estimated to have about 18,000 members in almost 70 fronts, organized in regional "blocs," plus mobile columns and urban militias. The group controlled and/or or operated freely in 40 to 60 percent of the country, usually sparsely populated areas, rural zones, jungles and plains, and rarely in significant population centers.

430.    While it received limited assistance from the Soviet bloc during the Cold War, the FARC financed itself through kidnapping for ransom, extortion, and involvement in Colombia's drug trade.

431.    The FARC grew rapidly during the 1990s, and dealt the Colombian military several humiliating defeats in 1996-1998.

<u>The AUC</u>

432.    The Autodefensas Unidas de Colombia ("AUC') is a right wing paramilitary organization in Colombia.

433.    Heretofore and at the time of the occurrences herein, The AUC's operations, included terrorism, massacres, extra-judicial killings, murders, disappearances forced displacements, threats and intimidation.

434.    The AUC financed itself from a variety of sources, including but not limited to the drug trade, and by monetary payments from American corporations such as CHIQUITA, as more fully set forth below.

435.    The AUC was founded by Carlos Castano Gil, and is the successor to the "ACCU", the Peasant Self-Defense Group of Cordoba and Uraba.

436.    In 1994, Castano and the ACCU sponsored a summit of the Self-Defense Groups of Colombia, bringing together regional paramilitaries from across the country. This summit led to the formation of the AUC, a national federation uniting Colombia's regional paramilitaries under Castano's leadership.

437.    In 1997, the AUC comprised roughly 4,000 combatants.  By 2001, Castano claimed to have 11,000 members, though government estimates put the number somewhere between 8,000 and 9,000.  By 2002, AUC forces were present in nearly the whole of Colombia.  AUC leaders have claimed that the organization comprised as many as 17,000 armed fighters and 10,000 associates at its peak before a demobilization process that began in 2004.

438.    Carlos Castano was allegedly murdered in April 2004. Subsquently, the most publicly recognized leader of the AUC was Salvatore Mancuso. A former Córdoba rancher, Mancuso became the "Maximum Comandante" of the AUC and chief negotiator in Santa Fe de Ralito.

439.    Run by AUC military leader Salvatore Mancuso, the Northern Bloc of the AUC incorporated Carlos Castaño's original ACCU, controlling municipalities in a swath of territory stretching from the Panamanian to the Venezuelan borders. Mancuso's deputy in the Caribbean coast was Rodrigo Tovar Pupo, more commonly known as Jorge 40, whom authorities believe controlled much of Colombia's Caribbean drug routes. Vicente Castaño, Carlos and Fidel's brother, is a third powerful player - and he is widely believed to have played a role in Carlos' death. The Northern Bloc demobilized in March of 2006. Vicente Castaño is a fugitive from justice.

440.    Led by José Alfredo "El Alemán" Berrío, the Elmer Cardenas Bloc of

the AUC was originally part of the ACCU, which through a wave of brutality and
massacres gained control of the strategic Urabá region near the Colombian-Panamanian
border during the 1990s. Substantial evidence suggests that Berrío and the Élmer
Cárdenas Bloc are very strong in drug trafficking.

441.    Other blocs of the AUC existed and/or continue to exist including, but not
limited to, the Catatumbo Bloc, the Madgdalena Medio Bloc, the Central Bolivar Bloc,
the Mineros Bloc, the Calima Bloc, and others.

442.    The activities of the AUC were directed toward elimination of anyone
considered close to the guerillas or who opposed or complicated the paramilitaries'
control of territory or population in the area in which they exerted their power.

443.    The AUC's primary method was terrorism against individuals or
communities.  To this end, the AUC routinely engaged in death threats, extrajudicial
killings, massacres, torture, rape, kidnapping, forced disappearances, and looting.  The
AUC periodically engaged in direct combat with armed guerilla forces, but the vast
majority of its victims were civilians targeted by a policy of political and social
cleansing,- typically rural workers, trade unionists, community activists, human rights
defenders, leftist politicians, judicial investigators and inhabitants of small towns in
contested rural areas.

444.    AUC violence has often caused entire communities to disperse, either due
to threats of an impending massacre or in the wake of such massacres and the looting and
destruction that commonly accompanied them.

445.    The AUC and its constituent groups, including the ACCU, have, at least
since 1994, been participating in an internal armed conflict in Colombia, at times

engaging in direct conflict with guerilla armies.  The AUC itself has accepted that it is subject to the laws of war, with the limited exception that it believes it has the privilege to execute guerillas hors de combat, and has accepted training in the laws of war from the International Committee of the Red Cross.

Ties Between the AUC and the Colombian Government

446.    The Colombian security forces tolerated and collaborated with the AUC in committing massacres, extra-judicial killings, murders, disappearances, forced displacements, threats and intimidation, including but not limited to the deaths and injuries of the plaintiff sued for herein.

447.    The Colombian security forces regarded the AUC as de facto allies in the civil war against leftist guerillas.

448.    High officials in the Colombian government collaborated with and directed the operations of the AUC including massacres, extra-judicial killings, murders, disappearances forced displacements, threats and intimidation.

449.    High officials in the Colombian civilian government and the Colombian military, collaborated with and orchestrated massacres, extra-judicial killings, murders, disappearances forced displacements, threats and intimidation against persons including the plaintiffs' decedents. To date, Colombian authorities have charged at least 14 members of Colombia's Congress, seven former lawmakers, the head of the secret police, mayors and former governors with illegally collaborating with paramilitaries.  According to testimony of Salvatore Mancuso, two current ministers in the present Uribe government, Vice President Francisco Santos, and Defense Minister Juan Manuel Santos, met and collaborated with paramilitaries.

450.    Senior officers in the Colombian military, including but not limited to former Military Forces Commanders Major General Manuel Bonett, and General Harold Bedoya, Vice Admiral Rodrigo Quinones, Gen. Jaime Uscategui; Gen. Rito Alejo Del, General Mario Montoya, Colonel Danilo Gonzalez, Major Walter Fratinni and Defense Minister Juan Manuel Santos, collaborated with, facilitated, aided and abetted the AUC in the commission of various massacres, extrajudicial killings and other atrocities against civilians, including the plaintiffs, and or gave tacit support to and acquiescence in their activities.

451.    General Montoya was linked to Diego Murillo, the former leader of an AUC affiliated paramilitary group in Medellin.

452.    The presence in the military of high ranking staff officers known to have close ties to the AUC and other paramilitaries was widely regarded within the army as tolerance for the paramilitaries.

453.    In July 1997, approximately 200 AUC paramilitaries from the Uraba region murdered at least 30 civilians in Mapiripan, Colombia with the active assistance of the Columbian military. The paramilitaries arrived by chartered plane at San Jose Del Guaviare airport and were not subjected to identification or cargo checks by airport police. During their 5 day stay in the town, the commander of a nearby military base, Major Hernan Orozco, then acting commander of the Joaquin Paris Battalion and Brig. General. Jaime Humerto Uscategui, Commander of the parent unit 7th Brigade, and other officials, including the Mayor, knowingly failed to respond to the massacre, indicating their complicity.

454.    AUC paramilitaries provided assistance to the military during large scale operations against guerilla strongholds.

455.    The AUC carried out selective assassinations, and massacres of suspected leftist sympathizers.

456.    The political goal of the AUC was to drive the FARC out of Uraba, Santa Marta and other regions of Colombia.

457.    The AUC was the de facto government of Uraba, Santa Marta and other regions of Colombia.

458.    In 2001, a ship unloaded 3400 AK47 rifles and 4 million rounds of ammunition in a Banadex controlled dock in Colombia destined for the AUC.

459.    According to Mario Iguaran, Colombia's attorney general, there was a criminal relationship between CHIQUITA and the AUC in which CHIQUITA supplied money and arms to the AUC in return for the bloody pacification of Uraba.

460.    The Colombian state was a participant in illegal payments by CHIQUITA to the AUC through a program known as Convivir, a network of private security cooperatives licensed by the government to patrol rural areas and gather intelligence under the direction of military commanders.

461.    The Colombian government authorized the formation of Convivirs in November 1995 to aid the military in counterinsurgency operations by empowering civilians to gather information about guerilla activities in rural areas and pass it on to local commanders.  The official name of these organizations was Rural Cooperatives of Vigilance and Security.

462.    Colombian president Alvaro Uribe was one of the program's key sponsors while governor of Uraba in the mid 1990s, which support has contined while he has been president.

463.    CHIQUITA channeled AUC payments through intermediaries from various convivir groups in Uraba; the fact that the company chanelled illegal payments through the ledgers of the state-backed security network indicates that the AUC, the convivir, the Colombian government and CHIQUITA were acting in concert.

464.    The Convivir were and are directly linked to some of the most brutal massacres in the Uraba region, including the deaths of the plaintiffs' decedents.

465.    The Colombian government, through ministry of defense officials authorized illegal arms sales to convivirs with links to the AUC and other paramilitaries , including a wide range of weapons legally restricted for exclusive use by the armed forces, including submachine guns, 9mm pistols, mini-Uzis, rifles and munitions.

466.    The Ministry of Defense was providing a legal cover for the paramiltiaries.

467.    According to the United States Drug Enforcement Agency (DEA), Carlos Castaño was connected to some of the world's richest drug dealers.  Castano has openly admitted that drug trafficking finances 70 percent of his operation.  He often boasts of his strategy, "quitarle agua al pez", or draining the sea to catch the fish (killing the innocent to catch the guerillas). When asked why he slaughters peasants, women and children, he replies, "Well, I can't wait for the guerillas to put on their uniforms before I kill them. When we take out [a sympathizer] we save many who would've been killed in the future."  Robin Kirk, author of "War with Colombia and International Law," claims

that the death squads make their massacres as brutal and gruesome as possible to make sure their message is understood.

468.    On a Friday in July 2000, in the village of El Salado, some 300 paramilitaries arrived and went straight to the makeshift basketball court which doubles as the main square there, announced themselves as members of the AUC, and with a list of names began "summoning people for judgment." A table and chairs were seized from a house, and after the death squad leader had made himself comfortable, the basketball court was turned into a court of execution. The paramilitary troops ordered up liquor and music, and then embarked on a rampage of torture, rape and killing.  By the time they left, they had killed at least 36 people whom they accused of collaborating with the enemy. The victims ranged from a six-year-old girl to an elderly woman.  As music blared, some of the victims were shot after being tortured; others were stabbed or beaten to death, and several more were strangled.  Yet during the three days of killing, military and police units just a few miles away made no effort to stop the slaughter. At one point the paramilitaries had a helicopter flown in to rescue a fighter who had been injured trying to drag some victims from their home. Instead of fighting back, the armed forces set up a roadblock on the road to the village shortly after the rampage began and prevented human rights and relief groups from entering and rescuing residents," (NYT News Service, July 2000).

469.    According to the 2000 State Department report on Human Rights, "High-ranking government security forces committed serious abuses, including extra judicial killings, but were rarely brought to justice."

470.    The US Army School of the Americas (SOA), now renamed the

Western Hemisphere Institute for Security Cooperation (WHISC), has an extensively documented history of training some of the hemisphere's worst human rights abusers. It acquired its nickname the "School of Assassins" for obvious reasons. SOA graduates are currently involved in the dirty war now being waged in Colombia with US support. The school is now drawing more of its students from Colombia than from any other country, over 10,000 to so far.

471.    In 2000, Human Rights Watch released a report linking SOA graduates to the formation and operation of Colombian paramilitary death squads. These groups are notorious for horrific atrocities including rape, torture, chainsaw massacres, other types of terrifying massacres, and assassinations. Among those graduates cited for involvement with paramilitary groups were: Maj. David Hernandez Rojas, cited for the 1999 murder of peace commissioner Alex Lopera, and who was working with the ACCU; Maj. Jesus Maria Clavijo and Maj. Alvaro Cortes Morillo, linked in 1999 to paramilitary groups through cell phone and beeper communications as well as regular meetings on military bases; Gen. Carlos Ospina Ovalle, former commander of the Fourth Brigade cited with "extensive evidence of pervasive ties" to paramilitary groups involved in human rights atrocities in 1999; Brigadier General Jaime Alban, who commands the Third Brigade of the Colombian military, the brigade responsible for setting up a paramilitary death squad known as the "Calima Front" in 1999.  A 2001 Human Rights Watch report states that "the Calima Front and the Third Brigade are the same thing. The Third Brigade provided the Calima Front with weapons and intelligence."  The report also notes that, "Half of Colombia's eighteen brigade-level army units have documented links to paramilitary activity.

472.    Longstanding and pervasive ties exist between the AUC and official

Colombian security forces, which include the Colombian Armed Forces and the

Colombian National Police.  Collusion with government forces has been a feature of

Colombian paramilitaries since their inception.  In the 1980's, paramilitaries were

partially organized and armed by the Colombian military and participated in campaigns

of the official armed forces against guerilla insurgents.  Paramilitary forces included

active-duty and retired army and police personnel among their members.  Although a

1989 government decree established criminal penalties for providing assistance to

paramilitaries, the continued existence of military/paramilitary ties has been documented

by Colombian non-governmental organizations, international human rights groups, the

U.S. State Department, the Office of the U.N. High Commissioner for Human Rights,

and the Colombian Attorney General 's office.  Cooperation with paramilitaries has been

demonstrated in half of Colombia's eighteen brigade –level Army units, spread across all

of the Army's regional divisions.  Such cooperation is so pervasive that the paramilitaries

are referred to by many in Colombian as the "Sixth Division," in addition to the five

official divisions of the Colombian Army.

473.    Government securities forces have habitually tolerated the presence of

paramilitaries and have willfully failed to prevent or interrupt their crimes, actively

conspired with them and coordinated activities with them.  Documented examples

include: Allowing paramilitaries to establish permanent bases and checkpoints without

interference; Failing to carry out arrest warrants for paramilitary leaders, who move about

the country freely; withdrawing security forces from villages deemed sympathetic to

guerillas, leaving them vulnerable to attack by paramilitaries; failing to intervene to stop

ongoing massacres occurring over a period of days; sharing intelligence, including the names of suspect guerilla collaborators; sharing vehicles, including army trucks used to transport paramilitary fighters; supplying weapons and munitions; allowing passage through roadblocks; providing support with helicopters and medical aid; communicating via radio, cellular telephones, and beepers; sharing members, including active-duty soldiers serving in paramilitary units and paramilitary commanders lodging on military bases; and planning and carrying out joint operations.

474.     In a recurring pattern, paramilitaries have taken over villages and assaulted inhabitants while nearby security forces have either failed to intervene or have intervened to facilitate the violence.  In October 1997, for example, members of the Army's Fourth Brigade reportedly established a perimeter around the village of El Aro, in Antioquia.  While the Army prevented entry and escape, members of the AUC entered the village and over a period of five days executed at least eleven people, burned most of the houses, looted stores, and destroyed pipes that fed the homes potable water.  Upon leaving the village, the paramilitaries forcibly disappeared over thirty more people and compelled most of the residents to flee.  In January 2001, more than one hundred AUC fighters took over the village of Chengue, in Sucre.  The AUC executed twenty-five people before setting fire to the village and forcibly disappearing ten additional villagers. Troops from the First Marine Infantry Unit positioned outside the village allegedly prevented humanitarian organizations from entering the area to aid survivors.

475.     According to testimony of Salvatore Mancuso given on May15-17, 2007, paramilitarism was State Policy in the Republic of Colombia.

CHIQUITA's Ties to the AUC and its Conspiracy and Aiding and Abetting of the
Murders/Disappearances/Tortures of Plaintiffs' Decedents and/or Plaintiff(s)

476.    Plaintiffs hereby incorporate by reference and specifically allege all of the allegations of the Factual Proffer filed March 19, 2007 in a criminal case entitled "United States of America v. Chiquita Brands International, Inc.," Criminal No. 07-055 in the United States District Court for the District of Columbia, as follows:

477.    Defendant CHIQUITA BRANDS INTERNATIONAL, INC. ("CHIQUITA"), was a multinational corporation, incorporated in New Jersey and headquartered in Cincinnati, Ohio. Defendant CHIQUITA engaged in the business of producing, marketing, and distributing bananas and other fresh produce. Defendant CHIQUITA was one of the largest banana producers in the world and a major supplier of bananas throughout Europe and North America, including within the District of Columbia. Defendant CHIQUITA reported over $2.6 billion in revenue for calendar year 2003. Defendant CHIQUITA had operations throughout the world, including the Republic of Colombia.

478.    C.I. Bananos de Exportación, S.A. (also known as and referred to hereinafter as "Banadex"), was defendant CHIQUITA's wholly-owned Colombian subsidiary. Banadex produced bananas in the Urabá and Santa Marta regions of Columbia. By 2003, Banadex was defendant CHIQUITA's most profitable banana-producing operation. In June 2004, defendant CHIQUITA sold Banadex.

479.    The United Self-Defense Forces of Colombia – an English translation of the Spanish name of the group, "Autodefensas Unidas de Colombia" (commonly known as and referred to hereinafter as the "AUC"), was a violent, right-wing organization in the Republic of Colombia. The AUC was formed in or about April 1997 to organize loosely-affiliated illegal paramilitary groups that had emerged in Colombia to retalitate against

left-wing guerillas fighting the Colombian government.  The AUC's activities varied from assassinating suspected guerilla supporters to engaging guerrilla combat units.  The AUC also engaged in other illegal activities, including the kidnapping and murder of civilians.

480.    Pursuant to Title 8, United States Code, Section 1189, the Secretary of State of the United States had the authority to designate a foreign organization as a Foreign Terrorist Organization ("FTO") if the organization engaged in terrorist activity threatening the national security of the United States.

481.    The Secretary of State of the United States designated the AUC as an FTO, initially on September 10, 2001, and again on September 10, 2003.  As a result of the FTO designation, since September 10, 2001, it has been a crime for any United States person, among other things, to knowingly provide material support and resources, including currency and monetary instruments, to the AUC.

482.    The International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et seq.,* conferred upon the President of the United States the authority to deal with threats to the national security, foreign policy and economy of the United States.  On September 23, 2001, pursuant to this authority, President George W. Bush issued Executive Order 13224.  This Executive Order prohibited, among other things, any United States person from engaging in transactions with any foreign organization or individual determined by the Secretary of State of the United States, in consultation with the Secretary of the Treasury of the United States and the Attorney General of the United States, to have committed, or posed a significant risk of committing, acts of terrorism that threaten the security of United States nationals or the national security, foreign policy or economy of

the United States (referred to hereinafter as a "Specially-Designated Global Terrorist" or "SDGT").  This prohibition included the making of any contribution of funds to or for the benefit of an SDGT, without having first obtained a license or other authorization from the United States government.

483.    The Secretary of the Treasury promulgated the Global Terrorism Sanctions Regulations, 31 C.F.R. § 594.201, *et seq.,* implementing the sanctions imposed by Executive Order 13224.  The United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), located in the District of Colombia, was the entity empowered to authorize transactions with an SDGT.  Such authorization, if granted, would have been in the form of a license.

484.    Pursuant to Executive Order 13224, the Secretary of State of the United States, in consultation with the Secretary of the Treasury of the United States and the Attorney General of the United States, designated the AUC as a Specially-Designated Global Terrorist on October 31, 2001.  As a result of the SDGT designation, since October 31, 2001, it has been a crime for any United States person, among other things, willfully to engage in transactions with the AUC, without having first obtained a license or other authorization from OFAC.

485.    Individual A was a high-ranking officer of defendant CHIQUITA.

486.    Individual B was a member of the Board of Directors of defendant CHIQUITA ("Board").

487.    Individual C was a high-ranking officer of defendant CHIQUITA.

488.    Individual D was a high-ranking officer of defendant CHIQUITA.

489.    Individual E was a high-ranking officer of defendant CHIQUITA.

490.    Individual F was a high-ranking officer of Banadex.

491.    Individual G was an employee of Banadex.

492.    Individual H was an employee of defendant CHIQUITA.

493.    Individual I was an employee of defendant CHIQUITA.

494.    Individual J was a high-ranking officer of defendant CHIQUITA.

495.    For over six years – from in or about 1997 through on or about February 4, 2004 – defendant CHIQUITA, through Banadex, paid money to the AUC in the two regions of Colombia where it had banana-producing operations: Urabá and Santa Marta. Defendant CHIQUITA paid the AUC, directly or indirectly, nearly every month. From in or about 1997 through on or about February 4, 2004, defendant CHIQUITA made over 100 payments to the AUC totaling over $1.7 million.

496.    Defendant CHIQUITA had previously paid money to other terrorist organizations operating in Colombia, namely to the following violent, left-wing terrorist organizations:  Revolutionary Armed Forces of Colombia – an English translation of the Spanish name of the group "Fuerzas Armadas Revolucionarias de Colombia" (commonly known as and referred to hereinafter as "the FARC"); and the National Liberation Army – an English translation of the Spanish name of the group "Ejército de Liberación Nacional" (commonly known as and referred to hereinafter as "the ELN").  Defendant CHIQUITA made these earlier payments from in or about 1989 through in or about 1997, when the FARC and the ELN controlled areas where defendant CHIQUITA had its banana-producing operations.   The FARC and the ELN were designated as FTOs in October 1997.

497.    Defendant CHIQUITA began paying the AUC in Urabá following a meeting in or about 1997 between the then-leader of the AUC, Carlos Castaño, and Banadex's then-General Manager.  At the meeting Castaño informed the General Manager that the AUC was about to drive the FARC out of Urabá.  Castaño also instructed the General Manager that defendant CHIQUITA's subsidiary had to make payments to an intermediary known as a "convivir." Castaño sent an unspoken but clear message that failure to make the payments could result in physical harm to Banadex personnel and property.  Convivirs were private security companies licensed by the Colombian government to assist the local police and military in providing security.  The AUC, however, used certain convivirs as fronts to collect money from businesses for use to support its illegal activities.

498.    Defendant CHIQUITA's payments to the AUC were reviewed and approved by senior executives of the corporation, to include high-ranking officers, directors, and employees.  No later than in or about September 2000, defendant CHIQUITA's senior executives knew that the corporation was paying the AUC and that the AUC was a violent, paramilitary organization led by Carlos Castaño.  An in-house attorney for defendant CHIQUITA conducted an internal investigation into the payments and provided Individual C with a memorandum detailing that investigation.  The results of that internal investigation were discussed at a meeting of the then-Audit Committee of the then-Board of Directors in defendant CHIQUITA's Cincinnati headquarters in or about September 2000.  Individual C, among others, attended this meeting.

499.    For several years defendant CHIQUITA paid the AUC by check through various convivirs in both the Urabá and Santa Marta regions of Colombia.  The checks

were nearly always made out to the convivirs and were drawn from the Colombian bank accounts of defendant CHIQUITA's subsidiary. No convivir ever provided defendant CHIQUITA or Banadex with any actual security services or actual security equipment in exchange for the payments, for example, security guards, security guard dogs, security patrols, security alarms, security fencing, or security training. Defendant CHIQUITA recorded these payments in its corporate books and records as "security payments" or payments for "security" or "security services."

500.    In or about April, 2002, defendant CHIQUITA seated a new Board of Directors and Audit Committee following defendant CHIQUITA's emergence from bankruptcy.

501.    Beginning in or about June, 2002, defendant CHIQUITA began paying the AUC in the Santa Marta region of Colombia directly and in cash according to new procedures established by senior executives of defendant CHIQUITA. In or about March, 2002, Individual C and others established new procedures regarding defendant CHIQUITA's direct cash payments to the AUC. According to these new procedures: Individual F received a check that was made out to him personally and drawn from one of the Colombian bank accounts of defendant CHIQUITA's subsidiary. Individual F then endorsed the check. Either Individual F or Individual G cashed the check, and Individual G hand-delivered the cash directly to AUC personnel in Santa Marta.

502.    Banadex treated these direct cash payments to the AUC as payments to Individual F, recorded the withholding of the corresponding Colombian tax liability, reported the payments to Individual F as such to Colombian tax authorities, and paid Individual F's corresponding Colombian tax liability. This treatment of the payments

made it appear that Individual F was being paid more money and thus increased the risk that Individual F would be a target for kidnapping or other physical harm if this became known.

503.    Individual F also maintained a private ledger of the payments, which did not reflect the ultimate and intended recipient of the payments. The private ledger only reflected the transfer of funds from Individual F to Individual G and not the direct cash payments to the AUC.

504.    On or about April 23, 2002, at a meeting of the Audit Committee of the Board of Directors in defendant CHIQUITA's Cincinnati headquarters, Individual C described the procedures referenced in Paragraph 25 [of the Factual Proffer]. Individual A, Individual B, and Individual E, among others, attended this meeting.

505.    The United States government designated the AUC as a FTO on September 10, 2001, and that designation was well-publicized in the American public media. The AUC's designation was first reported in the national press (for example, in the Wall Street Journal and the New York Times) on September 11, 2001. It was later reported in the local press in Cincinnati where defendant CHIQUITA's headquarters were located – for example, in the Cincinnati Post on October 6, 2001, and in the Cincinnati Enquirer on October 17, 2001. The AUC's designation was even more widely reported in the public media in Colombia, where defendant CHIQUITA had its substantial banana-producing operations.

506.    Defendant CHIQUITA had information about the AUC's designation as an FTO specifically and global security threats generally through an Internet-based, password-protected subscription service that defendant CHIQUITA paid money to

receive.  On or about September 30, 2002, Individual H, from a computer within

defendant CHIQUITA's Cincinnati headquarters, accessed this service's "Colombia –

Update page," which contained the following reporting on the AUC:

> "US terrorist designation.
>
> International condemnation of the AUC human rights abuses culminated in 2001 with the US State Department's decision to include the paramilitaries in its annual list of foreign terrorist organizations.  This designation permits the US authorities to implement a range of measures against the AUC, including denying AUC members US entry visas; freezing AUC bank accounts in the US; and barring US companies from contact with the personnel accused of AUC connections."

507.    From on or about September 10, 2001, through on or about February 4,

2004, defendant CHIQUITA made 50 payments to the AUC totaling over $825,000.

Defendant CHIQUITA never applied for nor obtained any license from the Department

of the Treasury's Office of Foreign Assets Control with respect to any of its payments to

the AUC.

508.    On or about September 12, 2001, Individual G paid the AUC in Urabá and

Santa Marta by check in an amount equivalent to $31,847.[1]

509.    On or about November 14, 2001, Individual F and Individual G paid the

AUC in Urabá and Santa Marta by check in the amount equivalent to $56,292.

510.    On or about December 12, 2001, Individual F and Individual G paid the

AUC in Urabá and Santa Marta by check in an amount equivalent to $26,644.

511.    On or about February 4, 2002, Individual F and Individual G paid the

AUC in Urabá and Santa Marta by check in an amount equivalent to $30,079.

---

[1]    With respect to all statements in this Factual Proffer relating to payments by check, the "on or about" dates refer to the dates on which such checks cleared the bank, not the dates on which the checks were issued or delivered.

512.    On or about March 7, 2002, Individual F and Individual G paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $25,977.

513.    On or about March 31, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in two equal payments in amounts equivalent to $3,689 each.

514.    On or about April 16, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $35,675.

515.    On or about May 15, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $10,888.

516.    On or about May 31, 2002, Individual F and Individual G paid the AUC Santa Marta in cash in two equal payments in amounts equivalent to $3,595 each.

517.    In or about June 2002, Individual F and Individual G began making direct cash payments to the AUC in the Santa Marta region of Colombia according to the procedures referenced in Paragraph 25.

518.    On or about June 11, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in three payments in amounts equivalent to $4,764, $6,670 and $6,269, respectively.

519.    On or about June 14, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $31,131.

520.    On or about July 2, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $11,585.

521.    On or about July 9, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $5,917.

522.    On or about August 6, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $4,654.

523.    On or about August 15, 202, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $27,841.

524.    On or about September 2, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $4,616.

525.    On or about October 7, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $8,026.

526.    On or about October 15, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $40,419.

527.    On or about November 8, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,164.

528.    On or about November 29, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $5,685.

529.    On or about December 9, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $47,424.

530.    On or about January 21, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $7,954.

531.    On or about January 27, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $22,336.

532.    On or about February 11, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $7,291.

533.    On or about February 20, 2003, Individual I stated to Individual C that Individual I had discovered that the AUC had been designated by the United States government as a Foreign Terrorist Organization.  Shortly thereafter, Individual C and Individual I spoke with attorneys in the District of Columbia office of a national law firm ("outside counsel") about defendant CHIQUITA's ongoing payments to the AUC.

534.    Beginning on or about February 21, 2003, outside counsel advised defendant CHIQUITA, through Individual C and Individual I, that the payments were illegal under United States law and that defendant CHIQUITA should immediately stop paying the AUC directly or indirectly.  Among other things, outside counsel, in words and in substance, advised defendant CHIQUITA:

"Must stop payments."
(notes, dated February 21, 2003)

"Bottom Line:  CANNOT MAKE THE PAYMENT"
"Advised NOT TO MAKE ALTERNATIVE PAYMENT through CONVIVIR"
"General Rule:  Cannot do indirectly what you cannot do directly"
"Concluded with: CANNOT MAKE THE PAYMENT"
(memo, dated February 26, 2003)

"You voluntarily put yourself in this position.  Duress defense can wear out through repetition.  Buz [business] decision to stay in harm's way.  CHIQUITA should leave Colombia."
(notes, dated March 10, 2003)

"[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization[.]"
(memo, dated March 11, 2003)

[T]he company should not make the payment."
(memo, dated March 27, 2003)

535.    On or about February 27, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $17,434.

536.    On or about March 27, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $19,437.

537.    On or about April 3, 2003, Individual B and Individual C first reported to the full Board of Directors of defendant CHIQUITA that defendant CHIQUITA was making payments to a designated Foreign Terrorist Organization.  A member of defendant CHIQUITA's Board of Directors objected to the payments and recommended that defendant CHIQUITA consider taking immediate corrective action, to include withdrawing from Colombia.  The Board agreed to disclose promptly to the Department of Justice the fact that defendant CHIQUITA had been making payments to the AUC.

538.    On or before April 4, 2003, according to outside counsel's notes concerning a conversation about defendant CHIQUITA's payments to the AUC, Individual C said: "His and [Individual B's] opinion is just let them sue us, come after us.  This is also [Individual A's] opinion."

539.    On or about April 8, 2003, Individual C and Individual D met at defendant CHIQUITA's headquarters in Cincinnati with Individual F, Individual G, Individual H, and Individual I.  According to the contemporaneous account of this meeting, Individual C and Individual D instructed Individual F and Individual G to "continue making payments" to the AUC.

540.    On or about April 24, 2003, Individual B and Individual C, along with outside counsel, met with officials of the United States Department of Justice, stated that defendant CHIQUITA had been making payments to the AUC for years, and represented that the payments had been made under threat of violence.  Department of Justice officials told Individual B and Individual C that defendant CHIQUITA's payments to the

116

AUC were illegal and could not continue.  Department of Justice officials acknowledged that the issue of continued payments was complicated.

541.    On or about April 30, 2003, Individual B and Individual C told members of the Audit Committee of the Board of Directors and the outside auditors of defendant CHIQUITA about the meeting with Department of Justice officials on April 24, 2003. Individual B and Individual C said that the conclusion of the April 24th meeting was that there would be "no liability for past conduct" and that there had been [n]o conclusion on continuing the payments."

542.    On or about May 5, 2003, according to the contemporaneous account of this conversation, Individual I instructed Individual F and Individual J to "continue making payments" to the AUC.

543.    On or about May 12, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,105.

544.    On or about May 21, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $47,235.

545.    On or about June 4, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $7,623.

546.    On or about June 6, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in two payments in amounts equivalent to $6,229 and $5,764, respectively.

547.    On or about July 14, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $7,139.

548.    On or about July 24, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $35,136.

549.    On or about August 8, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $5,822.

550.    On or about August 25, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $12,850.

551.    On or about September 1, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,963.

552.    On or about September 8, 2003, outside counsel advised defendant CHIQUITA in writing, through Individual C and Individual I, that: "[Department of Justice] officials have been unwilling to give assurances or guarantees of non-prosecution; in fact, officials have repeatedly stated that they view the circumstances presented as a technical violation and cannot endorse current or future payments."

553.    On or about October 6, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $18,249.

554.    On or about October 6, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent $9,439.

555.    On or about October 24, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $30,511.

556.    On or about November 5, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,937.

557.    On or about December 1, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,337.

558.    On or about December 2, 2003, Individual F and Individual G paid the AUC in Urabá by check in the amount equivalent to $30,193.

559.    On or about December 4, 2003, Individual B and Individual C provided the Board of Directors additional details concerning defendant CHIQUITA's payments to the AUC that had not previously been disclosed to the Board.  A member of defendant CHIQUITA's Board of Directors responded to this additional information by stating: "I reiterate my strong opinion – stronger now – to sell our operations in Colombia."

560.    On or before December 4, 2003, defendant CHIQUITA created and maintained corporate books and records that did not identify the ultimate and intended recipient of the payments to the AUC in Urabá in calendar year 2003 as follows:

| Reporting Period | Description of recipient | Description of payment |
| --- | --- | --- |
| 1st Quarter 2003 | "Papagayo Association, a 'Convivir.' (Convivirs are government licensed security providers.)" | "Payment for security service." |
| 2nd Quarter 2003 | "Papagayo Association, a 'Convivir.' (Convivirs are government licensed security providers.)" | "Payment for security services." |
| 3rd Quarter 2003 | "Papagayo Association, a 'Convivir.' (Convivirs are government licensed security providers.)" | "Payment for security services." |

561.    On or about December 16, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $24,584.

562.    On or about December 22, 2003, Individual B sent an email to other Board members on the subject of defendant CHIQUITA's ongoing payments to the AUC, stating, among other things: "This is not a management investigation.  This is an audit

committee investigation.  It is an audit committee investigation because we appear to [be] committing a felony."

563.    On or about January 9, 2004, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $10,630.

564.    On or about January 13, 2004, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $27,958.

565.    On or about February 4, 2004, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $4,795.

566.    According to defendant CHIQUITA's records, from September 10, 2001, through in or about January 2004, defendant CHIQUITA earned more than $49.4 million in profits from its Colombian banana-producing operations.

567.    The foregoing allegations contained in the factual proffer, were formally admitted in writing by Fernando Aguirre, Chairman of the Board of Directors, President and Chief Executive Officer of CHIQUITA BRANDS INTERNATIONAL, INC., on or about March 12, 2007.

568.    That heretofore and at the time of the occurrences herein, the defendants had entered into a conspiracy with the AUC to effectuate a variety of purposes that were of mutual benefit to CHIQUITA and the AUC.

569.    The joint purposes and mutual benefits of the conspiracy between CHIQUITA and the AUC included the political, military and economic control of the Republic of Colombia and specifically of the banana growing regions; the destruction and expulsion of guerilla groups such as the FARC and the ELN; the establishment of the AUC and CHIQUITA as the *de facto* power and authority over the banana growing

regions and their inhabitants; the wrongful and illegal seizure and/or acquisition of banana growing land from the peasants by the commission of various overt acts, including threats, intimidation, murders, massacres, disappearances and other atrocities; the elimination and/or domination of labor union organizers perceived by CHIQUITA to be hostile to their economic interests, accomplished by threats, intimidation, murders, massacres, disappearances and other atrocities; the acquisition and maintenance of monopolistic control over commerce in bananas by CHIQUITA and the destruction of all competition in the cultivation, distribution and marketing of bananas, accomplished by threats, intimidation, murders, massacres, disappearances and other atrocities.

570.    That pursuant to the conspiracy between CHIQUITA and the AUC, the co-conspirators actively cooperated in a variety of overt acts, including but not limited to the illegal payment of money as detailed in the "Factual Proffer".

571.    That pursuant to the conspiracy between CHIQUITA and the AUC, the co-conspirators actively cooperated in a variety of overt acts, including but not limited to the production, transportation, distribution and sale of illegal drugs.

572.    That pursuant to the conspiracy between CHIQUITA and the AUC, the co-conspirators actively conspired to acquire, transport and distribute illegal weapons and ammunition to be used in the commission of threats, intimidation, murders, massacres, disappearances and other atrocities.

573.    That pursuant to the conspiracy between CHIQUITA and the AUC, the co-conspirators actively conspired to acquire, transport and distribute vehicles and other war materiel for the purpose of committing threats, intimidation, murders, massacres, disappearances and other atrocities.

574.     CHIQUITA, by and through its agents, servants and employees, including but not limited to Individuals A through J, and other agents servants and employees including but not limited to James Reilly, Willie Gonzalez, Jose Anarbona and Giovanny Hurtado Torres ordered, directed and orchestrated weapons smuggling, threats, intimidation, murders, massacres, disappearances and other atrocities.

575.     As more fully alleged in detail above, Chiquita paid the AUC, directly or indirectly, nearly every month during the period 1997-2004, making over one hundred payments to the AUC totaling over 1.7 million.  Chiquita's payments to the AUC were reviewed and approved by senior executives of the corporation, including high ranking officers, directors, and employees.  Chiquita's senior executives knew that the corporation was paying the AUC and that the AUC was a violent, paramilitary organization led by Carlos Castano. Payments made to the AUC or to front organizations were recorded in Chiquita's corporate books and records as "security payments" or payments for "security" or "security services." Other payments, made to Banadex executives with the intent that they would be withdrawn as cash and handed directly to the AUC, were recorded as income contributions.

576.     At all relevant times, CHIQUITA knew that the AUC was a violent, terrorist paramilitary organization.  On September 10, 2001, the United States government designated the AUC as a Foreign Terrorist Organization ("FTO"), and that designation was well-publicized in the American public media, including in the Cincinnati Post on October 6, 2001, and in the Cincinnati Enquirer on October 17, 2001, as well as in the Colombian media.

577.    On March 19, 2007, CHIQUITA pled guilty in U.S. District Court for the District of Colombia to one count of engaging in transactions with a specially designated global terrorist.  The company's sentence will include a $25 million criminal fine, the requirement to implement and maintain an effective compliance and ethics program, and five years' probation.

578.    In 2001, CHIQUITA facilitated the clandestine and illegal transfer of arms and ammunition from Nicaragua to the AUC.

579.    The Nicaraguan National Police provided 3,000 AK-47 assault rifles and 2.5 million rounds of ammunition to a private Guatamalan arms dealership, Grupo de Representaciones Internationales S.A. ("GIR S.A."), in exchange for weapons more suited to police work.  GIR S.A., in turn, arranged to sell the AK-47's and ammunition for $575,000 to Shimon Yelinek, an arms merchant based in Panama.  In November 2001, Yelinek loaded the arms onto a Panamanian-registered ship with Panama as its declared destination, but the ship instead went to Turbo, Colombia.

580.    CHIQUITA, through Banadex, operated a private port facility at the Colombian municipality of Turbo, used for the transport of bananas and other cargo.  The arms ship docked at the CHIQUITA port, and Banadex employees unloaded the 3,000 assault rifles and 2.5 million rounds of ammunition.  These arms and ammunition were then transferred to the AUC.

581.    On information and belief, CHIQUITA facilitated at least four other arms shipments to the AUC.  In an interview with the Colombian newspaper El Tiempo, AUC leader Carlos Castano subsequently boasted, "This is the greatest achievement by the AUC so far.  Through Central America, five shipments, 13 thousand rifles."

582.    On information and belief, CHIQUITA was aware of the use of its facilities for the illegal transshipment of arms to the AUC, and intended to provide such support and assistance to the AUC.

583.    On information and belief, CHIQUITA also assisted the AUC by allowing the use of its private port facilities not only for the illegal importation of arms, but also for the illegal exportation of large amounts of illegal drugs, especially cocaine.  The drug trade was a major source of income for the AUC.  CHIQUITA intentionally and knowingly allowed use of its port and banana transportation boats for this purpose. CHIQUITA also transported illegal drugs in trucks and other vehicles acquired, owned and operated by it for the use in its conspiracy with the AUC.

**AS AND FOR A FIRST CAUSE OF ACTION**
**ENGAGING IN TERRORISM AND/OR PROVIDING**
**MATERIAL SUPPORT TO A TERRORIST ORGANIZATION**

584.    Plaintiffs repeat and reallege all of the previous allegations of the complaint with the same force and effect as if fully set forth again at length.

585.    The AUC was and is a global terrorist organization, having been so designated by the U.S. State Department, as hereinabove alleged.

586.    That heretofore and at the time of the occurrences herein, the AUC was engaged in terrorism in violation of the law of nations and of individual countries and states in that *inter alia* it engaged in violent acts, or acts dangerous to human life that were intended to intimidate or coerce a civilian population, and/or to influence the policy of a government by intimidation or coercion; and/or to affect the conduct of a government by mass destruction, assassination, kidnapping or hostage taking, as defined by 31 CFR § 594.311 and Chapter 113B of Part I of Title 18 of the United States Code;

engaged in criminal acts intended and/or calculated to create a state of terror in the minds

of particular persons or a group of persons or the general public as defined in the League

of Nations Convention (1937) and the General Assembly Resolution 51/210 (1999)

wherein such acts are strongly condemned; and/or engaged in crimes against a civilian

population intended to cause death or serious bodily harm to civilians or non-combatants

with the purpose of intimidating a population in violation of UN Resolution May 17,

2005 and UN General Assembly Resolution 49/60 of December 9, 1994 adopting the

Declaration of Measures to Eliminate International Terrorism and all other citations

therein condemning terrorism which are hereby incorporated by reference; and UN

General Assembly Resolution 42/159 (adopted December 7, 1987) and other

international laws and *jus cogens* as set forth herein and elsewhere.

587.    That terrorism is a violation of the law of nations.

588.    That conspiring with and aiding, abetting, facilitating, soliciting and

giving material aid to a terrorist organization is a violation of the law of nations.

589.    That heretofore and at the time of the occurrences herein, the AUC was

engaged in committing violent activities, including, but not limited to mass murders,

individual murders, forced disappearances, drug trafficking, extortion and kidnapping,

including but not limited to the murders of the plaintiffs' decedents and others.

590.    As heretofore alleged, from 1997 to 2004, CHIQUITA, directly and by

and through its subsidiaries, agents, and employees, made approximately 100 payments

to the AUC in an amount exceeding $1.7 million as hereinabove alleged.

591.    CHIQUITA directly and indirectly provided guns, ammunition, trucks and

other war material to the AUC, as hereinabove alleged.

592.    That as heretofore alleged, CHIQUITA was involved in a conspiracy with the AUC and committed the overt acts hereinabove alleged that proximately caused the deaths of plaintiffs' decedents.

593.    At all times material hereto, CHIQUITA knew or should have known that its providing money, guns, ammunition, war material and other forms of aid to the AUC would facilitate, aid and abet the commission of mass murders, individual murders, forced disappearances, kidnapping and other crimes, including the murders of the plaintiffs decedents.

594.    As a result of providing financial support to the AUC, defendant CHIQUITA violated the law of nations, established United States laws, international laws, treaties and norms, including, but not limited to those sections previously set forth including but not limited to:

The Declaration on Measures to Eliminate International Terrorism and citations therein incorporated by reference adopted by the United Nations General Assembly on December 9, 1994 (GA Res. 49/60);
The Anti Terror Act, 18 U.S.CC. 113B;
The Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996);
The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act"), Pub. L. No. 107-56, 115 Stat. 271 (2001);
The Convention on the Prevention and Punishment of the Crime of Genocide; Art. 2, Dec. 9, 1948, 78 U.N.T.S.;
International Convention for the Suppression of Terrorist Bombings, G.A. Res. 52-164, 1, U.N. Doc A/RES/52/164;
International Convention for the Suppression of the Financing of Terrorism, 39 I.L.M. 270 (Dec. 9, 1997);
United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);
(Universal Declaration of Human Rights, G.A. Res. 217A (iii), U.N. Doc. A/810 (1948);
International Covenant on Civil and Political Rights, G.A. Res. 2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. (A/6316 (1966);
Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 1100, U.N. doc. A/39/51 (1984);

Declaration on the Protection of all Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976);
Common Article 3 of the 1949 Geneva Conventions; Articles 4 and 13 of the 1977 Geneva Protocol II;
Convention on Combating Bribery of Foreign Public Officials in International Businesss Transactions, 37 I.L.M. 1 (Dec. 18, 1997);
and other *jus cogens*.

595.    The murders of the plaintiffs' decedents and/or injuries to plaintiff(s) were a direct and proximate result of CHIQUITA's conspiring with and providing aid to a terrorist organization as hereinabove alleged.

596.    The abuses described above were premeditated, politically-motivated acts of violence committed against noncombatant civilians for the purpose of instilling fear, targeting political opponents, and generally terrorizing a civilian population.

597.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC in bringing about the acts of terrorism against Plaintiffs.

598.    The murderous acts of terrorism against the plaintiffs were financed by the defendants' illegal payments of money hereinabove alleged.

599.    The murderous acts of terrorism against the plaintiffs were aided, abetted and facilitated by the illegal payments of money hereinabove alleged.

600.    The murderous acts of terrorism against the plaintiffs and the illegal payments of money hereinabove alleged as well as defendants furnishing arms to the AUC were overt acts committed in pursuance of the conspiracy hereinabove alleged.

601.    The defendants, their agents servants and employees including but not limited to James Reilly, Willie Gonzalez, Jose Anarbona and Giovanny Hurtado Torres,

participated in the coordination of joint and conspiratorial activities between CHIQUITA and the AUC, including identifying to the AUC who was to be killed, tortured and/or otherwise terrorized and intimidated and otherwise participated in the distribution of money, arms and ammunition, vehicles, war material, drugs and drug-making chemicals as hereinabove alleged.

602.    That the defendants, their agents servants and employees (a) knowingly and substantially assisted the AUC and their collaborators to commit acts that violate clearly established international law norms, and (b) facilitated the commission of international law violations by providing the AUC and their collaborators with the tools, instrumentalities, or services to commit those violations with actual or constructive knowledge that those tools, instrumentalities, or services would be (or only could be) used in connection with that purpose.

603.    That by reason of the wrongful conduct of the defendants, including aid to a terrorist organization as hereinabove alleged and the consequent crimes committed thereby, as hereinabove alleged, plaintiff's decedents suffered conscious pain, suffering and death, and the plaintiffs have suffered pecuniary and economic damages, loss of support, loss of nurture care and guidance, grief, anguish, loss of society, loss of services and other injuries, and accordingly, the plaintiffs claim all damages allowed by law, including compensatory and punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION
## WAR CRIMES

604.    Plaintiffs repeat and reallege all of the previous allegations of the complaint with the same force and effect as if fully set forth again at length.

605. Heretofore, and at the time of the murders of plaintiffs' decedents and/or injuries to plaintiffs, and prior thereto, there existed a state of civil war and armed conflict in Colombia and specifically in the regions where plaintiffs resided.

606. The murders of plaintiff's decedents and/or injuries to plaintiff(s) were committed in the course of a civil war and armed conflict.

607. The plaintiffs' decedents and/or plaintiffs were non-combatants in the civil war and armed conflict.

608. The defendants conspired with, aided, abetted, directed, solicited and facilitated the AUC in the orchestration of hostilities, armed conflict, and acts of murder, torture, terrorism, coercion and intimidation, including but not limited to the murders of plaintiffs' decedents and/or injuries to plaintiff(s)

609. The murders of plaintiffs' decedents constituted war crimes, in violation of the law of nations and laws of the United States, including but not limited to:

The Anti Terror Act, 18 U.S.CC. 113B; and
The Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996);
The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act"), Pub. L. No. 107-56, 115 Stat. 271 (2001);
The Convention on the Prevention and Punishment of the Crime of Genocide; Art. 2, Dec. 9, 1948, 78 U.N.T.S.;
International Convention for the Suppression of Terrorist Bombings, G.A. Res. 52-164, 1, U.N. Doc A/RES/52/164;
International Convention for the Suppression of the Financing of Terrorism, 39 I.L.M. 270 (Dec. 9, 1997);
United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);
(Universal Declaration of Human Rights, G.A. Res. 217A (iii), U.N. Doc. A/810 (1948);
International Covenant on Civil and Political Rights, G.A. Res. 2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. (A/6316 (1966);
Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 1100, U.N. doc. A/39/51 (1984);

Declaration on the Protection of all Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976);
Common Article 3 of the 1949 Geneva Conventions; Articles 4 and 13 of the 1977 Geneva Protocol II;
Convention on Combating Bribery of Foreign Public Officials in International Businesss Transactions, 37 I.L.M. 1 (Dec. 18, 1997);
and other *jus cogens*.

610.    That the defendants, their agents servants and employees (a) knowingly and substantially assisted the AUC and their collaborators to commit acts that violate clearly established international law norms, and (b) facilitated the commission of international law violations by providing the AUC and their collaborators with the tools, instrumentalities, or services to commit those violations with actual or constructive knowledge that those tools, instrumentalities, or services would be (or only could be) used in connection with that purpose.

611.    That by reason of the murderous war crimes herein alleged, plaintiff's decedents suffered conscious pain, suffering and death, and the plaintiffs have suffered personal injuries, pecuniary and economic damages, loss of support, loss of nurture care and guidance, grief, anguish, loss of society, loss of services and other injuries, and accordingly, the plaintiffs claim all damages allowed by law, including compensatory and punitive damages.

### AS AND FOR A THIRD CAUSE OF ACTION
### CRIMES AGAINST HUMANITY

612.    Plaintiffs repeat and reallege all of the previous allegations of the complaint with the same force and effect as if fully set forth again at length.

613.    Heretofore, and at the time of the murders of plaintiff's decedents and/or attempted murders/personal injuries, and prior thereto, the AUC, in pursuance of the

aforedescribed conspiracy with defendant CHIQUITA, and acting in concert with, aided, abetted, facilitated, and solicited by defendant CHIQUITA, engaged in a widespread and systematic attack on and persecution of large segments of the civilian populations of the banana growing regions of Colombia, including but not limited to the areas where plaintiffs resided, and including plaintiffs' decedents.

614.    The AUC's widespread and systematic attack on and persecution of large segments of the civilian population of the banana growing regions was carried out by mass murders/massacres, individual murders, disappearances, torture, threats, detention, coercion and intimidation.

615.    The AUC's acts of mass murder/massacre, individual murders, disappearances, torture, threats, and intimidation was designed, planned, orchestrated and executed for the primary purpose of exercising political and economic control over the subject areas as heretofore alleged.

616.    The murders of plaintiffs' decedents and/or attempted murders/personal injuries constituted crimes against humanity, in violation of the law of nations and laws of the United States, including but not limited to:

The Anti Terror Act, 18 U.S.CC. 113B; and
The Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996);
The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act"), Pub. L. No. 107-56, 115 Stat. 271 (2001);
The Convention on the Prevention and Punishment of the Crime of Genocide; Art. 2, Dec. 9, 1948, 78 U.N.T.S. 277;
International Convention for the Suppression of Terrorist Bombings, G.A. Res. 52-164, 1, U.N. Doc A/RES/52/164;
International Convention for the Suppression of the Financing of Terrorism, 39 I.L.M. 270 (Dec. 9, 1997);
United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);
(Universal Declaration of Human Rights, G.A. Res. 217A (iii), U.N. Doc. A/810 (1948);

International Covenant on Civil and Political Rights, G.A. Res. 2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. (A/6316 (1966);

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 1100, U.N. doc. A/39/51 (1984), 1465 U.N.T.S. 85;

Declaration on the Protection of all Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976);

Common Article 3 of the 1949 Geneva Conventions; Articles 4 and 13 of the 1977 Geneva Protocol II;

Convention on Combating Bribery of Foreign Public Officials in International Businesss Transactions, 37 I.L.M. 1 (Dec. 18, 1997);

and other *jus cogens*.

617.    That the defendants, their agents servants and employees (a) knowingly and substantially assisted the AUC and their collaborators to commit acts that violate clearly established international law norms, and (b) facilitated the commission of international law violations by providing the AUC and their collaborators with the tools, instrumentalities, or services to commit those violations with actual or constructive knowledge that those tools, instrumentalities, or services would be (or only could be) used in connection with that purpose.

618.    That by reason of the murderous crimes against humanity herein alleged, plaintiffs' decedents and/or plaintiff(s) suffered personal injuries, conscious pain, suffering and death, and the plaintiffs have suffered pecuniary and economic damages, loss of support, loss of nurture care and guidance, grief, anguish, loss of society, loss of services and other injuries, and accordingly, the plaintiffs claim all damages allowed by law, including compensatory and punitive damages.

## AS AND FOR A FOURTH CAUSE OF ACTION
## GENOCIDE

619.    Plaintiffs repeat and reallege all of the previous allegations of the complaint with the same force and effect as if fully set forth again at length.

620.    That the defendants, their agents servants and employees committed the following acts with the intent to destroy, in whole or in part, the national, ethnical, political or cultural group of which the plaintiff's decedents were a part of: killing members of the group; causing serious bodily or mental harm to members of the group; deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part; imposing measures to prevent births within the group; and forcibly transferring children of the group to another group.

621.    That the defendants, their agents servants and employees (a) knowingly and substantially assisted the AUC and their collaborators to commit acts that violate clearly established international law norms including the deliberate and systematic destruction of a national, ethnical, political or cultural group (genocide) and (b) facilitated the commission of international law violations including the deliberate and systematic destruction of a national, ethnical, political or cultural group (genocide) by providing the AUC and their collaborators with the tools, instrumentalities, or services to commit those violations with actual or constructive knowledge that those tools, instrumentalities, or services would be (or only could be) used in connection with that purpose.

622.    That by reason of the deliberate and systematic destruction of a national, ethnical, political or cultural group (genocide), as herein alleged, plaintiff's decedents suffered conscious pain, suffering and death, and the plaintiffs have suffered personal injuries, pecuniary and economic damages, loss of support, loss of nurture care and guidance, grief, anguish, loss of society, loss of services and other injuries, and

accordingly, the plaintiffs claim all damages allowed by law, including compensatory and

punitive damages.

### AS AND FOR A FIFTH CAUSE OF ACTION
### EXTRAJUDICIAL KILLING/TORTURE IN VIOLATION OF TVPA

623.    Plaintiffs repeat and reallege all of the previous allegations of the

complaint with the same force and effect as if fully set forth again at length.

624.    The murders of the plaintiffs' decedents and/or attempted murders of

plaintiff(s) were extra-judicial killings/torture in violation of the TVPA.

625.    The deliberate killings and/or attempted murders, under color of law, of

plaintiffs' decedents and/or plaintiff(s) were not authorized by a lawful judgment

pronounced by a regularly constituted court affording all the judicial guarantees which

are recognized as indispensable by civilized peoples

626.    The murders of plaintiffs' decedents and/or attempted murders of

plaintiff(s) were committed under color of law, in that the AUC's commission of these

atrocities was done with the knowledge, acquiescence and complicity of the official

security forces of the Republic of Colombia as heretofore alleged; that the AUC was

acting as a *de facto* government and/or agency of government of the banana growing

regions with the knowledge, acquiescence and complicity of large segments of the

Colombian government, including ranking members of the executive and legislative

branches as well as the security forces; and payments were made by CHIQUITA utilizing

officially sanctioned Convivirs, as hereinabove alleged.

627.    That the defendants, their agents servants and employees (a) knowingly

and substantially assisted the AUC and their collaborators to commit acts that violate

clearly established international law norms, and (b) facilitated the commission of

international law violations by providing the AUC and their collaborators with the tools, instrumentalities, or services to commit those violations with actual or constructive knowledge that those tools, instrumentalities, or services would be (or only could be) used in connection with that purpose.

628.    Plaintiffs have no alternative remedy to the within action.  Legal action by Plaintiffs in Colombia would be futile.  In June 2004, CHIQUITA sold its Colombian subsidiary Banadex.  On information and belief, CHIQUITA no longer owns any production operation in Colombia and is not subject to service there.

629.    Legal action by Plaintiffs in Colombia could also result in serious reprisals.  Individuals who seek redress for paramilitary crimes committed against them or their family members are regularly targeted for further retributive violence. This has been well-documented in credible human rights reports by the U.S. Department of State, Human Rights Watch and Amnesty International.  *See*, *e.g.* The Ties that Bind: Colombia and Military-Paramilitary Links, Human Rights Watch (February, 2000).

630.    Further, various non-governmental organizations in Colombia, such as Justicia y Paz, have sought the assistance and protection of the Colombian government. No action was taken, and these complaints were futile because of the lack of an independent or functioning legal system within Colombia.  The justice system in Colombia has utterly failed to bring the perpetrators of violence to justice under the laws of Colombia.  Finally, even if there were remedies available Plaintiffs in Colombia, such remedies are inadequate and would not afford the compete relief available to Plaintiffs by this Complaint.

631.    Plaintiffs were unable to bring suit in the United States until the present due to the poor security situation and the danger of reprisals, which CHIQUITA's support of the AUC contributed to, as well as the criminal secreting of evidence by CHIQUITA and the conspiratorial and secretive nature of the acts and omissions of the defendants only brought to light by the above referenced criminal proceedings instituted by the United States.  This suit is brought within one year from the termination of said criminal proceeding and within all applicable statutes of limitation.

632.    That by reason of the extrajudicial killing of the plaintiffs' decedents and that plaintiffs' decedents suffered conscious pain, suffering and death, and the plaintiffs have suffered pecuniary and economic damages, loss of support, loss of nurture care and guidance, grief, anguish, loss of society, loss of services and other injuries, and accordingly, the plaintiffs claim all damages allowed by law, including compensatory and punitive damages.

### AS AND FOR A SIXTH CAUSE OF ACTION
### WRONGFUL DEATH AND SURVIVAL ACTIONS
### UNDER THE LAW OF OHIO

633.    Plaintiffs repeat and reallege all of the previous allegations of the complaint with the same force and effect as if fully set forth again at length.

634.    By reason of the extrajudicial killing and wrongful death of the plaintiff's decedents as hereinabove alleged, and the negligence of the defendants in failing to exercise proper supervision; in negligently hiring, supervising and retaining its agents, servants and employees; in negligently violating their duties as directors and officers of CHIQUITA; in negligently contracting, agreeing, acting in concert with and conspiring with persons whom defendants knew or should have known were violent and had the

intention, means and propensity to commit crimes, perpetrate murders, disappearances, kidnappings, torture and other atrocities, and in otherwise being negligent, the defendants are liable to the plaintiff for wrongful death damages under laws of the State of Ohio, including R.C. § 2125.01, 2125.02 et seq. and for the conscious pain and suffering of the decedent pursuant to R.C. § 2305.21 et seq. pertaining to survival of actions.

635.    That the defendants, their agents servants and employees (a) knowingly and substantially assisted a the AUC and their collaborators to commit acts that violate clearly established international law norms, and (b) facilitated the commission of international law violations by providing the AUC and their collaborators with the tools, instrumentalities, or services to commit those violations with actual or constructive knowledge that those tools, instrumentalities, or services would be (or only could be) used in connection with that purpose.

636.    That by reason of the extrajudicial killing and wrongful death of the plaintiffs' decedents as hereinabove alleged, plaintiff's decedents suffered conscious pain, suffering and death, and the plaintiffs have suffered pecuniary and economic damages, loss of support, loss of nurture care and guidance, grief, anguish, loss of society, loss of services and other injuries, and accordingly, the plaintiffs claim all damages allowed by law, including compensatory and punitive damages.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## BATTERY

637.    Plaintiffs repeat and reallege all of the previous allegations of the complaint with the same force and effect as if fully set forth again at length.

638.    Defendants murdered, tortured and/or attempted to murder plaintiffs' decedents and/or plaintiff(s), constituting common law battery.

639.    That the defendants, their agents servants and employees (a) knowingly and substantially assisted the AUC and their collaborators to commit acts that violate clearly established international law norms, and (b) facilitated the commission of international law violations by providing the AUC and their collaborators with the tools, instrumentalities, or services to commit those violations with actual or constructive knowledge that those tools, instrumentalities, or services would be (or only could be) used in connection with that purpose.

640.    That by reason of the foregoing, plaintiffs' decedents suffered conscious pain, suffering and death, and the plaintiffs have suffered personal injuries, pecuniary and economic damages, loss of support, loss of nurture care and guidance, grief, anguish, loss of society, loss of services and other injuries, and accordingly, the plaintiffs claim all damages allowed by law, including compensatory and punitive damages.

### AS AND FOR A EIGHTH CAUSE OF ACTION
### NEGLIGENCE

641.    Plaintiffs repeat and reallege all of the previous allegations of the complaint with the same force and effect as if fully set forth again at length.

642.    Defendants were negligent in failing to exercise proper supervision; in negligently hiring its agents, servants and employees; in negligently violating their duties as directors and officers of CHIQUITA; in negligently contracting, agreeing, acting in concert with and conspiring with persons whom defendants knew or should have known were violent and had the intention, means and propensity to commit crimes, perpetrate murders, disappearances, kidnappings, torture and other atrocities, in acting and in otherwise being negligent and failing to exercise reasonable care.

643.    That the defendants, their agents servants and employees (a) knowingly and substantially assisted the AUC and their collaborators to commit acts that violate clearly established international law norms, and (b) facilitated the commission of international law violations by providing the AUC and their collaborators with the tools, instrumentalities, or services to commit those violations with actual or constructive knowledge that those tools, instrumentalities, or services would be (or only could be) used in connection with that purpose.

644.    That defendants' negligence was a proximate cause of injury and or/death of plaintiff(s) and /or plaintiffs' decedents.

645.    Defendants acted willfully, wantonly, maliciously and with a reckless disregard and depraved indifference to human life in the commission of the acts and omissions hereinabove alleged in all counts of the complaint.

## AS AND FOR AN NINTH CAUSE OF ACTION
## LOSS OF SERVICES, SOCIETY AND CONSORTIUM

646.    Plaintiffs repeat and reallege all of the previous allegations of the complaint with the same force and effect as if fully set forth again at length.

647.    All plaintiffs who are the spouses, children, siblings, parents and/or relations of persons injured or killed, as heretofore alleged, claim damages for loss of services, society and consortium.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all causes of action.

**WHEREFORE**, plaintiffs demand judgment against the defendants on each and all Causes of Action in the complaint on behalf of each and all plaintiff(s) against each and all defendant(s) for compensatory damages in the sum of $10 million for each individual plaintiff and/or decedent, totaling $3,930,000,000.00 (THREE BILLION NINE HUNDRED THIRTY MILLION DOLLARS) in compensatory damages, and punitive damages in the sum of $10 million for each individual plaintiff and/or decedent, totaling $3,930,000,000.00 (THREE BILLION NINE HUNDRED THIRTY MILLION DOLLARS) in punitive damages, making in all the sum of $7,860,000,000.00 (SEVEN BILLION EIGHT HUNDRED SIXTY MILLION DOLLARS), along with interest, costs and disbursements.

**LAW FIRM OF JONATHAN C. REITER**

By:    _____
            JONATHAN C. REITER (7522)
            Attorneys for Plaintiffs
            350 Fifth Avenue, Suite 2811
            New York, New York 10118
            212-736-0979

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

FILED
04 FEB -6 AM 11: 06
U.S. DISTRICT COURT
N.D. OF ALABAMA

JOHN DOE II and                          )
 SINTRAMIENERGETICA,                     )
                                         )
        Plaintiffs                       )        CASE NO.:
                                         )
        v.                               )
                                         )
Drummond Company, Inc.,                  )        JURY TRIAL DEMANDED
Drummond Ltd,                            )
Garry N. Drummond & Augusto Jiminez,     )
                                         )        CV-04-JEO-0242-W
        Defendants.                      )

## COMPLAINT

### I. NATURE OF THE ACTION

1.      Plaintiff John Doe II was a member and an activist of Plaintiff
SINTRAMIENERGETICA, and was employed by Defendants Drummond Company, Inc.,
Drummond Ltd., Garry N. Drummond and Augusto Jiminez (collectively referred to as
"Defendants"). Plaintiff John Doe II brings this action for equitable relief and damages for the
suffering he has endured as a result of the torture, including imminent threats of death and forced
exile, inflicted upon him by Defendants. He was a member and outspoken activist of Plaintiff
SINTRAMIENERGETICA when he was subjected to torture, including regular and credible threats
of death made by agents or employees of Defendants.

2.      This case involves the systematic intimidation and murder of trade unionists in
Colombia, South America at the hands of paramilitaries working as agents of Defendants. The
violent persecution of trade unionists in Colombia has been at epidemic proportions for many years.
Since 1986 when the Central Unitaria de Trabajadores de Colombia ("CUT"), the largest trade union

confederation in Colombia, was formed, over 4,000 trade unionists have been murdered. Presently, of every five (5) trade unionists murdered in the world, over three (3) are Colombian. This case is brought under the Alien Tort Claims Act (ATCA), Torture Victim Protection Act (TVPA) and state tort law, and seeks to remedy and prevent the violent persecution of trade unionists working at the Drummond Company facilities in Colombia. These include the coal mine in Valledupar, Colombia, the rail line connecting the coal mine to the port near Santa Marta, Colombia, and Puerto Drummond, the company-owned port used to load coal on shipping barges. The Drummond Companies are knowingly engaged in an ongoing campaign of terror against trade unionists in Colombia.

3.    With respect to their business operations in Colombia, the Defendant companies have hired, contracted with or otherwise directed paramilitary security forces that utilized extreme violence and murdered, tortured or otherwise silenced trade union leaders of unions representing workers at Defendants' facilities. The torture that Plaintiff John Doe II was subjected to followed the murders of three of his close colleagues in SINTRAMIENERGETICA, Valmore Locarno, Victor Hugo Orcasita Amaya, and Gustavo Soler Mora, all of whom were murdered in 2001 by paramilitary agents working for Defendants in a campaign to eliminate effective leaders of the trade union representing Drummond workers, and to intimidate other workers from joining the union or assuming a union leadership position. The torture of Plaintiff John Doe II is in violation of the Alien Tort Claims Act (ATCA), 28 U.S.C. §1350, the Torture Victims Protection Act (TVPA), international human rights law, and the common tort law of the state of Alabama.

4.    Plaintiffs do not have access to an independent or functioning legal system within Colombia to raise their complaints. Any effort by Plaintiffs to seek legal redress would be futile

2

because those seeking to challenge official or paramilitary violence, including prosecutors and prominent human rights activists, are at great risk from retaliation. This has been well-documented in credible human rights reports by the U.S. Department of State, Human Rights Watch and Amnesty International. The U.S. Department State, in its March 4, 2002 Country Report on Colombia explained that "[t]he civilian judiciary is inefficient, severely overburdened by a large case backlog, and undermined by intimidation and the prevailing climate of impunity. This situation remains at the core of the country's human rights problems." And, there is especially great impunity for the murder of trade unionists. As the U.S. State Department, quoting the ILO, has concluded, "'cases where the instigators and perpetrators of the murders of trade union leaders are identified are practically nonexistent, as is the handing down of guilty verdicts.'" The U.S. Department, in its most recent, March 31, 2003 Report, concluded that "perpetrators of violence against workers operated with virtual impunity."

5. This assessment about the Colombian judicial system is corroborated in detail by the February 28, 2002 Report of the UN High Commissioner for Human Rights on the human rights situation in Colombia ("UNHCR Report"), which relates that "[t]he administration of justice continues to suffer from serious weaknesses and deficiencies that help bolster the high rates of impunity for major human rights violations and breaches of international humanitarian law." The UNHCR concludes that "the main challenge in Colombia may be defined as the future of the rule of law. The rule of law is in grave jeopardy as result of the continuing armed conflict, the escalation of violence, . . . the lack of a proper administration of justice and the burgeoning paramilitary states."

6. The UNHCR further states that "[s]everal events have called into question the independence and autonomy of prosecutors in their investigation into human rights violations,

3

particularly those involving paramilitary groups and public officials." The UNHCR notes that those

who investigate and prosecute human rights abuses are at real risk of violent retaliation, including

murder, and that "[o]fficials investigating cases implicating paramilitaries or State officials are

particularly vulnerable, and here lies the greatest danger." The UNHCR advises that there is a

"disquieting reluctance on the part of the State to implement the right to independent, impartial and

rights-based justice."

7. The UNHCR relates that these deficiencies in the judicial system are only

exacerbated by Colombia's recent passage of the Security and National Defense Law which has

resulted in "the subordination of the civilian authority to the military, the undermining of the rule

of law and the violation of human rights." On June 24, 2002, UN High Commissioner for Human

Rights, Mary Robinson, expressed her "deep concern over an escalation in harassment and violence

against human rights defenders in Colombia," mostly by the paramilitaries. Mary Robinson further

explained that this harassment and violence is being spurred on by "public servants, and especially

members of the security forces . . . ." (*Id.*).

8. Further, prior to their murders, Locarno and Orcasita sought the assistance and

protection of Colombia's Minister of the Interior, citing threats of death against them and their

colleagues. No action was taken, and these complaints were futile because of the lack of an

independent or functioning legal system within Colombia. Indeed, the UNHCR itself noted that the

murder of Valmore Locarno was a notable example of the Colombian State's inability and/or

unwillingness to protect vulnerable groups, such as trade unionists. As the UNHCR relates, "[t]he

Office is particularly disturbed at cases such as that of Valmore Locarno, President of the

Drummond company workers' union, who was killed for lack of effective protection, having been

4

assessed by DAS as 'medium to low' risk." Similarly, the UNHCR noted the murder of Gustovo Soler "six months after the double murder of Valmore Locarno and Victor Orcasita" as another example of the Colombian State's utter failure to address the prevailing state of violence against trade unionists.

9.    Plaintiff John Doe II, before going into exile, was well aware that his colleagues Valmore Locarno, Victor Hugo Orcasita and Gustavo Soler were murdered even though they had sought the assistance and protection of Colombia's Minister of Labor. The government took no effective action to protect them, and their efforts to use the Colombian legal system proved futile.

10.    The justice system in Colombia has failed to bring the perpetrators of anti-union violence to justice under the laws of Colombia. Indeed, out of the thousands of cases of trade union assassination which have taken place since 1986, only a handful of cases have been successfully prosecuted, leading the UNHCR to conclude that "impunity [is] still enjoyed for those responsible for the murders of trade unionists." Subsequent to the murders of Locarno and Orcasita, Soler and other officials of SINTRAMIENERGETICA again requested assistance and protection from Colombia's Minister of Interior, all to no avail. Finally, even if there were remedies available to Plaintiffs in Colombia, such remedies are inadequate and would not afford the complete relief available to Plaintiffs by this Complaint. Defendants, because they do business in Colombia, are well aware of these conditions, and know that Plaintiffs do not have the option of seeking justice in Colombia for human rights violations that target trade unionists.

## II. JURISDICTION AND VENUE

11.    This Court has federal question jurisdiction pursuant to 28 U.S.C. §1331, based on the ATCA and the TVPA, 28 U.S.C. §1350, for the alleged violations of international human rights

5

law. Supplemental jurisdiction exists over the state law causes of action pursuant to 28 U.S.C. § 1367.

12. This Court also has diversity jurisdiction pursuant to 28 U.S.C. 1332 (a)(2). All Plaintiffs are citizens and permanent domiciles of Colombia, and the Defendants are all United States domiciles with their principal place of business and/or residence also in the United States. Defendants Drummond Company, Inc and Drummond Ltd. are Alabama corporations, with their principal places of business in Alabama. Defendant Garry Drummond is domiciled in Alabama. The amount in dispute between each Plaintiff and each defendant exceeds $75,000.

13. Venue properly lies in this Judicial District pursuant to 28 U.S.C. §1391(b) and (c).

### III. PARTIES

#### Plaintiffs

14. Plaintiff SINTRAMIENERGETICA is a Colombian trade union that represents workers at the Drummond facilities in Colombia. SINTRAMIENERGETICA has had numerous members and leaders assassinated and tortured by paramilitary forces. Based on the allegations herein, this murder and torture has been perpetrated by paramilitary units that were acting as employees or agents for Defendants. SINTRAMIENERGETICA brings this action for injunctive relief to stop any further murder and torture of its leaders by the employees or agents of Defendants. In addition, SINTRAMIENERGETICA seeks money damages for the losses it has suffered as a result of the murders, intimidation and torture of the trade union leaders at issue in this case and the resulting intimidation of its remaining union leaders and members; to recover funds spent to protect its members, leaders, and their family members who have received threats of death from the employees or agents of Defendants; and to recover funds provided for medical care, safe houses, and

6

living expenses for members, leaders, and their family members who have received threats of death from the employees or agents of Defendants.

15.     Plaintiff John Doe II is a citizen of Colombia.  John Doe II worked at the Drummond La Loma Mines from August 2, 1999 until his forced exile on November 9, ,2001.  During his period of employment, John Doe II was an active member of SINTRAMIENERGETICA.  John Doe II is currently in forced exile outside of Colombia, in another Latin American country, following systematic and credible threats made by paramilitary employees and/or agents of Defendants.  John Doe II brings this case on behalf of himself for the damages he has suffered as a result of the torture, including imminent threats of death and force exile, he has suffered at the hands of these employees and/or agents of Defendants.  He files this case anonymously because if he is identified as bringing this action to challenge and seek compensation for the torture to which he has been subjected by the paramilitaries, he would be at imminent risk of violent retribution, including murder, by these same paramilitary forces who have already tracked him down to the country in which he is in exile and have already made threats against him there based upon their mere suspicion that he is somehow involved in the instant case against Defendants.

**Defendants**

16.     Defendant Drummond Company, Inc. is a for-profit corporation incorporated in Alabama that is engaged primarily in the mining and shipment of coal. It is a closely-held corporation owned by the Drummond family, and is controlled in its day-to-day operations by Defendant Garry N. Drummond. Its principal place of business is located at 530 Beacon Parkway, Suite 900, Birmingham, Alabama 35209.  Among other places, Drummond Company, Inc. owns and operates a large coal mine, rail line and port in Colombia, South America.  The operations in

7

Colombia are financed and managed from the Alabama headquarters of Drummond Company, Inc,

and the profits from the Colombia operations revert to Drummond Company, Inc.

17.      Defendant Drummond Ltd. is an Alabama company, incorporated in Jasper, Alabama,

and has its principal place of business at 3000 Highway 78, Jasper, Alabama 35501. It is wholly-

owned by Drummond Company, Inc. Drummond Ltd. manages the day-to-day operations of the

Drummond coal operations in Colombia, but is at all times operating under the complete ownership,

direction and control of Defendant Drummond Company, Inc, and Defendant Garry N. Drummond.

Drummond Ltd. lists Drummond Company, Inc. as its Chief Executive. Fully aware of the violence

in Colombia, particularly anti-union violence, and the absolute impunity afforded the perpetrators

of such violence in Colombia, Drummond Company, Inc. created Drummond Ltd. for the sole

purpose of operating the Colombian mines for the sole benefit of Drummond Company, Inc. while

also attempting to shield Drummond Company, Inc. from liability for any and all tortious conduct

committed by the management of these mines. The creation of Drummond Ltd. was a sham done for

the aforesaid unlawful purpose.

18.      Defendant Garry N. Drummond is the Chief Executive Officer and Chief Operating

Officer of Defendant Drummond Company, Inc. Defendant Garry N. Drummond is active in

Drummond's operations in Colombia, and personally deals with issues relating to collective

bargaining negotiations and relations with paramilitary forces used by the company.

19.      Defendant Drummond Company, Inc. is a closely-held corporation, owned and

controlled by Defendant Garry Drummond and other members of his family. Defendant Garry

Drummond makes all of the day-to-day decisions regarding the operation of Defendant Drummond

Company, Inc. and profits from the company's operations in Colombia are transferred to one or more

8

bank accounts held by Defendant Drummond Company, Inc. and/or Defendant Garry Drummond in Alabama. Defendant Garry Drummond caused Defendant Drummond Company, Inc. to create Defendant Drummond Ltd., which is a wholly-owned, undercapitalized alter ego of Defendant Drummond Company, Inc. totally under the dominance and control of Defendant Drummond Company, Inc. and Defendant Garry Drummond. Defendant Drummond Ltd. was created and exists purely to serve as an instrumentality for Defendant Drummond Company, Inc. to operate the company's coal mine and related facilities in Colombia.

20.     Defendant Garry Drummond makes decisions relating to the Colombia operations in Alabama, and then either personally implements them or orders others employed by Defendant Drummond Company, Inc. and/or Defendant Drummond Ltd. to implement them in Colombia. Defendant Garry Drummond's complete control over and ownership of Defendant Drummond Company, Inc. and Defendant Drummond Ltd. makes these companies his alter ego.

21.     Defendant Augusto Jiminez is a Colombian national who is the President of the Drummond mining operations in Colombia, and manages most aspects of the operation. He now resides in Alabama, which is his legal domicile. He spends significant portions of his time at the Drummond facilities in Alabama to consult with Defendant Gary Drummond, participate in making decisions with Garry Drummond, and to then be responsible for implementing those decisions in Colombia through local staff.

22.     Defendant Drummond Company, Inc. is jointly and severally liable for all of the tortious actions committed when its alter ego and/or agent, Drummond Ltd., acts in concert with any other person or entity in furtherance of Drummond Company, Inc.'s business interests and activities. All of the wrongful acts alleged herein were committed by paramilitary forces hired by or retained

9

by employees or agents of Drummond Company, Inc. or Drummond Ltd., making Drummond Company, Inc. directly or vicariously liable for all of the wrongful acts. Likewise, because both companies are alter egos of Garry Drummond, he is vicariously liable for the acts of employees or agents of his alter ego companies. He is also liable for the conduct of the paramilitaries at issue in this case because he was made aware by the Union prior to the murders of Locarno, Orcasita and Soler that Drummond Ltd. had hired known paramilitaries as security at the La Loma mines, and that these paramilitaries were threatening the lives of the leaders of the Union. Defendant Garry Drummond was further asked by the Union to deal with this situation in the interest of protecting the lives of the workers and trade unionists at the La Loma mines, and yet, in reckless disregard for these lives, failed to stop Drummond Ltd. from retaining such paramilitary forces.

23. The paramilitary forces that murdered Locarno, Orcasita and Soler and tortured Plaintiff John Doe II were acting within the course and scope of a business relationship with Defendants with the advance knowledge, acquiescence or subsequent ratification of Defendants.

## IV. BACKGROUND FACTS CONCERNING VIOLENCE AGAINST TRADE UNION LEADERS AND MEMBERS IN COLOMBIA.

24. Colombia is widely-known as a country that is torn by a long-standing civil war involving armed leftist groups on the one side, and the Colombian military as well as right-wing paramilitaries on the other. It is universally acknowledged that the regular military in Colombia, and the civil government authorities, tolerate the paramilitaries, allow them to operate, and often cooperate, protect and/or work in concert with them.

25. The extent of the civil conflict is so pervasive that the country's civil war necessarily must be governed by the rules of war so that the combatants, the right-wing paramilitaries, the leftist

guerillas, and the regular military are governed by Article 3 of the Geneva Convention which applies to "an armed conflict not of an international character." Thus, noncombatants to the Colombian civil war, including the Plaintiffs herein, standing in the place of the deceased, are protected from human rights violations and other war crimes committed by any parties to the conflict, regardless of whether the combatant parties are formally recognized as government officials. This includes the paramilitary forces which clearly are major participants in the civil conflict.

26.     The paramilitaries in Colombia, including those directly involved in the wrongful acts alleged herein, were created based on official sanction of the Government of Colombia. Under "Law 48," passed in 1968, the Defense Ministry was authorized to create and provide weapons to civil patrols. It is by this authorization that most of the paramilitaries were created and sustained in Colombia. Such paramilitary groups continue to thrive under official sanction, often with the ongoing cooperation with and/or participation from the Colombian military.

27.     The paramilitaries in Colombia have a mutually-beneficial, symbiotic relationship with the Colombia government's military. As reported by such reputable human rights organizations as Human Rights Watch, 78% of the murders in Colombia from October 1999 to March 2000 were attributable to the paramilitaries. The Human Rights Watch investigators found "detailed, abundant, and compelling evidence of continuing close ties between the Colombian Army and paramilitary groups responsible for gross human rights violations." The facts supporting the ongoing symbiotic relationship between the military and paramilitaries in Colombia include that active and retired military actually set up paramilitary units, the military provides the paramilitaries with weapons, intelligence, and supplies, and the paramilitaries conduct missions at the request of the military.

28.     The close, symbiotic relationship between the military and paramilitaries in Colombia

11

is so widely acknowledged that the U.S. State Department confirms this fact without reservation:

> Credible allegations of cooperation with paramilitary groups, including instances of both silent support and direct collaboration by members of the public security forces, in particular the army, continued. Evidence suggests that there were tacit arrangements between local military commanders and paramilitary groups in some regions, and paramilitary forces operated freely in some areas that were under military control or despite a significant military presence. Individual members of the security forces actively collaborated with members of paramilitary groups – passing them through roadblocks, sharing intelligence, providing them with ammunition, and allegedly even joining their ranks while off-duty.

29.     In the February 28, 2002 Report of the UN High Commissioner for Human Rights on the human rights situation in Colombia ("UNHCR Report"), the UN High Commission explains that the links between the paramilitaries and the State continue and indeed are intensifying. As the UNHCR Report explains:

> During 2001, the Office continued to observe that paramilitary activity was strengthening and spreading throughout much of the country's territory. . . . Toleration, support and complicity on the part of public servants, as well as non-fulfillment of their duty to safeguard rights, with respect to several acts by these groups, means that the State continues to bear responsibility.

The UNHCR Report further relates that "the growth in paramilitary activity has been aided by the State's inaction or slow reaction in preventing the formation of illegal armed groups, and in keeping new territories from falling into the de facto control of these organizations." Finally, the UNHCR explains that the growth in paramilitary control and violence has been assisted by the impunity which human rights violators receive in the Colombian judicial system described in detail above at paragraphs. 4-10. Thus, the UNHCR states that, throughout 2001, it "continued to receive troubling reports of ties between members of the security forces and elements of the paramilitary groups. The existence of pending criminal and disciplinary investigations of members of the security forces shows how widespread these relationships are. However, the investigations have not led to any

determination of responsibility or the application of relevant sentences and punishments to ensure that these acts do not benefit from impunity."

30. The UNHCR reached the very same conclusions in its most recent, March 18, 2003 report, stating that there remain "open collusion" on the part of Colombian security forces with paramilitaries and that there is continued "expansion and consolidation of paramilitaries in several areas."

31. Further, in *Country Reports on Human Rights Practices — Colombia* (March, 2002), the U.S. State Department, which recently designated the chief and largest paramilitary group (the AUC) as a "terrorist" group, continued to conclude that "in some locations elements of the state security forces tolerated or even collaborated with paramilitary forces." The State Department reached this same conclusion in its Report of March 31, 2003, stating that "[s]ome members of the security forces collaborated with paramilitary groups that committed serious abuses."

32. For a number of years, the location in which Defendants operate in Colombia, the Cesar Province, has been one of these locations where the collaboration between the state security forces and the paramilitary forces is especially keen. Thus, Amnesty International has reported that it "has been increasingly concerned by the escalation in human rights violations carried out in the Department of Cesar by members of the security forces and paramilitary allied to them. 'Disappearances,' extrajudicial executions and other human rights violations continue to be reported as the security forces have increased their presence and paramilitary organizations have been set up and consolidated in the region, sometimes with the support of powerful economic interests."

33. The close, symbiotic relationship between the military and paramilitaries in Colombia is such that the paramilitaries are acting under color of the authority of the government of Colombia.

13

The paramilitaries in Colombia, including those who committed the wrongful acts alleged herein, are legal creations of the government of Colombia, and they act with support from and cooperation with the official military.

34.      In order to have plausible deniability, the Government of Colombia does not officially sanction the murders and other human rights violations committed by the paramilitaries. However, there have been few successful prosecutions of paramilitaries because the Government of Colombia knowingly permits the paramilitaries to operate and to carry out assignments for the formal military.

35.      The paramilitaries in Colombia are particularly well-known for murdering, abducting and torturing trade union leaders who they view as being subversives.      The paramilitaries' characterization of trade unionists as subversives is in accord with the view of the  Colombian government which, in Decree 180, has designated trade union leaders as "terrorists." As a result, in the words of the International Confederation of Free Trade Union's in their 2002 Report ("ICFTU Report"), Colombia is "the most dangerous place in the world to be a trade union activist." And, as the ICFTU notes, these trade unionists are being murdered by very virtue of the fact that they are trade unionists -- that is, they are not merely being caught in the cross-fires of the armed conflict in Colombia; they are targets, particularly of the paramilitaries which are "hostile towards the unions."

36.      Amnesty International, in specifically describing the human rights situation in the Cesar Province -- the area in which the acts described herein took place -- explains that "[t]he systematic violation of human rights against members of popular organizations . . . in the department of Cesar corresponds to a national strategy of undermining organizations which the [state] security forces deem to be subversive."      Amnesty International further finds that "[m]any violations of human rights in the [Cesar] region are committed in order to advance and protect the interests of

14

economically powerful sectors. Labeling anyone who dares to challenge the interests of powerful economic sectors as subversive . . . and then targeting them for human rights violations provides a means for those sectors to protect their interests." Recently, the UNHCR has confirmed this assessment of Amnesty International, noting in the same breath that "members of paramilitary groups have been blamed for most of the[] violent deaths" suffered by trade unionists and that Cesar is one of "[t]he departments most affected by anti-union violence . . . ."

37.     The paramilitaries' targeting of thousands of individuals for assassination, including Locarno, Orscasita and Soler, simply because of their status as trade unionists, constitutes genocide and a war crime. The Colombian Minister of Labor himself, in testimony to the International Labor Organization ("ILO"), characterized the murder of trade unionists in Colombia as "genocide." The paramilitaries are able to execute trade unionists with impunity, including Locarno, Orscasita and Soler, because of the lawless environment in Colombia created by the ongoing civil conflict.

38.     As a consequence of the official vilification of trade unionists by the Colombian government, which serves as an open invitation to paramilitaries to target trade union leaders with violence, Colombia has led the world in the number of murders of trade unionists for the past 10 years. More than 180 trade union leaders were killed in 2002, over 200 were killed in 2001, 128 were killed in the year 2000, and in the last 10 years, over 1,800 have been murdered. A much larger number have been subjected to torture, including regular threats of death, unlawful detention, and kidnapping.

39.     In addition to the referenced reports by Human Rights Watch and the U.S. State Department, there is comprehensive public reporting on the systematic human rights violations occurring in Colombia by the paramilitaries, as well as on the specific targeting for murder and other

15

human rights violations of trade union leaders and members. Major print and television media in the U.S. have reported on the violence in Colombia targeting trade union leaders. In addition, international organizations, including Amnesty International, the International Labor Organization, and the United Nations Commission on Human Rights have all reported extensively on paramilitary violence against trade union leaders in Colombia. At the time of the events alleged herein, Defendants knew, or were substantially certain, that they were doing business in an environment in Colombia where their workers who were members of trade unions were at great risk of being murdered, tortured, kidnapped or unlawfully detained by paramilitaries.

40.     As more fully explained below, the Defendant Companies took advantage of the fact that paramilitaries target trade unionists in Colombia to prevail upon these paramilitaries to commit violent acts against the employees at the La Loma mines who held leadership positions in the union. Defendants knew that, because of the lawless environment created by the civil conflict in Colombia, the paramilitaries acting as their agents could murder and torture trade unionists employed at their mines with impunity. The ICFTU, in its 2002 report, noted with alarm that "[t]rade union activists affiliated to the Union of Workers of the Mining and Energy Industry of Colombia [SINTRAMIENERGETICA] and working at mines run by the US multinational Drummond have been particularly severely affected by the violence that occurred throughout 2001."

## V. SPECIFIC EVENTS LEADING TO THE TORTURE OF FRANCISCO RUIZ

41.     Defendants Drummond Company, Inc. and Drummond Ltd. utilize the services of the Colombian military to protect its mining facilities, railway lines and U.S. workers in Colombia. Drummond Company, Inc. and/or Drummond Ltd. actually support a military base on company property by providing the land, as well as electricity, fuel, and equipment. The Defendant companies

16

also maintain the local roads used by the military. Defendants do so with specific knowledge that some of the local military supported by the company cooperate with the paramilitaries that also operate on the Drummond property and act on behalf of Drummond. Further, a significant number of these military personnel also are members of the paramilitaries operating in Valledupar, Colombia and elsewhere.

      42.    In addition, Drummond Company, Inc. and Drummond Ltd. permit known paramilitaries of the United Self-Defense Forces of Colombia ("AUC") to freely enter their mining facilities in Colombia. These AUC paramilitaries are permitted to operate openly in and around the Drummond facilities in Colombia because they are in a cooperative and symbiotic relationship with the regular military that are stationed on Drummond's property. Further, some of the regular military soldiers based on Drummond's property also are members of the AUC paramilitaries operating in and around the Drummond facilities. Pedro Maya, a Human Resources Manager for Drummond at the La Loma mines, has regular contacts and meetings with the AUC. Likewise, Alfredo Araujo, a community relations manager for Drummond, openly associates with paramilitaries, and coordinates their activities in the Cesar Department. The Defendant companies provide supplies, including fuel, as well as monetary support to these paramilitaries. The Defendant companies pay the paramilitaries out of a slush fund account which is controlled in Colombia by La Loma mines' President Augusto Jiminez. The Defendant companies transfer monies from Alabama into this Colombian account under the pretext of paying wages to their U.S. employees in Colombia. However, in fact, the Defendant companies actually remunerate their U.S. employees by paying monies into their individual accounts in the United States.

      43.    Drummond's decision to employ paramilitaries to terrorize the trade union leaders

17

employed by the company began with a meeting held in 1997 at the company headquarters in Birmingham, Alabama. This was following the July 22, 1996 formation of a union at the company's facilities in Colombia by Drummond employees. Among those present at the meeting were Defendant Garry Drummond, Defendant Augusto Jiminez, Pedro Maya, a Human Resources Manager for Drummond, and Leonar Manrique, a company manager. In response to Garry Drummond's question to the assembled staff about how to deal with the "union problem," Jiminez, Maya, and Manrique advocated "getting rid of the union." Others at the meeting took the position that the union could be managed, but the campaign of violence against the union officially began at this meeting.

44. After the campaign of violence against trade union leaders at Drummond began, a number of Drummond managers at the La Loma mines, including John Ruddick (general foreman of the mines), Scotty Elmore (construction supervisor) and Ronny Hanley (safety supervisor) openly characterized the SINTRAMIENERGETICA union and the left-wing guerillas as one and the same and openly accused this union as being responsible for the blowing up of the rail lines which was generally attributed to the guerillas. This same management openly stated that "the paramilitaries would take care of this problem" for them. In addition, key members of the Drummond Ltd. management -- including Defendant Augusto Jiminez; Ricardo Urbina Aroca, Senior Human Resources supervisor; and Pedro Maya, Human Resources Manager at the La Loma mines -- met with leaders of the AUC during the latter part of 2000 and the beginning of 2001 to arrange for the AUC to eradicate the union through violent means. In furtherance of this conspiracy, this management made payments to the AUC from the slush fund account mentioned above as consideration for the AUC's carrying out this violent destruction of the union.

18

45.    Among the first victims of the Drummond campaign of terror were Locarno and Orcasita, President and Vice President, respectively, of the union. They had been in heated negotiations with Defendants for nearly a year for a new contract.  In the course of the ongoing negotiations, pamphlets were passed out on and around the Drummond Company facilities in Colombia labeling SINTRAMIENERGETICA a "guerilla union," and attacking Locarno and Orcasita as supporters of the guerillas.  In a letter to Drummond Ltd, Locarno specifically protested that the pamphlets described above had been distributed around the La Loma mine in the Cesar Department of Colombia.  He asked for security protection from the death threats he had been receiving.  His request was denied by Drummond Ltd.'s Senior Human Resources supervisor, Ricardo Urbina Aroca by letter dated October 6, 2000.  In rejecting this request without explanation, Ricardo Urbina Aroca told Locarno, on behalf of Drummond Ltd., that "[w]e hope that the authorities can take measures that they consider appropriate regarding the situations raised by you all."

46.    There were two persistent issues that were the subject of heated negotiations between SINTRAMIENERGETICA and the Drummond Company. First, the union demanded better security to protect them from the paramilitaries who had been hired or retained by Defendants to protect the Drummond rail lines and other facilities from attacks by guerillas operating in the area. The other contentious issue was that in the prior year, several Drummond workers were killed in a mining accident, and the company had failed to pay the compensation due their families under the laws of Colombia.  During these negotiations, the President of the La Loma mines, Defendant Augusto Jiminez, made veiled threats against the union leaders, telling them on several occasions that "the fish dies from opening his mouth."

19

47. Locarno met personally with Defendant Garry Drummond on the worker compensation issue on or about June 12, 2000, in Colombia. Locarno and Orcasita had also written and faxed to Garry Drummond personally their concerns that their lives, and the lives of other union leaders and members, were in danger due to the presence of the violent paramilitary forces that were agents of or employees of Defendants. They also specifically notified other officials of the Drummond Company and/or Drummond Ltd, including, but not limited to, Augusto Jiminez, President of Drummond Ltd, D.L. Lobb, General Manager of Drummond Ltd, and Mike Zerbos, an employee of Drummond Company, Inc, about their security concerns.

48. The concerns expressed by Locarno and Orcasita to Garry Drummond and other representatives of Defendants were based on recent assassinations, kidnappings and torture of other members and leaders of SINTRAMIENERGETICA. In the year prior to the murders of Locarno and Orcasita, Candido Mendez and Manuel Enrique Charris Ariza were also murdered by the paramilitaries. Locarno and Orcasita had made a very simple demand to be permitted to sleep at the coal mine, rather than being transported to nearby villages by bus, where they were exposed to the paramilitaries who control the local roads. This request, made to Garry Drummond and other Drummond officials, was denied despite the fact that Colombia's secret service agency, the DAS, had alerted Drummond that Locarno and Orcasita were at risk of assassination and despite the fact that the DAS itself echoed their request to be able to sleep at the coal mine.

49. Although Defendants flatly refused to improve security arrangements for the union leaders who had received specific death threats, Defendants made sure that the expatriate employees from the U.S. were never exposed to danger. At all times material hereto, these U.S. employees were flown in and out of the Drummond mines and port on a private runway and provided with a

compound where they lived and were protected by the military and private security forces 24 hours a day, 7 days a week. Drummond's private security forces, which guard both its operations and U.S. personnel, are themselves led by active and former military personnel, including General Pena (chief of security for both the port and mines), Retired Colonel Jorge Garzon (chief of security for the port) and Retired Colonel Edgar Ruiz.

50.     On March 12, 2001, shortly after they were threatened by Defendant Augusto Jiminez, Locarno and Orcasita were pulled off a Drummond company bus and murdered by paramilitaries of the AUC. Some of these paramilitaries were dressed in regular military uniforms demonstrating that, as is common in Colombia, these paramilitary forces included members of the regular military and were getting direct support from the regular military. The paramilitaries who killed Locarno and Orcasita were working as agents or employees of Defendants at the time.

51.     The paramilitaries boarded the bus and asked for Locarno and Orcasita by name, saying that these two "had a problem with Drummond." The paramilitaries made the workers produce their identification cards. When Locarno was identified by the paramilitaries, he was pulled off the bus and shot in the head several times in front of the other workers. Orcasita was then identified. He was tied up and thrown in the paramilitaries' vehicle. He was found dead by the side of the road several hours later, shot in the head. He had been tortured before he was murdered. There were cuts on his chest, and his teeth had been knocked out. Both because some of the regular military in the area were involved in the executions as members of the paramilitaries, and because the regular military stationed at the Drummond compound allow the paramilitiaries to operate with impunity, no action was taken to bring those responsible for the murders of Locarno and Orcasita to justice.

21

52.     Subsequent to the murders of Locarno and Orcasita, their families received threats to keep quiet about the murders. Many workers were afraid to return to the Drummond mine, and stayed away. The local office of SINTRAMIENERGETICA received threats from the paramilitaries to get back to work at Drummond. The murders of Locarno and Orcasita left the union paralyzed without its key leaders, and with others afraid to take leadership positions that would expose them to a substantial risk of assassination.

53.     In addition, in a meeting with unionists held on March 14, 2001, just two days after the murders of Locarno and Orcasita, Defendant Augusto Jiminez, in referring to these murders and to the union's renewed request for increased safety measures to protect its leaders, again stated that "the fish dies who opens his mouth." The unionists present reasonably construed this statement as a direct and serious threat of imminent harm, including death, against the union leaders at Drummond. The union officials were again subjected to this threat by Jiminez on another, later occasion, again in the context of discussions over increased safety measures for union officials.

54.     Also, just after the murders of Locarno and Orcasita, Plaintiff John Doe II began a strike of the food service operations at Drummond to protest these murders. When Plaintiff John Doe II was confronted by Drummond management as to why he was doing this, he stated to them that he was protesting the murders of Locarno and Orcasita -- murders which he himself had witnessed -- and the links of the paramilitaries to Drummond. Thus, Plaintiff John Doe II had, on a number of occasions, witnessed paramilitaries entering Drummond property to refuel their vehicles, and John Doe II declared that he is was aware of this. After John Doe II denounced these Drummond-paramilitary links, Retired Colonel Edgar Ruis Garzon, a security officer for the Drummond Defendants, placed him on a list of "troublemakers" which he gave to the paramilitaries

22

in the area. Plaintiff Francisco Ruiz was also placed on this list by Garzon.

55.    John II and his family then began receiving death threats from a paramilitary commander known as Commandante John. Commandante John told Plaintiff John II and his family that John II was included on this list of "troublemakers" prepared by Drummond management and handed to the paramilitaries. Specifically, he explained that John Doe II was included on the list because of his denouncements of Drummond-paramilitary ties.

56.    On May 11, 2001, paramilitaries came looking for John Doe II in La Loma to carry out their threats to assassinate him. He barely escaped with his wife. After learning that more orders were given to the paramilitaries to look for him at his house and kill him, he fled to Bogota on May 23 with his wife. He never returned to work at Drummond or to the Cesar Department. Shortly after arriving in Bogota, he received threats from the paramilitaries, again through Commandante John, that they were going to seize his son at school to put pressure on John Doe II to stop denouncing ties between Drummond and the paramilitaries. John Doe II then took all of his children out of school.

57.    In August of 2001, Francisco Ruiz, the Treasurer of the local SINTRAMIENERGETICA union, received a call at the union office in Valludepar from a paramilitary leader. This paramilitary stated: "You have [Plaintiff] John Doe II], you must tell us where he is. He has some accounts which he must settle with us. You all are agitators who we are going to bring to justice. Very soon, you will hear from us." Francisco Ruiz told John Doe II of this threat so that he could take measures to protect himself.

58.    Meanwhile, Gustavo Soler eventually stepped up to assume the position of President of the Union at the La Loma mine. He renewed negotiations with Drummond and specifically

23

sought to obtain new security arrangements for the workers, especially in light of the murder of Locarno and Orcasita. He and the other leaders of SINTRAMIENERGETICA sent a letter to Defendant Garry Drummond renewing the demand to allow the workers to have sleeping facilities at the mine site. Again, this request was denied. In addition, Soler publicly denounced the murders of Locarno and Orcasita and publicly stated his belief that someone at the La Loma mines must have told the paramilitaries which specific bus was carrying them on the fateful night of March 12, 2001. Meanwhile, threats against Soler's life and the lives of other union leaders continued. Plaintiff John Doe II learned, again from Commandante John, that the paramilitaries were planning to murder Gustavo Soler. In response, John Doe II warned Soler by telephone.

59. In late September, 2001, at a meeting of trade union leaders, Defendant Augusto Jiminez again made a threat that trade union leaders who caused trouble for the company would have a problem with the paramilitaries. On October 5, 2001, Soler was murdered by paramilitaries of the AUC.

60. Shortly after the murder of Gustavo Soler, John Doe II fled with his family from Colombia in fear for his life and the life of his family. John Doe II and his family fled to another Latin American country. Even in this other country, paramilitaries have tracked him down, and he has received 7 to 8 threats by phone from the paramilitaries stating that if he persisted in making denouncements against Drummond and giving information to the press about Drummond's collaboration with the paramilitaries, they would impose upon his "the sanction of war." Recently, in November of 2003, these AUC paramilitaries sent John Doe II a written threat in which they stated

We want to let you know that we have knowledge of your activities since you left

24

Colombia; against the Drummond Ltd. You should know that we have located you . . . as well as your family who we have tracked down in Valludepar, like your brother (you know which one) . . . We know about the accusations that you along with the attorneys from the U.S. and the Drummond union are making in Alabama (U.S.A).

The command has decided to reactiviate operations against you for being enemies of development and impeding foreign investment such as in the case of the Drummond company . . . . Therefore, you have been declared military objectives by our organization. We have already ordered rewards, annihilation, and collection of economic sanctions (war tax) for unions who block the development and progress of the people. You, as well as the communist guerillas that some union members belong to, are enemies of the people and their economic and social development, for harassing foreign companies who invest in the country.

This position of yours is what has brought our organization to declare you as enemies and to make your extermination and subjegation our goal; therefore we inform you, your colleagues, and the organizations that support them that they will be sought and executed in the country or place where they are found; if they continue to pressure companies that bring investment and development to our country. . . .

We already told you by phone, and we are going to show you that we have people [in the country John Doe II is in]; expect some surprises . . .

61.     To this day, the local leaders of SINTRAMIENERGETICA continue to receive threats from Drummond management, including Augusto Jiminez who has personally threatened these leaders that he will turn them over to the paramilitaries if they do not desist from their union activities.

## VI. DEFENDANTS' VIOLATIONS OF LAW

62.     Defendants' actions violate, and Plaintiffs' causes of action arise from, the following laws, agreements, conventions, resolutions and treaties, which constitute specific examples of the applicable law of nations or customary international law:

(a)     Alien Tort Claims Act, 28 U.S.C. § 1350;

(b)     Torture Victim Protection Act, 28 U.S.C. § 1350;

25

(c)      Common law of the United States of America;

(d)      United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);

(e)      Universal Declaration of Human Rights, G.A. Res. 217A(iii), U.N. Doc. A/810 (1948);

(f)      International Covenant on Civil and Political Rights, G.A. Res. 2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966);

(g)      Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984)(ratified 10/28/98);

(h)      Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976);

(i)      Vienna Declaration and Programme of Action (World Conference on Human Rights, 1993);

(j)      International Labor Organization Conventions 87 and 98, which protect the fundamental rights to associate and organize;

(k)      Article 3 of the Geneva Conventions; and

(l)      Statutes and common law of the State of Alabama, including but not limited to, wrongful death, negligence, and recklessness.

## VII. CAUSES OF ACTION

### First Cause of Action
### The Alien Tort Claims Act, 28 U.S.C. § 1350
### For Torture on Behalf of
### All Plaintiffs Against All Defendants

63.     Plaintiffs incorporate by reference paragraphs 1 through 62 of this Complaint as is set forth herein.

64.     Defendants Drummond Company, Inc., Drummond Ltd., Garry Drummond and Augusto Jiminez engaged in acts and omissions of intentionally and tortiously causing their employees and/or agents to torture Plaintiff John Doe II.  Specifically, as is alleged above, the Defendant companies' employees and/or agents, including Defendant Augusto Jiminez, Pedro Maya, and Ricardo Urbina engaged in joint action with, and/or conspired with, paramilitary forces that were operating under color of law, and, so acting, tortured Plaintiff John Doe II.  Further, through their employees and/or agents, including Defendant Augusto Jiminez, Pedro Maya, Ricardo Urbina and Retired Colonel Edgar Ruis Garzon, the Defendant companies knowingly aided and abetted the paramilitary forces that tortured John Doe II by providing financial support, supplies, access, and other substantial assistance that contributed to the ability of the paramilitary forces to torture Plaintiff John Doe II.  Defendant Garry Drummond was aware of the relationship between the Drummond companies and the paramilitaries and the threats posed by the paramilitaries to the unionists at the Drummond facilities.  After the murders of Locarno, Orcasita and Soler, no action was taken to provide security for the remaining union leaders, and no action was taken to terminate the business relationship between Drummond and the AUC paramilitaries.  However, while having the requisite control to do so and while having set in motion the forces of violence against the union and its

27

leaders as discussed above, he recklessly failed to do anything to cease this relationship or to otherwise protect Plaintiff John Doe II.

65.     Defendants realized substantial benefits from the torture of John Doe II that forced him into hiding and exile, including the de-stabilization of SINTRAMIENERGETICA and the avoidance of financial obligations to members of the union.  As noted by the ICFTU, the "[t]rade union activists affiliated to the Union of Workers of the Mining and Energy Industry of Colombia [SINTRAMIENERGETICA] and working at mines run by the US multinational Drummond have been particularly severely affected by the violence that occurred throughout 2001" (ICFTU Report at p. 81), and Plaintiff SINTRAMIENERGETICA has suffered greatly as a result.  The violence directed by Defendants against members of Plaintiff SINTRAMIENERGETICA has caused specific damage to the union's continued viability, mission, interests, and has inflicted financial damage. Plaintiff SINTRAMIENERGETICA has been forced to use scarce resources to investigate threats to members and leaders, and to provide security and protection to those under threat, including John Doe II and his family.  Plaintiff union has also lost many members and leaders, such as John Doe II, who, because of violence and threats of violence, have been intimidated into going into hiding and exile.

66.     The aforesaid acts violate the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 62. The acts described herein are actionable under the ATCA, and, if such a showing is required, were done with the complicity of state actors. The paramilitary security forces in the Cesar Province on the Drummond property are permitted to exist, openly operate under the laws of Colombia, and are assisted by  government

28

military officials. In engaging in joint action and/or a conspiracy with such paramilitary agents or other state government officials, Defendants acted under color of law in violating each of the applicable laws, agreements, conventions, resolutions and treaties listed in paragraph 62. Further, the Government of Colombia fails to enforce its laws that would prevent or remedy the violations alleged herein.

67.     Defendants' conduct in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 62 resulted in the torture of Plaintiff John Doe II.  Defendants are jointly and severally liable for the acts of any and all subsidiaries that are in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 62. Defendants are also vicariously liable for any violations of their employees or agents of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 62. The Plaintiffs seek compensatory and punitive damages in amounts to be ascertained at trial. The Plaintiffs further seek equitable relief to prevent further human rights violations.

**Second Cause of Action**
**The Torture Victim Protection Act, 28 U.S.C. § 1350**
**For Torture on Behalf of**
**on Behalf of Plaintiff John Doe II Against All Defendants**

68.     Plaintiffs incorporate by reference paragraphs 1 through 67 of this Complaint as if set forth herein.

69. Defendants Drummond Company, Inc., Drummond Ltd., Garry Drummond and Augusto Jiminez engaged in acts and omissions of intentionally and tortiously causing their employees and/or agents to torture Plaintiff John Doe II. Specifically, as is alleged above, the Defendant companies' employees and/or agents, including Defendant Augusto Jiminez, Pedro Maya, and Ricardo Urbina engaged in joint action with, and/or conspired with, paramilitary forces that were operating under color of law, and, so acting, tortured Plaintiff John Doe II. Further, through their employees and/or agents, including Defendant Augusto Jiminez, Pedro Maya, Ricardo Urbina and Retired Colonel Edgar Ruis Garzon, the Defendant companies knowingly aided and abetted the paramilitary forces that tortured Plaintiff John Doe II by providing financial support, supplies, access, and other substantial assistance that contributed to the ability of the paramilitary forces to torture Plaintiff. Defendant Garry Drummond was aware of the relationship between the Drummond companies and the paramilitaries and the threats posed by the paramilitaries to the unionists at the Drummond facilities. After the murders of Locarno, Orcasita and Soler, no action was taken to provide security for the remaining union leaders, and no action as taken to terminate the business relationship between Drummond and the AUC paramilitaries. However, while having the requisite control to do so and while having set in motion the forces of violence against the union and its leaders as discussed above, he recklessly failed to do anything to cease this relationship or to otherwise protect Plaintiff John Doe II.

70. Defendants realized substantial benefits from the torture of Plaintiff John Doe II that forced him into hiding and exile, including the de-stabilization of SINTRAMIENERGETICA and the avoidance of financial obligations to members of the union. As noted by the ICFTU, the "[t]rade union activists affiliated to the Union of Workers of the Mining and Energy Industry of Colombia

[SINTRAMIENERGETICA] and working at mines run by the US multinational Drummond have been particularly severely affected by the violence that occurred throughout 2001" (ICFTU Report at p. 81), and Plaintiff SINTRAMIENERGETICA has suffered greatly as a result. The violence directed by Defendants against members of Plaintiff SINTRAMIENERGETICA has caused specific damage to the union's continued viability, mission, interests, and has inflicted financial damage. Plaintiff SINTRAMIENERGETICA has been forced to use scarce resources to investigate threats to members and leaders, and to provide security and protection to those under threat including John Doe II and his family. Plaintiff union has also lost many members and leaders who, because of the violence and threats of violence at issue herein, have been intimidated into leaving the union and going into hiding and exile.

71.    The aforesaid acts violate the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 62. The acts described herein are actionable under the TVPA, and, if such a showing is required, were done with the complicity of state actors. The paramilitary security forces in the Cesar Province on the Drummond property are permitted to exist, openly operate under the laws of Colombia, and are assisted by government military officials. In engaging in joint action and/or a conspiracy with such paramilitary agents or other state government officials, Defendants acted under color of law in violating each of the applicable laws, agreements, conventions, resolutions and treaties listed in paragraph 62. Further, the Government of Colombia fails to enforce its laws that would prevent or remedy the violations alleged herein.

72.    Defendants' conduct in violation of the law of nations, customary international law,

31

and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 62 resulted in the torture of Plaintiff John Doe II. Defendants are jointly and severally liable for the acts of any and all subsidiaries that are in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 62. Defendants are also vicariously liable for any violations of their employees or agents of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 62. Plaintiff John Doe II seeks compensatory and punitive damages in amounts to be ascertained at trial. Plaintiff further seek equitable relief to prevent further human rights violations.

### Third Cause of Action
### The Alien Tort Claims Act, 28 U.S.C. § 1350
### For Denial of Fundamental Rights to Associate and Organize
### on Behalf of All Plaintiffs Against All Defendants

73.     Plaintiffs incorporate by reference paragraphs 1 through 72 of this Complaint as is set forth herein.

74.     Defendants Drummond Company, Inc. , Drummond Ltd., Garry Drummond and Augusto Jiminez committed, or acted in concert to commit, or Defendants' co-venturers or agents committed, violent acts against unionists, such as John Doe II, and murdered Locarno, Orcasita and Soler as is described fully in the preceding paragraphs. This violence was intentionally designed and carried out to deny member and leaders of SINTRAMIENERGETICA, including John Doe II, their fundamental rights to associate and organize, and did in fact result in the denial of these rights.

32

Defendant Garry Drummond was aware of the relationship between the Drummond companies and the paramilitaries and the threats posed by the paramilitaries to the unionists at the La Loma mines, including Plaintiff John Doe II. However, while having the requisite control to do so, he recklessly failed to do anything to cease this relationship or to otherwise protect the life and safety of Plaintiff John Doe II.

75    The acts described herein constitute violations of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 62. The acts described herein are actionable under the ATCA, and, if such a showing is required, were done with the complicity of state actors. The paramilitary forces of the Cesar Province are permitted to exist, openly operate under the laws of Colombia, and are assisted by government military officials. In engaging in joint action and/or a conspiracy with such paramilitary agents and/or other state government entities, Defendants acted under color of law in violating each of the applicable laws, agreements, conventions, resolutions and treaties listed in paragraph 62. Further, the Government of Colombia fails to enforce its laws that would prevent or remedy the violations alleged herein.

76.    Defendants' conduct in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 62 resulted in the murders of Locarno, Orcasita and Soler and the forced exile of John Doe II and has caused significant injury to Plaintiff SINTRAMIENERGETICA, which has lost significant membership because of death threats directed against, and the murders of, leaders of local unions. SINTRAMIENERGETICA must expend substantial resources to protect and support union members who are targets of death threats.

33

SINTRAMIENERGETICA must also provide material support and protection to family members of murdered trade union leaders, including the family of John Doe II. Defendants are jointly and severally liable for the acts of any subsidiaries that are in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 62. Defendants are also vicariously liable for any violations of their employees and/or agents of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 62. Plaintiff SINTRAMIENERGETICA seeks compensatory and punitive damages for the aforesaid harms which resulted from the forced exile of John Doe II. Plaintiff SINTRAMIENERGETICA also seeks injunctive relief to prevent further murders, intimidation, torture and forced displacement of its leaders and members.

77. Plaintiff John Doe II seeks compensatory and punitive damages for the harm done to his right to associate and organize as a direct consequence of his torture and forced exile.

### Fourth Cause of Action
### Assault on behalf of
### Plaintiff John Doe II Against All Defendants

78. Plaintiffs incorporate by reference paragraphs 1 through 77 of this Complaint as is set forth herein.

79. Defendants committed, or acted in concert to commit, or Defendants' employees or agents, committed acts that constitute assault under the laws of the State of Alabama, the laws of the United States and the laws of Colombia, and that caused the immediate threat of bodily harm to Plaintiff John Doe II. Defendants Garry Drummond Augusto Jiminez were aware of the relationship

34

between the Drummond companies and the paramilitaries and the threats posed by the paramilitaries to the unionists at the Drummond facilities, including Plaintiff John Doe II. However, while having the requisite control to do so and while having set in motion the forces of violence against the union and its leaders as discussed above, they recklessly failed to do anything to cease this relationship or to otherwise protect these Plaintiff, who seeks damages herein for the injuries suffered due to the concrete threats to his life.

80.      Defendants' actions and omissions were a direct and substantial cause of the assaults to Plaintiff John Doe II. Defendants failed to use due care to protect them from injury and harm, thereby proximately causing their injuries. Plaintiff John Doe II is entitled to recover compensatory and punitive damages in amounts to be ascertained at trial.

### Fifth Cause of Action
### Intentional Infliction of Emotional Distress
### on Behalf of Plaintiff John Doe II Against All Defendants

81.      Plaintiffs incorporate by reference paragraphs 1 through 80 of this Complaint as is set forth herein.

82.      The acts described herein constitute outrageous conduct against Plaintiff John Doe II and were without privilege.

83.      Defendants committed, or acted in concert to commit, or Defendants' co-venturers or agents committed acts, which were intended to cause Plaintiff John Doe II to suffer emotional distress. In the alternative, Defendants engaged in the conduct with reckless disregard of the probability of causing Plaintiff to suffer emotional distress. Plaintiff was present at the time the outrageous conduct occurred, and Defendants, or Defendants' alter egos or agents, knew that the Plaintiff was present.

35

84.     Plaintiff suffered severe emotional distress and the outrageous conduct of Defendants was a cause of the emotional distress suffered by Plaintiff.

85.     Defendants' outrageous conduct constitutes the intentional infliction of emotional distress and is actionable under the laws of the State of Alabama, and the laws of the United States.

### Sixth Cause of Action
### Negligent Supervision
### on Behalf of Plaintiff John Doe II Against All Defendants

86.     Plaintiffs incorporate by reference paragraphs 1 through 85 of this Complaint as is set forth herein.

87.     The Defendant companies, Garry Drummond and Augusto Jimenez owed a duty to Plaintiff John Doe II to adequately supervise their employees and agents. Defendants' management team and paramilitary agents repeatedly threatened Plaintiff with bodily harm and imminent death and forced him into exile. Even if the Defendants did not have actual knowledge of their employees' and agents' acts, the egregious and frequent nature of the acts should have given the Defendants notice if they had supervised their employees and agents with due care. Moreover, because of management's and the paramilitaries' past record of threatening, torturing, and murdering the companies' workers, Defendants should have known that their employees and agents would continue to act improperly if not adequately supervised.

### VIII. DEMAND FOR JURY TRIAL

88.     Plaintiffs demand a trial by jury on all issues so triable.

### IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court to:

(a)     enter judgment in favor of Plaintiffs on all counts of the Complaint;

(b)    declare that Defendants have violated Plaintiffs' human rights and the laws of the State of Alabama and the United States, as set forth herein;

(c)    award Plaintiffs compensatory and punitive damages;

(d)    grant Plaintiffs equitable relief, permanently enjoining Defendants from further engaging in human rights abuses against Plaintiffs and other members of SINTRAMIENERGETICA;

(e)    award Plaintiffs the costs of suit including reasonable attorneys' fees;

(f)    award Plaintiffs such other and further relief as the Court deems just under the circumstances.

Respectfully submitted this ___ day of February, 2004,

Richard P. Rouco

OF COUNSEL:
Whatley Drake, LLC
Post Office Box 10647
Birmingham, Alabama 35202-0647
Phone:(205) 328-9576
Fax:    (205) 328-9669

Terry Collingsworth
INTERNATIONAL LABOR
RIGHTS FUND
733 15th Street, N.W., Suite 920
Washington, D.C. 20005
Tel: (202) 347-4100

Daniel Kovalik
UNITED STEELWORKERS OF
AMERICA, AFL-CIO
5 Gateway Center
Pittsburgh, PA 15222
Tel: (412) 562-2518